**JUDD J. BALMER, ESQ.**
NEVADA BAR NO. 006212
**JUDD J. BALMER, ESQ., LTD.**
*A Nevada Professional Corporation*
6362 McLeod Drive, Suite 6
Las Vegas, Nevada 89120
T: (702) 642-4200
F: (702) 642-4300
E: jbalmer@balmerlawfirm.com
*Attorneys for Defendant MATTHEW A. CATHCART*
*and CHERYLE T. CATHCART*

# UNITED STATES DISTRICT COURT
## DISTRICT NEVADA

| | |
|---|---|
| UNIVERSAL NORTH AMERICA INSURANCE COMPANY, | Case No.: 2:13-cv-01767-RCJ-GWF |
| Plaintiff, | |
| vs. | **MOTION FOR SUMMARY JUDGMENT** |
| MATTHEW A. CATHCART, individually; CHERYLE T. CATHCART, individually; and JOHN DOES 1-100, inclusive, and JANE ROES 1-20, inclusive, | Date of Hearing: <br> Time of Hearing: |
| Defendants. | |

## MOTION FOR SUMMARY JUDGMENT

COME NOW, Defendants MATTHEW A. CATHCART and CHERYLE T. CATHCART, by and through their attorney of record, JUDD J. BALMER, ESQ., LTD., a Nevada Professional Corporation, and hereby moves this Honorable Court for Summary Judgment on Plaintiff's Complaint, pursuant to Federal Rule of Civil Procedure 56(a).

This Motion for Summary Judgment is made and based upon the Federal Rules of Civil Procedure, the United States code, any applicable caselaw, any exhibits attached hereto, the …

- 1 -

attached Memorandum of Points and Authorities, and such oral argument as may be permitted at

the hearing of this matter.

DATED this 30th day of March, 2016.

JUDD J. BALMER, ESQ., LTD.
*A Nevada Professional Corporation*

By:     /s/ Judd J. Balmer
JUDD J. BALMER, ESQ.
Nevada Bar No. 006212
6362 McLeod Drive, Suite 6
Las Vegas, Nevada 89120
T:  (702) 642-4200
F:  (702) 642-4300
E:  jbalmer@balmerlawfirm.com
*Attorneys for Defendants Matthew A. Cathcart*
*and Cheryle T. Cathcart*


## **NOTICE OF MOTION**

TO:     ALL PARTIES AND THEIR COUNSEL OF RECORD

YOU AND EACH OF YOU WILL PLEASE TAKE NOTICE that the undersigned will

bring the foregoing **MOTION FOR SUMMARY JUDGMENT** on for hearing in the aforesaid

Department of the above-entitled Court, on the 26th day of April, 2016, at 10:00 A.M. or as soon

thereafter as counsel may be heard.

DATED this 30th day of March, 2016.

JUDD J. BALMER, ESQ., LTD.
*A Nevada Professional Corporation*

By:     /s/ Judd J. Balmer
JUDD J. BALMER, ESQ.
Nevada Bar No. 006212
6362 McLeod Drive, Suite 6
Las Vegas, Nevada 89120
T:  (702) 642-4200
F:  (702) 642-4300
E:  jbalmer@balmerlawfirm.com
*Attorneys for Defendants Matthew A. Cathcart*
*and Cheryle T. Cathcart*

- 2 -

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION.

This matter is about an insurance company's bad faith and self-dealing handling of a covered water loss, that involved botched mold remediation and restoration by the insurance company's own chosen and directed preferred vendor.    Plaintiff UNIVERSAL NORTH AMERICA INSURANCE COMPANY (hereinafter "UNIVERSAL"), Defendants MATTHEW & CHERYLE CATHCART's (hereinafter "CATHCART") homeowner's insurance carrier, in concert with negligent water damage repair and mitigation contractors caused CATHCART's home to become, and remain to this day, water damaged and dangerously mold contaminated and uninhabitable.   The baseless declaratory relief action was designed by UNIVERSAL to distract from its bad faith handling of the covered water loss and the damage to CATHCART's home that ensued.

In bad faith breach of its first-party insurance duties to the CATHCART family, UNIVERSAL wrongfully and unreasonably attempted to distance itself from its own selected, recommended, directed, and supervised contractor ALS, withdrawing homeowner's insurance coverage to the CATHCARTS, refusing to pay its contractor, ALS, and further refusing to pay for the necessary mold remediation and reconstruction of the CATHCART home which has been estimated at over $91,000.  The current state of uninhabitability and contamination of Defendant CATHCART's home was caused by UNIVERSAL's and ALS's collective and concerted failures to adhere to safe and industry standard water damage mitigation and mold remediation practices, which malfeasance was designed and executed to save UNIVERSAL money at the expense of CATHCART's property and health.   In fact, UNIVERSAL's "declaratory relief action" on the additional living expenses and alleged mold "limitations" under the insurance policy is a preemptive attempt to misdirect the Court on the true nature of the CATHCART's first-party claims *against UNIVERSAL*— which include bad faith, tort, and extra contractual claims for damages caused to the CATHCARTS and their home by the direct action, inactions, and malfeasance of UNIVERSAL in its selection, recommendation, direction, supervision, and approval of the failed water damage mitigation, incompetent dry-down, malfeasant investigation,

1   and botched mold remediation in CATHCART's home following the covered sudden and

2   accidental water loss in the CATHCART home.   Each maneuver of UNIVERSAL in the

3   "adjustment" of the CATHCART's valid insurance claims in selecting, recommending, directing,

4   supervising, and approval of ALS was done to the detriment of CATHCARTS and their property

5   and designed to save UNIVERSAL money.   UNIVERSAL also worked in concert with CRS, a

6   temporary housing finder, to unreasonably and recklessly deplete the ALE benefits admitted by

7   UNIVERSAL that it owed to the CATHCARTS.

8           This is not a simple case of "insurance policy language" interpretation in an artificial

9   judicial vacuum.   Whether additional insurance coverage is available turns more on the facts of

10  UNIVERSAL's tortious conduct and the damage UNIVERSAL caused to CATHCART's home

11  and persons, than sterile policy language that UNIVERSAL would have this Court decide in a

12  vacuum without the facts of this case.   UNIVERSAL cannot, cause over $200,000 in damage to

13  the CATHCART home, cause them personal injury, and destroy their personal property, then

14  delay and ignore response to the CATHCART's pleas for assistance, information, and

15  accountability, then seek cover behind alleged policy language that it has waived by its own

16  conduct.   Policy limits, to the extent they could even be applicable, are inapplicable to the

17  damage caused by UNIVERSAL and its agent contractors to CATHCARTs and their property.

18  And, to the extent that UNIVERSAL extended ALE or other benefits, UNIVERSAL's payment

19  and allocation of those benefits was unreasonable and wasteful in light of UNIVERSAL's

20  campaign of "ignore and delay" related to avoiding accountability for the damage UNIVERSAL

21  and its contractors did to CATHCART's home, the home's resulting uninhabitability,

22  UNIVERSAL's refusal to provide information regarding the home and CATHCART's valid

23  claim, and long delays by UNIVERSAL in approving necessary investigation into the damage it

24  and its contractors had done to CATHCART's home.   Thus, this case is not about a sterile

25  "declaration" by the Court of certain aspects of the subject homeowner's insurance policy; rather,

26  it is a blatant and bad faith attempt by UNIVERSAL to omit from this case necessary

27  consideration of all the factual and legal issues surrounding UNIVERSAL's liability to

28

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

- 4 -

CATHCARTs, and the liability of its own selected, recommended, directed, supervised and approved contractor ALS.

An aside, Defendants CATHCART have been financially forced by UNIVERSAL to move back into the dangerously water damaged and contaminated home due to UNIVERSAL's wrongful and unreasonable conduct in the handling of CATHCART's valid insurance claim. The CATHCART family is currently living sick in their home, with nowhere else to go. CATHCART's physician has warned UNIVERSAL about the health dangers and consequences of forcing CATHCARTs back into their contaminated home.

## II.    STATEMENT OF FACTS.

Defendants CATHCART own the home at 1012 Beaver Crest Terrace, Henderson, Nevada 89015, having purchased the home on March 11, 2011. CATHCART's homeowner's insurer is UNIVERSAL, policy number NVVH0000015034-0, policy period 3/11/11 to 3/11/12 and 3/11/12 to 3/11/13. The CATHCART family was current on its homeowner's insurance premiums with UNIVERSAL.

On or about May 21, 2012, a slab leak in the master bathroom flooded rooms throughout the home's structure, a fact recorded in the claims notes of UNIVERSAL. Water was ankle deep in places of the home. The CATHCARTS placed a claim with UNIVERSAL for the flood. UNIVERSAL accepted the claim and assigned the flood Claim No. 1201NV24000202. UNIVERSAL directly contacted and retained UNIVERSAL's own remediation and reconstruction contractor, ALS, to address the covered loss in CATHCART's home. CATHCARTS reposed a special trust in UNIVERSAL and believed that ALS had been properly vetted and qualified by UNIVERSAL to perform work in their home. ALS sent their estimates and scopes of work directly to UNIVERSAL for review, direction, approval, and supervision. Under Claim No. 1201NV24000202, UNIVERSAL approved and oversaw the scopes of work and estimates ALS. ALS breached its duty of care to the CATHCART Family, botching its remediation, and reconstruction services, all under the direction, approval, participation, and supervision of UNIVERSAL.

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

- 5 -

1       During activities by ALS in the home, ALS identified fungal growth throughout the home

2   related to the covered water loss and, with UNIVERSAL's express direction, approval,

3   participation, and oversight, began mold remediation throughout the home.  ALS alleged its mold

4   remediation was successful based upon "clearance testing," although ALS and UNIVERSAL

5   steadfastly refused to provide the CATHCARTS with a copy of the "clearance test" results.

6   ALS, again with UNIVERSAL's express approval, began reconstruction of the home.  However,

7   due to UNIVERSAL's and ALS's refusal to provide any evidence at all that the mold remediation

8   was complete or successful and, further, due to ALS, under the direction and supervision of

9   UNIVERSAL, conducting substandard and careless activities in the home that resulted in broken

10  countertops, glass doors, tile floors, and other parts of the home, ALS was removed from the

11  CATHCART's home on or about December 18, 2012.

12      Given the unresponsiveness of UNIVERSAL and its contractors, the CATHCARTs were

13  forced to retain legal counsel.   On February 11, 2013, counsel for CATHCART wrote to

14  UNIVERSAL in an attempt to gather information about the prior nine (9) months of

15  UNIVERSAL's activities in the CATHCART home:

16      Dear Mr. Ketcham:

17      Please be advised that this law firm has been retained to represent Mathew Cathcart and his family
        in relation to claims and damages associated with the above-named property and insurance policy.
18      The Cathcart Family are first-party insureds under the above-named Universal homeowners
        insurance policy.

19
        We are currently investigating the facts and circumstances surrounding the Cathcart's insurance
20      claim and the underlying water loss and ensuing damage.  Furthermore, we are also investigating
        the malfeasance of [Universal]'s remediation contractor, Paul Davis Restoration, and Absolute
21      Flood Response & Construction's failure to properly dry-down the Cathcart home immediately
        after the water loss.  It appears that the water mitigation performed by Absolute Flood Response &
22      Construction and directed by Universal North America did not comply with standards in the
        industry. As a result of the unmitigated water damage, the home has been caused to incur mold
23      growth and contamination that must be remedied.  In addition, the Cathcart Family has reported
        symptomatology consistent with exposure to mold in their water damaged home.

24      Please contact me **as soon as possible** to discuss Universal's immediate provision of the
25      following:

26          • In light of the Cathcart family's reported symptomatology consistent with exposure to mold
              in their water damaged home, as well as the building-related health effects suffered by the
              members of the Cathcart Family since the botched water mitigation effort by Absolute
27            Flood Response & Construction and Universal, consultation by the Cathcart Family with an
              experienced occupational and environmental health physician of the Cathcart's choosing to
28            investigate their reported building-related symptoms and habitability of the home and,
              further, to oversee the remediation processes of the home and personal property, and to

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

- 6 -

design and oversee the clearance protocol and sampling results to ensure the home is properly returned to a habitable condition;

- Implementation of additional environmental sampling undertaken by an indoor environmental professional of the Cathcart's choosing, pursuant to a health-based sampling protocol for the home to be designed and overseen by an experienced occupational and environmental health physician;

- Remediation of the Cathcart Family's structure by a licensed, bonded, insured, and properly experienced remediation contractor of the Cathcart's choosing and based upon an appropriately thorough mold remediation protocol designed by a competent indoor environmental professional of the Cathcart's choosing in coordination with the occupational and environmental health physician;

- Remediation and/or replacement of the Cathcart Family's personal property based upon an appropriately thorough mold remediation protocol designed by a competent indoor environmental professional of the Cathcart's choosing in coordination with the occupational and environmental health physician;

- Implementation of a health-based clearance sampling protocol designed by a competent indoor environmental professional of the Cathcart's choosing in coordination with the occupational and environmental health physician;

- Reconstruction of the Cathcart home following remediation by a licensed, bonded, insured, and properly experienced reconstruction contractor of the Cathcart's choosing;

- Reimbursement of all out-of-pocket expenses incurred the Cathcart family; and

- Extend all replacement housing expenses through the time the Cathcart family home is verifiably remediated, tested, cleared, and reconstructed.

In addition, please provide to my office immediately a certified copy of the Cathcart homeowner's insurance policy (Policy No. NVVH0000015034-0).  Please also provide to my office immediately a copy any and all environmental sampling results and analyses for the Cathcart home.  I am aware that the mold sampling was conducted by some or all of the following or others:

- MSE Environmental (Erik Lundgaard)

- Nevada Mold Testing, Inc. (Dennis Whitaker)

The Cathcart family has not been provided with any of the testing results, despite their request for them.  Please also immediately provide my office with a copy of the entire claims file (including all electronically stored information and materials and photographs and video) for this matter (Claim No.1201NV2400022) so that we may fully examine the nature of the water loss and ensuing mitigation efforts and also so that we may provide the same to the Cathcart's physicians to consider in conjunction with their medical examinations, investigations, opinions, and treatment course for the members of the Cathcart Family.

It is important that we receive all of these materials immediately.

Finally, we demand that you preserve and protect all claims file materials until further notice.

I look forward to hearing from you.

See Letter to Adjuster Ketcham at UNIVERSAL, dated February 11, 2013, attached hereto as Exhibit 1.  UNIVERSAL ignored the majority of first-party insureds CATHCART's requests for

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

1   information and action.      The reasons for UNIVERSAL's refusal to provide copies of its claim

2   file materials and test results came into clear focus as the CATHCART Family was forced to

3   retain its own experts to inspect their home and conduct mold sampling to test the water damage

4   mitigation and mold remediation work that had allegedly been accomplished by ALS in their

5   home.  CATHCARTS retained Earth Resource Group ("ERG") to inspect the home, the activities

6   of UNIVERSAL, YES, ABSOLUTE, and ALS, and conduct mold sampling in the home that

7   employed a health based mold sampling protocol.  ERG noted in its expert report the reason for

8   its retention by the CATHCARTS:

> Due to homeowner concerns regarding prior mold remediation activities, possible existing mold contamination and possible building-related symptoms/illness, ERG was asked to perform a limited microbial survey to assess levels of airborne fungal spores, secondary settled spores on surfaces and microbial growth that may be present within the structure.  Per communication with the homeowners, significant health issues exist with family members and the residential structure had recently gone through a series of mold remediation efforts.  Containment materials from the most recent remediation efforts, consisting of polyurethane sheeting and duct tape, were left on the living room floor.

14   See Expert Report of Earth Resource Group, attached hereto as Exhibit 2, at page 1.    ERG's

15   Expert Report includes photographs, as well as the raw laboratory data sheets for his mold

16   sampling compiled by Sean Abbott, Ph.D., of Natural Link Mold Lab in Reno, Nevada.   See

17   ERG Report.    ERG discussed its visual observations of the CATHCART home allegedly

18   remediated by UNIVERSAL, YES, ABSOLUTE, and ALS:

> During the survey, water damage and fungal growth were identified on carpet tack strip along the east wall of the living room adjacent to the kitchen.  Fungal growth was also identified within wall cavities in the kitchen, living room and master bathroom.  New bootie covers were utilized by ERG personal upon entering the residential structure and throughout the sampling activities.

22   See Expert Report of Earth Resource Group, Exhibit 2, at page 1.  ERG reported the results of its

23   mold sampling:

24   …

25   …

26   …

27   …

28

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

*JUDD J. BALMER, ESQ., LTD.*
*A Nevada Professional Corporation*

### *SURVEY RESULTS*

| APRIL 10, 2013 NON-VIABLE SAMPLE SUMMARY TABLE | | | | |
|---|---|---|---|---|
| Sample ID of Surface Fungal Growth from Kitchen, Laundry Room and Garage Source Areas | Sample Types | Source Area Non-Viable Fungal Identification | Sample ID of Surfaces Contaminated with Fungal Spores Associated with Mold Growth Source | Sample ID of Areas Contaminated with Non-Viable Fungal Spores Associated with Mold Growth Source |
| Bulk Samples B-01, S-01, WC-01 | Bulk Samples Non-Viable Microscopic Examination | Penicillium/Aspergillus *Chaetomium* *Ulocladium* | Sampling not conducted | Area Air Samples A-03, A-04, A-05 |

| APRIL 10, 2013 CULTURABLE SAMPLE SUMMARY TABLE | | | | |
|---|---|---|---|---|
| Sample ID of Surface Fungal Growth from Kitchen, Laundry Room and Garage Source Areas | Sample Types | Source Area Culturable Fungal Identification | Sample ID of Surfaces Contaminated with Fungal Spores Associated with Mold Growth Source | Sample ID of Areas Contaminated with Fungal Spores Associated with Mold Growth Source |
| B-01 – Bulk sample of sheetrock from the baseboard area on the north wall of the master bedroom west of the sliding glass door. | Culturable Bulk Sample | *Scopulariopsis* *Ulocladium* | Vacuum Dust Samples V-01, V-02, V-03, V-04, V-05, V-06, V-07, V-08, V-09, V-10, V-11 | Area Air Samples CA-04 |
| S-01 –Swab sample from carpet tack strip along the east wall of the living room adjacent to the kitchen. | Culturable Swab Sample | *Aspergillus ustus* *Chaetomium* *Penicillium chrysogenum* | Vacuum Dust Samples V-01, V-02, V-03, V-04, V-05, V-06, V-07, V-08, V-09, V-10, V-11 | Area Air Samples CA-03, CA-04, CA-05, CA-06 |

See Expert Report of Earth Resource Group, attached hereto as Exhibit 2, at page 4. Indeed, dust vacuum samples performed demonstrated alarming levels of mold spores, fragments, and colony forming units spread throughout the home, undeniable evidence of failed containment and botched water damage mitigation and mold remediation activities of ALS. As an exemplar, vacuum sampling performed on the fan blades on the living room (adjacent to the kitchen) ceiling demonstrated 6,815,000 Colony Forming Units ("CFU")/gram of dust, predominated by *Penicillium chrysogenum*, a known water damage-related mold that affects occupant health:

| Sample Identification: V-06, Fan blades, living room ceiling fan; Dust Sample; 04-10-2013 |
|---|

| Fungi Identified | Plate Count (CFU/plate) | Optimal Medium | Calculated Count (CFU/g) |
|---|---|---|---|
| *Penicillium* | (113) | | (5 700 000) |
| *P. chrysogenum* | 113 | MEA | 5 700 000 |
| *Aspergillus* | (26) | | (850 000) |
| *A. niger* | 12 | MEA | 600 000 |
| *A. ustus* | 4 | MEA | 200 000 |
| *A. caespitosus* | 9 | DG18 | 45 000 |
| *A. flavus* | 1 | DG18 | 5 000 |
| *Chaetomium* | 29 | CEL | 150 000 |
| *Cladosporium* | 1 | MEA | 50 000 |
| *Paecilomyces* | 5 | MEA | 25 000 |
| *Ulocladium* | 4 | CEL | 20 000 |
| *Bipolaris* | 2 | CEL | 10 000 |
| *Mucor* | 1 | CEL | 5 000 |
| Yeasts | 1 | MEA | 5 000 |
| **TOTAL** | | | **6 815 000** |

See ERG Report, at Analytical Laboratory Report [Fungal Culture, Aspergillus/Penicillium ID; Dust/Bulk/Swab Sample], Exhibit 2, at page 6.   Similar alarming vacuum sample results were recorded throughout the remainder of the house.   See ERG Report, Exhibit 2 hereto, at Analytical Laboratory Report [Fungal Culture, Aspergillus/Penicillium ID; Dust/Bulk/Swab Sample] at pages 1-12, which included counts of 1,665,000 CFU/gram of dust; 730,000 CFU/gram of dust; 850,000 CFU/gram of dust; 2,575,000 CFU/gram of dust; 105,000 CFU/gram of dust; 6,815,000 CFU/gram of dust; 7,001,000 CFU/gram of dust; 3,146,000 CFU/gram of dust; 3,240,000 CFU/ gram of dust; 1,365,000 CFU/gram of dust; among others.   These dust cultures demonstrate that the water damage mitigations and mold remediations by UNIVERSAL, YES, ABSOLUTE, and ALS were wildly and dangerously unsuccessful, as well as insightful as to the reason UNIVERSAL and ALS refused to provide a copies of reports and files to the CATHCART Family.   ERG concluded:

> Surface and area air sampling conducted by ERG confirmed the presence of secondary fungal spore contamination (Condition 2) from mold growth (Condition 3) identified in the living room, kitchen and master bedroom.   Fungal spore contamination was identified throughout the residence.   The presence of fungi including but not limited to *Penicillium chrysogenum, Chaetomium, Aspergillus ustus* and *Ulocladium* in the surface and air sampling indicates an abnormal accumulation of microbial contamination related to interior water intrusion.   (See attached laboratory results).   Based on the results of the survey conducted by ERG within the residential structure at 1012 Beaver Crest Terrace, Henderson, NV, additional microbial remediation is necessary.

See ERG Report, Exhibit 2, at p 5.   Pages 5-8 of the ERG Report contain the "Recommendations for Microbial Abatement and Intrusive Testing," which are "[b]ased on the survey results and guidelines set forth in the ANSI/IICRC S520 Standard." UNIVERSAL, YES, ABSOLUTE, and ALS worked in concert to create these dangerous conditions in CATHCART's home.

Summit Restoration, expert mold remediation contractors, have assembled an estimate of the anticipated cost of the remediation that now is required in the CATHCART home due to the malfeasance of UNIVERSAL and its agents.   The Estimate is based upon ERG's written mold remediation protocol set forth on pages 5-8 of the ERG Expert Report.   Summit Restoration's Estimate for the necessary remediation, excluding necessary cleaning of the home's HVAC system, necessary reconstruction, clearance testing, and storage pods, totals **$91,816.82**:

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

JUDD J. BALMER, ESQ., LTD.
*A Nevada Professional Corporation*

**CATHCART_MATT**

**CATHCART_MATT**

| DESCRIPTION | QNTY | UNIT COST | TOTAL |
|---|---|---|---|
| This estimate is for remediation costs- as specified in Earth Resource Group's Job Scope Only. Additional costs will occur when remediation needs have gone beyond the scope. At the time of job scope expansion all parties will be notified prior to beginning additional work. | | | |
| This estimate excludes HVAC cleaning, re-construction, clearance, storage pods | | | |

**General**

| DESCRIPTION | QNTY | | UNIT COST | | TOTAL |
|---|---|---|---|---|---|
| Hazardous Waste/Mold Clearing Technician - per hour | 1,100.00 | HR @ | 54.50 = | | 59,950.00 |
| Negative Air Machine- 2000cfm (Per Day) | 180.00 | EA @ | 150.00 = | | 27,000.00 |
| 10 @ 18 days | | | | | |
| Replacment Filters, primary, secondary | 20.00 | EA @ | 4.50 = | | 90.00 |
| Tyvek Suit | 108.00 | EA @ | 10.81 = | | 1,167.48 |
| 6 mil Plastic Bag | 200.00 | EA @ | 1.57 = | | 314.00 |
| Containment- 6 mil plastic | 2,200.00 | EA @ | 0.51 = | | 1,122.00 |
| Lay Flat | 200.00 | SF @ | 0.52 = | | 104.00 |
| Replacement Respirator Cartridge | 8.00 | EA @ | 13.70 = | | 109.60 |
| Sanding Paper-per box | 12.00 | EA @ | 12.50 = | | 150.00 |
| Spray Glue-per can | 12.00 | EA @ | 16.50 = | | 198.00 |
| Masking Tape (Blue)-per roll | 24.00 | EA @ | 10.00 = | | 240.00 |
| Heavy Duct Tape (Red)-per roll | 36.00 | EA @ | 8.00 = | | 288.00 |
| Install Toilet Plug | 3.00 | EA @ | 10.00 = | | 30.00 |
| Peel & seal zipper | 8.00 | EA @ | 13.50 = | | 108.00 |
| Valve Caps | 4.00 | EA @ | 4.50 = | | 18.00 |
| Expansion Foam-per can | 4.00 | EA @ | 12.50 = | | 50.00 |
| Equipment decontamination charge - per piece of equipment | | EA @ | 51.16 = | | 0.00 |
| No Charge - 18 pieces of equipment | | | | | |
| Antimicrobial Agent / Biocide Wipe | | EA @ | 25.92 = | | 0.00 |
| No Charge | | | | | |
| Bubble Wrap - per roll | 3.00 | EA @ | 25.00 = | | 75.00 |
| Boxes - Large | 75.00 | EA @ | 3.05 = | | 228.75 |
| Packing Paper - per roll | 1.00 | EA @ | 48.00 = | | 48.00 |
| Dumpster load - Approx. 40 yards, 7-8 tons of debris | 1.00 | EA @ | 525.99 = | | 525.99 |

**Summary**

| | |
|---|---|
| Line Item Total | 91,816.82 |
| **Replacement Cost Value** | **$91,816.82** |
| **Net Claim** | **$91,816.82** |

<u>See</u> Expert Estimate of Summit Restoration, attached hereto as Exhibit 3. The cost to reconstruct the home following remediation and to replace personal property has been estimated by expert contractor Linda Hoy to be **$138,658.18**. <u>See</u> Expert Cost of Repair by Linda K. Hoy, attached hereto as Exhibit 9. In August, 2013, the CATHCART family was financially forced to move out of replacement housing and back into the contaminated home, where they have become sick.

On May 30, 2013, CATHCART counsel wrote to UNIVERSAL's lawyers, laying out the facts of the claims and UNIVERSAL's liability, both contractually and extra-contractually for the CATHCARTS damages. <u>See</u> Letter to Counsel for UNIVERSAL, dated May 30, 2013, attached hereto as Exhibit 4. Despite CATHCART's first-party insured demand, and the reasons underlying the demand, UNIVERSAL sat on and ignored CATHCART's February 11, 2013, demands until August 30, 2013, when it wrote a self-serving summary letter that provided no claim conclusions. On September 25, 2013, UNIVERSAL faxed a letter to CATHCARTs that, for all intents and purposes, denied the CATHCARTs claims while continuing to ignore the

- 11 -

CATHCART's February 11, 2013, requests for information and action.  Thereafter, the very next day, UNIVERSAL raced to the Federal Courthouse to file its Complaint for Declaratory Relief on September 26, 2013, as a calculated preemptive strike against CATHCARTS.

As discussed herein, at the time the Complaint for Declaratory Relief was filed by UNIVERSAL, UNIVERSAL **knew** that the bases of their declaratory relief claims were false and further knew of the sound factual bases of the CATHCART's contractual and extra-contractual claims relating to the insurance policy, claims handling, and UNIVERSAL's concerted actions with ALS and CRS.  UNIVERSAL's malfeasance in selecting, recommending, directing, supervising, and approving the activities of ALS, and CRS caused damage to CATHCART's home and personal property, caused CATHCART's to suffer personal injury and suffer financial and emotional damages.   Even UNIVERSAL's reckless depletion of policy benefits is at issue.  This case is not about a sterile interpretation of policy language, it is about the bad faith conduct and malfeasance of UNIVERSAL and its posse that have injured Plaintiffs and their property.

## III.    FRCP 56(a) STANDARD AND L.R. 56-1 STATEMENT OF UNDISPUTED FACTS.

Federal Rule of Civil Procedure 56(a) provides:

(a)    Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

See FRCP 56(a).    A judgment on the pleadings is appropriate when the moving party clearly establishes on the face of the pleading that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law.

Summary judgment is appropriate when trial would serve no useful purpose.   Short v. Hotel Riviera, Inc., 79 Nev. 94, 96 (1963).  As noted by the Nevada Supreme Court, summary judgment procedure is an "integral part" of civil practice and is "designed to secure the just, speedy, and inexpensive determination of every action."  Wood v. Safeway, Inc., 121 P.3d 1026, 1030 (2005), citing Celotex Corporation v. Catrett, 477 U.S. 317, 327 (1986).   The governing legal standard for summary judgment motions is set out in Safeway, a case explaining the

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

- 12 -

summary judgment standard that is substantially similar to Federal standards.   In <u>Safeway</u>, the Court referred approvingly to prior holdings that when reviewing a motion for summary judgment, the evidence, and any reasonable inferences drawn from it, must be viewed in a light most favorable to the non-moving party.   In setting forth the new summary judgment standard, the <u>Safeway</u> Court stated:

> We now adopt the standard employed in <u>Liberty Lobby</u>, <u>Celotex</u>, and <u>Matsushita</u>. Summary Judgment is appropriate under NRCP 56 when the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that are properly before the court demonstrate that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.   The substantive law controls which factual disputes are material and will preclude summary judgment; other factual disputes are irrelevant.  ***A factual dispute is genuine when the evidence is such that a rational trier of fact could return a verdict for the non-moving party.***

<u>Wood v. Safeway, Inc.</u>, 121 P.3d 1026, 1031 (2005)(emphasis added).   The Court further held that while the pleadings and other proof must be construed in a light most favorable to the non-moving party, the non-moving party bears the burden to do more than simply show that there is some "metaphysical doubt" as to the operative facts in order to avoid summary judgment being entered in the moving party's favor.   The non-moving party must, by affidavit or otherwise, set forth specific facts demonstrating the existence of a genuine issue for trial or have summary judgment entered against him.   <u>Wood v. Safeway, Inc.</u>, 121 P.3d 1026, 1031 (2005).   Here, Plaintiffs have failed to carry that burden.

In <u>Cuzze v. University and Community College System of Nevada</u>, 12 Nev. Op. 55, 172 P.3d 131, 134 (2007), the Court stated:

> ...if the nonmoving party will bear the burden of persuasion at trial, the party moving for summary judgment may satisfy the burden of production by either **(1) submitting evidence that negates an essential element of the nonmoving party's claim, <u>or</u> (2) "pointing out...that there is an absence of evidence to support the nonmoving party's case."**   In such instances, in order to defeat summary judgment, the nonmoving party must transcend the pleadings and, by affidavit or other admissible evidence, introduce specific facts that show a genuine issue of material fact.

Emphasis added.   Thus, the party seeking summary judgment bears the initial responsibility of informing the Court of the basis for the motion, but need not negate the opposing party's claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323; 106 S. Ct. 2548 (1986).  ***This burden may be met by showing that there is inadequate evidence to support any one or more of the prima facie elements of the non-moving party's case.***   <u>Celotex</u>, 477 U.S., at 323.   Here, as set forth in detail

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

below, UNIVERSAL's own FRCP 30(b)(6) witnesses admitted at deposition that there is additional money owed to Defendants under the Additional Living Expenses benefit and further admitted that UNIVERSAL directed its preferred vendor, ALS, to perform whatever work was necessary in CATHCART's home, regardless of any later alleged "mold limit" on the insurance policy.  Furthermore, Policy limits, to the extent they could even be applicable under the facts of UNIVERSAL's malfeasance and bad faith here, were waived by UNIVERSAL when it authorized Paul Davis to perform work without regard to any alleged "mold limit."  Therefore, as set forth hereinbelow, Plaintiff is not entitled to any relief on its declaratory relief complaint, and CATHCARTS are entitled to summary judgment as a matter of law.  See Exhibits 1-9.

A party opposing summary judgment must set forth facts demonstrating the existence of a genuine issue for the court or have summary judgment entered against it.  Bulbman, Inc. v. Nevada Bell, 108 Nev. 105, 110 (1992); Collins v. Union Fed. Savings & Loan, 99 Nev. 284, 294 (1983).  In addition, a party opposing summary judgment cannot simply rest upon  allegations in the pleadings; rather, it must affirmatively set forth facts demonstrating the existence of a material issue of fact.  Garvey v. Clark County, 91 Nev. 127, 130, 532 P.2d 269, 271 (1978); Adamson v. Bowker, 85 Nev. 115, 118-20, 450 P.2d 796, 799-800 (1969).  By its very terms, the summary judgment standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  Wood v. Safeway, 121 P.3d, at 1030.  Conclusory allegations are insufficient to satisfy such a burden.  The non-moving party must produce evidence to support its claim.  Bird v. Casa Royale West, 97 Nev. 67, 69-70 (1981).   Here, Plaintiff has admitted that additional benefits are owed to Defendants under the ALE policy provision.  Plaintiff further admitted that it authorized the work of its preferred vendor, ALS, without regard for any "limit" for mold under Defendants' policy.

In sum, the Nevada Supreme Court has held that summary adjudication is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Riley v. OPP IX, LP, 112 Nev. 826, 830 (1996).  The Nevada Supreme Court has expressly abolished the "slightest doubt" standard in Nevada and adopted the more stringent

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

- 14 -

Federal standard for summary judgment.   <u>Wood v. Safeway, Inc.</u>, 121 P.3d, at 1030-32.   A genuine issue of material fact is such that a rational trier of fact could return a verdict for the non-moving party.   <u>Wood v. Safeway, Inc.</u>, 121 P.3d 1026, 1032 (Nev. 2005); <u>Posadas</u>, 109 Nev. at 452.   Finally, a plaintiff is not entitled to build a case on the gossamer threads of whimsey, speculation, and conjecture."   <u>Collins v. Union Federal Savings and Loan</u>, 99 Nev. 283, 302 (1983).

Thus, Plaintiff is not entitled to a"declaration" by the Court of certain aspects of the subject homeowner's insurance policy and Defendants' motion for summary judgment must be granted.

**IV.     JAMES R. KETCHAM IS PLAINTIFF'S FRCP 30(b)(6) WITNESS.**

Defendants' properly noticed the deposition of Plaintiff's FRCP 30(b)(6) witness to take place on or about February 26, 2016 (<u>see</u> Amended Notice of Taking Deposition, attached hereto as Exhibit 5).   Plaintiff produced former employee James R. Ketcham, who was also the adjuster handling Defendants' claims which are the subject of this litigation:

```
24     Q    You're appearing today on behalf of Universal
25   North America Insurance Company as the witness to bind

 1   the company.  Do you understand that?
 2     A    Yes.
 3     Q    And you understand that you're the witness to
 4   bind the company even though you don't work there
 5   anymore?
 6     A    Yes.
```

<u>See</u> deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 7:24-8:6.

**V.     PLAINTIFF FAILED TO PAY UNDER THE ALE POLICY PROVISION.**

*A.     Benefits remain to be paid on the ALE provision of Defendants' policy.*

UNIVERSAL prematurely withdrew Additional Living Expense benefits owed to Defendants under the policy.   Mr. Ketcham, UNIVERSAL's FRCP 30(b)(6) witness testified initially that there was about $1,500 left owing under the ALE policy provision of Defendants'

JUDD J. BALMER, ESQ., LTD.
*A Nevada Professional Corporation*

1   policy.  Then Mr. Ketcham testified that there remained $2,700 outstanding in deposits with CRS

2   that Plaintiff submitted to CRS but never asked to be returned:

```
 8    Q    There was all kinds of screw-ups concerning the
 9   calculation of the additional living expenses; isn't that
10   right?
11    A    There were a few.
12    Q    You couldn't get straight what the
13   additional-living-expense tally was, could you?
14    MR. CANNON:  Objection; argumentative.
15    THE WITNESS:  No.  I figured it out.
16    MR. BALMER:  Oh.
17    Q    Ultimately isn't it true that when you cut off
18   additional living expenses for the Cathcarts, that there
19   still remained a couple of thousand dollars on that
20   $46,000 limit?  Isn't that true?
21    A    About $1500.
22    Q    Do you know that you filed a lawsuit in federal
23   court against the insureds to say that you, Universal,
24   exhausted those policy limits?
25    A    Well, technically, yes.
```

```
 1    Q    What do you mean "technically, yes"?
 2    A    Because there's a 2700 -- in the calculations
 3   there's a $2700 refundable deposit.
 4    Q    Did you get that back?
 5    A    No, not that I'm aware of.
 6    Q    Why would you not get that back?  There's no
 7   evidence that the Cathcarts damaged in any way the home,
 8   is there?
 9    A    I don't know if the deposit was ever refunded.
10    Q    Why wouldn't you -- did you ever call and ask
11   about the deposit?
12    A    It's something that wasn't taken care of.
13    MR. CANNON:  What's the deposit for?
14   BY MR. BALMER:
15    Q    What was the deposit for?
16    A    Damage deposit.
17    Q    So a $2700 deposit and you're telling me that
18   you just never followed up on it.  Meanwhile the
19   Cathcarts are moving back into their house; is that true?
20    A    That's true.
```

27   See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 276:8-25,

28   277:1-20.  Mr. Ketcham also testified that no effort was made to secure a return of the deposit:

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

- 16 -

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

```
10      Q     How does it protect the insureds'
11  additional-living-expense limit when Universal has the
12  right and ability to request a refund of the refundable
13  deposit and you just fail to do it?
14      A     Well, sometimes it takes a long time to get that
15  deposit back and sometimes we don't get it all back and
16  it could exceed the $4600.
17      Q     Tell me where in the file it demonstrates any
18  effort on behalf of Universal to receive back any part of
19  the $2700 refundable deposit.
20      A     I'm not sure it's in there.
21      Q     And if it's not in there, you can't testify that
22  any effort was made in that regard; is that right?
23      A     That's true.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 281:10-23.   Mr.
Ketcham further testified that UNIVERSAL could call and request a return of the refundable
deposit made to CRS:

```
15      Q     What could a Universal employee do?
16      A     They could probably check on it.
17      Q     How would they do it?
18      A     Call up CRS.
19      Q     And say, "Where's the deposit"?
20      A     Yes.
21      Q     Two and a half years later?  Yeah?
22      A     Yes.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 284:15-22.   Mr.
Ketcham agreed that UNIVERSAL's failure to seek reimbursement of the refundable deposit
from CRS directly impacted Defendants' right to benefits owed them under the policy:

```
5       Q     And if Universal, as it appears, failed to seek
6   reimbursement of that refundable security deposit, that
7   that failure would directly impact the Cathcarts' right
8   to the money under the additional-living-expense portion
9   of their policy, wouldn't it?
10      A     Yes.
```

- 17 -

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 283:5-10.

      **B.**      ***UNIVERSAL RECKLESSLY DEPLETED ALE POLICY BENEFITS.***

UNIVERSAL recklessly depleted policy benefits owed to Defendants.   UNIVERSAL contracted with CRS, to set Defendants up with alternative living arrangements:

```
20    Q    Concerning -- thank you.  Concerning the
21    additional living expenses, did Universal set the
22    Cathcarts up on CRS?
23    A    Yes.
24    Q    Who brought CRS into the mix?
25    A    Universal.
```

```
1     Q    Does Universal typically work with CRS?
2     A    It works with several different
3     temporary-housing companies.
4     Q    In Nevada is CRS the go-to company for
5     Universal?
6     A    Most of the time, yes.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 187:20-25 and 188:1-6.

In spite of UNIVERSAL's actual and direct knowledge that the Cathcart home remained contaminated, UNIVERSAL sat back and did nothing to remedy the ongoing contamination, forcing the Cathcart Family's lengthy displacement from their home and personal property. UNIVERSAL forced Defendants to stay in expensive hotel after hotel unreasonably running up expenses.   Initially, UNIVERSAL's housing contractor, CRS, placed Defendants in hotel after hotel at rates ranging from $109.65 per night to $183.57(!) per night.   See CRS billing statements, attached hereto as Exhibit 7.

When UNIVERSAL finally chose to place Defendants in a rental house, UNIVERSAL recklessly entered into a rental agreement for a monthly rental rate substantially higher than any reasonable rate for same.  Shockingly, the **monthly rent** for the rental home was **$4,752.25(!!)**, thereby irresponsibly depleting policy ALE benefits far sooner than reasonable or necessary.  See Exhibit 7 at UNAIC000220 and UNAIC000222.  While burning down Defendants' ALE limits,

1   UNIVERSAL even sat unresponsive for two (2) months on Defendants' request to conduct mold

2   sampling in their home, unreasonably causing two (2) months of delays in the investigation of

3   the habitability of the home, all to the detriment of Defendants and a wrongful depletion of

4   desperately needed policy benefits. UNIVERSAL recklessly drained Defendants' ALE benefits,

5   then forced Defendants back into their *known* contaminated home, exposing Defendants to

6   further risk (and, according to Defendants' physician in a letter provided directly to

7   UNIVERSAL, *likelihood*) of injury.

8       **C.   DEFENDANTS' INSURANCE EXPERT FOUND THE ALE RENTAL COSTS**
       **TO BE UNREASONABLE.**

9

10       Defendants' Insurance Expert, Paul W. Burkett, JD, CPCU, CIC, CRM, ARM ALCM,

11   determined that Plaintiff unnecessarily depleted policy benefits owed to Defendants based upon

12   the cost of the alternative living arrangements selected by UNIVERSAL's vendor, CRS:

13    

14   > Since the first claim, the Cathcart family was forced to move from their home and to live
initially in expensive hotels that significantly depleted the limits of coverage in the
homeowners insurance policy provided by Universal. The temporary living
arrangements were coordinates by Universal's approved vendor CRS. What was hoped
to be a short stay by the Cathcart family became a lengthy continuous displacement
and eventually because of the ongoing water damage and mold remediation to their
home, the Cathcart's were placed into a monthly rental house by Universal adjuster and
CRS. The CRS arranged monthly rental costs were substantially above market home
rentals and this higher costs depleted limits of coverage. With the insurance limits for
Coverage D - Loss of Use Additional Living Expenses exhausted because of Universal
adjuster delays in getting clearance air sampling testing completed on the home and
failure to hire competent contractors to complete the unfinished work by the previously
Universal approved contractors, the Cathcart family was required to move back into
their contaminated home. Universal adjusters refused to extend the Cathcart's
alternative housing accommodations until their home has been properly remediated and
restored to habitability.

15

16

17

18

19

20   <u>See</u> Second Supplemental Expert Report of Paul W. Burkett, JD, CPCU, CIC, CRM, ARM

21   ALCM, attached hereto as Exhibit 8, at page 11.  Mr. Burkett further found that UNIVERSAL

22   fell below the industry standard of care in its handling of the ALE portion of the claim and failed

23   to protect the policy limits:

24    

25   > When the water mitigation started, the Cathcart's family moved from the house into
temporary living quarters. There was no discussion by Universal adjusters about the
$46,000 limits for Coverage D Loss of use and the length of time that the remediation
would take. The benefits under Coverage D of the Universal homeowner policy were not
explained to the Cathcart's family. The failure of the Universal adjuster to disclose the
coverage limitations does not meet the industry standard of care and it is a
misrepresentation of pertinent facts relating to this important coverage issue as per
NRS 686.310. This is not a reasonable basis for interpreting the insurance contract as
stated by the Universal Expert. [Lane J. Ashley Expert Report page 27, paragraph 2.]

26

27

28

MOTION FOR SUMMARY JUDGMENT

*JUDD J. BALMER, ESQ., LTD.*
*A Nevada Professional Corporation*

In addition, Universal adjusters through its approved vendor CRS did not work with the Cathcart's family concerning the placement in reasonable accommodations to protect the Coverage D limit. When the threatening and harassing actions of CRS employees was brought to the attention of the Universal adjusters, nothing was done to assist the Cathcart's family.

The request for an extension of the temporary living arrangements under Coverage D was ignored by the Universal adjusters even with the knowledge that the Cathcart's home was uninhabitable. Universal adjusters selected and hired CRS for all of its temporary housing placements. The Universal adjusters did not properly supervise CRs and make a reasonable accommodation to avoid the subsequent lawsuit by Cathcart's legal counsel in the May 30, 2013 letter to Mr. Olson.

> **D. Coverage D – Loss Of Use**
>
> The limit of liability for Coverage D is the total limit for the coverages in **1.** Additional Living Expense, **2.** Fair Rental Value and **3.** Civil Authority Prohibits Use below.
>
> **1. Additional Living Expense**
>
> If a loss covered under Section **I** makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living. Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.

There is no debate that the home is "not fit to live in" and the request was reasonable for the safety of the insured's. This opinion is contrary to the opinion provided by Universal's expert. [Lane J. Ashley Expert Report page 28, paragraph 5.]

Therefore, the Universal adjusters misrepresented to the Cathcart's Family pertinent facts concerning the Universal Homeowners 3 – Special Form coverage form provisions relating to specific benefits and how the damage claim would get paid. The adjusters did not properly communicate the coverage issues within this claim.

<u>See</u> Second Supplemental Expert Report of Paul W. Burkett, JD, CPCU, CIC, CRM, ARM ALCM, attached hereto as Exhibit 8, at pages 16-17.    Mr. Burkett further opined that UNIVERSAL failed to act reasonably with respect to Defendants' ALE benefits:

> c.    **Universal claims adjusters failed to recognize, acknowledge and act reasonably promptly upon received communications from the Cathcart's family with respect to the loss of use claim arising under Coverage D within the Universal Homeowners Policy.**
>
> It is well known in the industry that the loss of use coverage provides protection when the residence premises cannot be used because of an insured loss. Three benefits are provided: (1) additional living expense (ALE), (2) fair rental value (FRV), and (3) prohibited use. The limit of liability for loss of use shown in the declarations is the total limit for these three benefits and the policy limit was $46,000 for a normal water damage mitigation and minimal mold intrusion.
>
> The Universal adjusters did not follow proper protocols and properly discuss and disclose the coverage provided under Coverage D Loss of Use – Additional Living Expense with all of the limitations and conditions that apply to the coverage. Universal adjusters knew that the master bedroom, hallways and kitchen areas were going to be de-commissioned for an extended period of time and that numerous extra expenses impacting the Cathcart's family would be incurred. The long term relocation possibility and rental of a house versus hotel rooms during the remediation process was not quickly identified and offered to the Cathcart's family.

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

1
2
3
4
5
6

> Therefore, the Universal adjusters failed to investigate all elements of this loss of use claim. The Universal adjusters did not properly evaluate Universal's exposure in terms of direct and indirect losses being created by the water saturation claim, kitchen water pipe leak, improper water mitigation procedures and subsequent poor workmanship of the approved contractors that allowed and created the need for a significant mold remediation project. If a proper air and surface test had been ordered before the remediation starts, the Universal adjusters would have determined the extent of the loss of use claim exposure. The Universal claims adjusters failed to use good judgment in determining whether re-location expenses rental house versus hotel costs should have been provided to preserve the $46,000 limit of coverage. The Universal adjusters failed to aggressively pursue a fair resolution to the loss of use claim when brought to their attention. The Universal adjusters failed to intercede and manage the issues created by their contractor CRS.

7    See Second Supplemental Expert Report of Paul W. Burkett, JD, CPCU, CIC, CRM, ARM

8    ALCM, attached hereto as Exhibit 8, at pages 19-20.    Finally, Mr. Burkett found that

9    UNIVERSAL failed to act in good faith by failing and refusing to timely obtain environmental

10   testing of Defendants' home, thereby unnecessarily depleting desperately needed ALE benefits:

11
12
13
14

> 3.   The Universal claims personnel failed in their duty to in good faith to effectuate a prompt, fair, and equitable settlement of the Cathcart's Loss of Use Claim by failing to understand the health issues facing the family during the remediation process that necessitated broader coverage and payments under the Loss of Use Coverage D within the Universal North America Insurance Company ("Universal") under policy number NVVH0000015034-0, policy period March 11,

15
16

> The Universal claims adjusters failed to order an air and surface sampling test of the Cathcart's house before the start of water saturation and water damage mitigation and mold remediation within the kitchen area. This air and surface testing would have shown that relocation was a necessary requirement for the Cathcart's family. Pre-remediation tests are necessary to establish the appropriate base line for adjusting the claim.

17
18
19

> The Universal claims adjusters failed to clearly discuss the available coverages provided under Coverage D Loss of Use – Additional Living Expenses. Since the master bedroom and kitchen area was being de-commissioned for an extended period of time, the additional expenses of eating out needed to be included in the analysis of the available limits of insurance.

20
21

> Loss of use coverage provides protection when the residence premises cannot be used because of an insured loss. Three benefits are provided: (1) additional living expense (ALE), (2) fair rental value (FRV), and (3) civil authority prohibited use. The limit of liability for loss of use shown in the declarations is the total limit for these three benefits and in the Cathcart's policy the limit was $46,000.[10] Coverage is provided for the

22

---

23
24
25
26
27

> [10] **D. Coverage D – Loss Of Use**
> The limit of liability for Coverage D is the total limit for the coverages in 1. Additional Living Expense, 2. Fair Rental Value and 3. Civil Authority Prohibits Use below.
> **1. Additional Living Expense**
> If a loss covered under Section I makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living.
> Payment will be for the shortest time required to repair or replace the damage or, if you permanently relocate, the shortest time required for your household to settle elsewhere.
> **2. Fair Rental Value**
> If a loss covered under Section I makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the fair rental value of such premises less any expenses that do not continue while it is not fit to live in.
> Payment will be for the shortest time required to repair or replace such premises.
> **3. Civil Authority Prohibits Use**

28

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

Cathcart's family loss of use claim as per the Mold, "Fungi", Wet or Dry Rot, or Bacteria Additional Coverage under Section I – Property Coverages.

When the remediation or abatement process started, Cathcart's family members started a lengthy and continuous displacement from their home and their personal property because of the remediation work and subsequent mold contamination through-out their house making it uninhabitable. Instead of evaluating the cause-and-origin of the contamination and determine the length of remediation, the Universal adjusters treated the loss as a short period for restoration and sent the Cathcart's family to expensive hotels to live in lieu of renting a more modest apartment of house for the family. This was an unreasonable assessment and ran up the expenses quickly which subsequently eliminated the available limit. This continuous claim requires a longer period of time to eliminate all contamination as indicated in the ERG report. This house is not habitable and needs to be brought into compliance with current industry standards which requires time to ensure the safety to the Cathcart's family members.

Therefore, the Universal claims personnel failed in their duty to in good faith to effectuate a prompt, fair, and equitable settlement of the Cathcart's Loss of Use Claim because of the contamination that made the house uninhabitable and extended their need to live outside the house. The Universal adjusters failed to understand the health issues facing the family during the failed water and mold remediation process that contaminated the house. The Universal underwriters failed to hire an air and surface sampling expert to establish the base line health exposures prior to the start of the water and mold remediation. If the air sampling and surface test had been accomplished, the Universal adjusters would have provides the broadest coverage available and extended the Loss of Use benefits because of their approved contractor's failures.

<u>See</u> Second Supplemental Expert Report of Paul W. Burkett, JD, CPCU, CIC, CRM, ARM ALCM, attached hereto as Exhibit 8, at pages 26-27.

Based upon all of the foregoing, Defendants are entitled to summary judgment as a matter of law and fact, as Plaintiff has NOT exhausted all of the benefits owed under the Additional Living Expenses provision of Defendants' insurance policy, a fact **known** to UNIVERSAL when it sued its insureds in this action.

**VI.    UNIVERSAL OWES ON PROPERTY DAMAGE.  THE ALLEGED MOLD LIMIT WAS WAIVED OR RENDERED INAPPLICABLE BY UNIVERSAL'S MALFEASANCE AND THAT OF ITS PREFERRED VENDOR, ALS.**

UNIVERSAL retained and directed the work of ALS in Defendants' home. UNIVERSAL directed ALS to perform water damage restoration, mold remediation and reconstruction in Defendants' home without regard for the alleged "mold limit" and, therefore, any alleged "mold limit" in the policy is waived or rendered inapplicable.

***A.      ALS IS UNIVERSAL'S PREFERRED VENDOR AND WAS DIRECTED AND SUPERVISED BY UNIVERSAL.***

UNIVERSAL contacted ALS (Paul Davis) and sent them to Defendants' home:

JUDD J. BALMER, ESQ., LTD.
*A Nevada Professional Corporation*

JUDD J. BALMER, ESQ., LTD.
*A Nevada Professional Corporation*

```
20      Q    Who called out Paul Davis to the Cathcart house?

21      A    I'm not sure.  I believe it was the Cathcarts.

22  I think they probably called them out.

23      Q    Are you sure about that?

24      A    No.

25      Q    If the records indicate that Paul Davis was
```

```
1   contacted and sent out to the Cathcart home by Universal,

2   does that refresh your recollection?

3       A    Yeah.  It probably would have been -- probably

4   would have called them out for help on this one.

5       Q    Who probably would have called them out for help

6   on this one?

7       A    Either myself or Brenda Jenkins.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 112:20-113:7.
Mr. Ketcham testified that Paul Davis (ALS) was called out to Defendants' home as a preferred
vendor, according to the claims notes:

```
25      A    Okay.  "Paul Davis has also been called out as a
```

```
1   preferred vendor to provide the insurance -- insured --

2   reconstruction services.  This has been communicated with

3   Brenda.user Hpereira."

4       Q    All right.  So there we have it in the claims

5   notes:  "Paul Davis has also been called out as a

6   preferred vendor."  Do you see that?

7       A    Yes.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 217:25-218:7.

**B.   *UNIVERSAL DIRECTED PAUL DAVIS (ALS) TO PERFORM ALL MOLD
RELATED WORK REGARDLESS OF POLICY LANGUAGE, WHICH
CONSTITUTES A WAIVER OF ANY ALLEGED POLICY LIMIT.***

Mr. Ketcham, on behalf of UNIVERSAL further testified that he authorized ALS (Paul
Davis) to perform the mold remediation without regard to any policy limits:

MOTION FOR SUMMARY JUDGMENT

```
 3      Q    And then you told Paul Davis Restoration what?
 4      A    To proceed with any new mold detecting.
 5      Q    To remediate it; correct?
 6      A    Yes.
 7      Q    You didn't tell Paul Davis Restoration, "Hold
 8   on.  There's a mold limit here."  You told Paul Davis
 9   Restoration to proceed with any new mold detected, didn't
10   you?
11      A    Yes.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 244:3-11.  Mr. Ketcham continued:

```
21      Q    So in relationship to your direction to Paul
22   Davis to proceed with any new mold detected, you did not
23   inform Paul Davis that there was any sort of mold
24   limitation that would somehow cap the amount that they
25   would be able to spend to remediate that mold issue;
```

```
 1   true?
 2      A    True.
 3      Q    In fact you gave Paul Davis Restoration what
 4   appears to be carte blanche permission to proceed with
 5   any new mold detected, didn't you?
 6      A    Yes.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 244:21-225:6. UNIVERSAL contacted its preferred vendor, ALS (Paul Davis) to perform mold remediation work at Defendants' home.  UNIVERSAL then authorized ALS to perform whatever work ALS deemed necessary in Defendants' home, without any mention to ALS or the insured of an alleged policy limit.  Therefore, UNIVERSAL *waived* its right to assert any such policy limit.

**C.    *UNIVERSAL FAILED TO PAY ALS, CAUSING DEFENDANTS TO GET SUED.***

After directing ALS to perform mold remediation work in Defendants home, UNIVERSAL knowingly refused to pay ALS for the work it performed, ignored ALS' repeated

JUDD J. BALMER, ESQ., LTD.
*A Nevada Professional Corporation*

1  requests for payments and ignored ALS' threats to place a mechanic's lien on Defendants' home.

2  UNIVERSAL acknowledged that it failed to pay ALS and that as a result, ALS did in fact file a

3  mechanic's lien against Defendants' home and sued Defendants to foreclose on said lien:

```
7     Q    Do you understand that Universal never paid Paul
8  Davis the $40,000?
9     A    Correct.
10    Q    And as a result of Universal not paying Paul
11 Davis the $40,000, Paul Davis perfected a Notice of Lien
12 on the Cathcart home?
13    A    Yes.
14    Q    And because Universal had failed to pay Paul
15 Davis, Paul Davis initiated a lawsuit against the
16 Cathcarts to foreclose on that mechanic's lien to take
17 and sell their home to pay the 40,000.  Do you understand
18 that?
19    A    Yes.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 91:7-19.

Mr. Ketcham even acknowledged that he received the ALS Notice of Intent to Lien and

chose to disregard the same:

```
12    Q    I'm going to show you a couple of documents.
13 Let me show you what is Bates No., down in the bottom,
14 ALS 16.  What is that document?
15    A    It's a Notice of Intent to Lien on the Cathcarts
16 from ALS Development and Management Corp. doing business
17 as Paul Davis Restoration.
18    Q    So what is this document?  What's your
19 understanding of what this document is?
20    A    That means if the Cathcarts don't pay them,
21 they're going to put a lien on their house.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 155:12-21.  Mr.

Ketcham continued:

…

…

…

- 25 -

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

```
 8      Q    I'm going to show you another document that is
 9    Bates numbered in the bottom right ALS 94 and 95.  It's a
10    two-page document.  Ask you to review that and I've got
11    some questions for you.
12           What is that document?
13      A    It's from collections at Paul Davis Restoration
14    addressed to James Ketcham.  "James, please be advised we
15    must receive payment on this claim in the 15 days to
16    avoid lien process.  Please contact our office with any
17    further questions you may have."
18      Q    Did you receive this E-mail?
19      A    Yes.
20      Q    Have you look at the second page.  Is that a
21    read confirmation from you?
22      A    Yes.
23      Q    So you actually read this E-mail from Paul Davis
24    Restoration that said unless they receive payment on the
25    claim within 15 days, they're going to move forward with
```

```
 1    the lien process on the Cathcart house?
 2      A    Yes.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 156:8-157:2.  Mr. Ketcham admitted that he took no action to protect the insureds:

```
15      Q    And how long did Paul Davis indicate to
16    Universal, to you specifically, that you had before they
17    would move forward with lien proceedings?
18      A    Fifteen days.
19      Q    And you took no action?
20      A    Correct.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 162:15-20.  Mr. Ketcham further acknowledged the inconsistent position taken by UNIVERSAL with regard to ALS:

…

…

…

…

- 26 -

```
 7        Q    Do you see an inconsistency with the permission
 8   that you were giving to Paul Davis, the preferred vendor
 9   of Universal, concerning mold remediation and the
10   position now being taken by Universal that some sort of a
11   mold limitation of $10,000 somehow now applies to the
12   claim of the Cathcarts?  Do you see some inconsistency
13   there?
14        MR. CANNON:  I'm going to object to that.  It's
15   compound, it's argumentative, lacks foundation.
16        Go ahead.
17   BY MR. BALMER:
18        Q    Go ahead.
19        A    Yeah, I can see some conflicts.
20        Q    You see some inconsistency, don't you?
21        A    Yes.
22        Q    Now, you're supposed to be fair with the
23   insureds, aren't you?
24        A    Yes.
```

See deposition transcript of James R. Ketcham, attached hereto as Exhibit 6, at 245:7-24.

UNIVERSAL specifically directed ALS to perform work in Defendants' home. UNIVERSAL then intentionally ignored ALS' repeated requests for payment and threats to place a lien on Defendants' home, resulting in Defendants being sued by ALS to foreclose on the home in order to collect on its mechanic's lien. UNIVERSAL knowingly placed its insureds in peril and knowingly risked Defendants' home being lost in foreclosure as a result of the mechanic's lien - a mechanic's lien that resulted from work specifically approved by UNIVERSAL without regard to any alleged policy limits.

### D.     UNIVERSAL IS RESPONSIBLE FOR DAMAGE CAUSED TO DEFENDANTS' HOME BY ITS PREFERRED VENDOR.

During its work in Defendants' home, ALS broke Defendants' granite countertop and refused to replace the same. The original water loss was covered under Defendants' policy of insurance. Defendants' policy has no exclusion for damage that results from work performed to repair a covered loss and, therefore, UNIVERSAL is obligated to pay for the damage caused during the repairs performed by ALS. Defendants' insurance expert Paul W. Burkett, JD, CPCU, CIC, CRM, ARM ALCM opined:

MOTION FOR SUMMARY JUDGMENT

JUDD J. BALMER, ESQ., LTD.
A Nevada Professional Corporation

The failure to properly supervise these approved contractors and require that proper industry protocols be followed for water removal, water mitigation, mold remediation, structural restoration, fixture remodeling (kitchen cabinets), and reconstruction work in the home proximately caused the current damage in the house. Proper claims handling protocols for this mold claim was not followed by the Universal adjusters. If proper claims handling protocols were followed the adjusters would have established clearly the analytical framework that would demonstrate that the covered peril of water damage along with the negligent actions of the approved contractors complied with the "But For" test to determine claims coverage.

The water damage peril was covered and there is no exclusion for the negligent activities of the approved contractors and therefor the resulting damage caused by those contractors is covered. The Universal adjusters should have paid the Summit Restoration costs to correct the failed mold remediation work by Universal approved contractors ALS Development and Absolute under the water damage claim. The ERG Post Remediation Inspection and Testing Protocol to restore the habitability of the Cathcart's home should also be paid by Universal adjusters.

See Second Supplemental Expert Report of Paul W. Burkett, JD, CPCU, CIC, CRM, ARM ALCM, attached hereto as Exhibit 8, at pages 26-27.   UNIVERSAL has failed to pay for the repair to Defendants' granite countertops and other damaged areas of the home and, therefore, has not honored its obligations under the governing policy of insurance.

### E.    UNIVERSAL IS OBLIGATED TO PAY TO RESTORE DEFENDANTS' HOME.

UNIVERSAL improperly directed and supervised its preferred contractor, ALS, who was retained by UNIVERSAL to remediate Defendants' home and restore the same to a habitable condition.   ALS botched its remediation in Defendants' home and, therefore, UNIVERSAL is obligated to cover the cost of remediation of Defendants' by a licensed, bonded, insured, and properly experienced remediation contractor.   Paul W. Burkett, JD, CPCU, CIC, CRM, ARM ALCM concluded:

**CONCLUSION:**

As indicated above, Universal claims adjusters failed in many areas in properly adjusting this emergency plumbing, water mitigation, reconstruction, and repair services created by this covered water damage claim. These failures as outlined above and within NRS 686A.310 increased the out of pockets costs that the Cathcart's incurred. The associated costs for remediation of the home, remediation of personal property, debris removal, extra living expenses, moving costs, and other unreimbursed costs necessary to return the Cathcart's to a habitable home should be paid because of the above failures. This opinion that these extra expenses should be paid are based upon a reasonable degree of professional certainty that the many insurance coverage sections have been triggered under Coverage A and Coverage D within the Universal North America Insurance Company policy number NVVH0000015034-0. Universal claims adjusters have negligently adjusted the water damage claim and failed to properly keep the Cathcart family informed about the coverages and activities being performed on their behalf to adjust the water damage claim.

See Second Supplemental Expert Report of Paul W. Burkett, JD, CPCU, CIC, CRM, ARM ALCM, attached hereto as Exhibit 8, at pages 27-28.

###### F.   UNIVERSAL IS LIABLE FOR THE COST TO PROPERLY REMEDIATE AND REPAIR DEFENDANTS' HOME.

Summit Restoration, expert mold remediation contractors, have assembled an estimate of the anticipated cost of the remediation that now is required in the CATHCART home due to the malfeasance of UNIVERSAL and its agents.   The Estimate is based upon ERG's written mold remediation protocol set forth on pages 5-8 of the ERG Expert Report.   Summit Restoration's Estimate for the necessary remediation, <u>excluding</u> necessary cleaning of the home's HVAC system, necessary reconstruction, clearance testing, and storage pods, totals **$91,816.82**   <u>See</u> Expert Estimate of Summit Restoration, attached hereto as Exhibit 3.   The entirety of the home's personal property is dangerously contaminated.   Summit Restoration's estimate is for the mold remediation only.   The cost to reconstruct Defendants' home and replace the non-restorable personal property is **$138,658.18.**   <u>See</u> Expert Cost of Repair by Linda K. Hoy, attached hereto as Exhibit 9.   UNIVERSAL has not retained any experts nor produced any reports to dispute or contradict Defendants' remediation estimate or reconstruction estimate.

## VII.   CONCLUSION.

Based upon the foregoing, as a matter of law, there are no genuine issues of material fact existing to preclude summary judgment on the entirety of Plaintiffs' Complaint in favor of Defendants.   UNIVERSAL's own 30(b)(6) witness testified under oath that UNIVERSAL still owes money under the ALE provision of Defendants' homeowners insurance policy that UNIVERSAL also intentionally and recklessly depleted.   Thus, Defendants are entitled to summary judgment as a matter of law on the ALE claims for relief.

Moreover, UNIVERSAL contacted, retained, and directed its preferred vendor, ALS for work in Defendants' home.   UNIVERSAL's own 30(b)(6) witness testified under oath that UNIVERSAL directed and authorized all of ALS' work in Defendants' home, without regard for

1    or mention of any alleged mold "sublimit," admittedly expressly giving ALS "carte blanche" to

2    conduct any and all mold related remediation and repairs in CATHCART's home.    Despite

3    admittedly giving ALS express authorization to conduct any and all mold remediation work in

4    CATHCART's home, UNIVERSAL thereafter refused to pay ALS after ALS had performed the

5    UNIVERSAL authorized work.  Thereafter, UNIVERSAL admitted ignored ALS's demands for

6    payment, that resulted in ALS perfecting a mechanic's lien on CATHCART's home and then

7    ALS suing CATHCARTS in Clark County District Court to foreclose on the mechanic's lien

8    (i.e., to take and sell CATHCART's family home).  *ALS v. Cathcart* continues to pend in Clark

9    County District Court.  UNIVERSAL cannot expressly authorize work to be done by its own

10   preferred and chosen vendor, then skate on payment to the detriment to its insureds.  In addition,

11   UNIVERSAL is responsible to pay for the damage caused by its preferred vendor in Defendants'

12   home and for the necessary remediation and repairs that its preferred vendor botched.  Based

13   upon the admitted actions of UNIVERSAL, any mold "sublimit" has been waived or has been

14   rendered inapplicable by UNIVERSAL's own malfeasance in causing damage to CATHCART's

15   home.  There is no question that UNIVERSAL has failed to honor its contractual obligations to

16   Defendants and, therefore, Defendants are entitled to summary judgment on the mold "sublimit"

17   component of UNIVERSAL's complaint.

18          Based upon all the foregoing, CATHCARTS are entitled to summary judgment on

19   UNIVERSAL's complaint in its entirety.

20          DATED this 30th day of March, 2016.

21                                          JUDD J. BALMER, ESQ., LTD.
22                                          *A Nevada Professional Corporation*

23                                          /s/ Judd J. Balmer
                                     By:_____
24                                          JUDD J. BALMER, ESQ.
                                            Nevada Bar No. 006212
25                                          6362 McLeod Drive, Suite 6
                                            Las Vegas, Nevada 89120
26                                          T:  (702) 642-4200
                                            F:  (702) 642-4300
27                                          E:  jbalmer@balmerlawfirm.com
                                            *Attorneys for Defendants Matthew A. Cathcart*
28                                          *and Cheryle T. Cathcart*

## CERTIFICATE OF SERVICE

I am an employee of the Law Firm of Judd J. Balmer, Esq., Ltd., in the County of Clark, State of Nevada.  I am over the age of 18, and not a party to the within action.  My business address is 6362 McLeod Drive, Suite 6, Las Vegas, Nevada 89120.

On the date indicated below, I served the foregoing document(s) described as: PLAINTIFFS' **MOTION FOR SUMMARY JUDGMENT** on the interested parties as follows:

James R. Olson, Esq.
OLSON, CANNON, ET AL.
9950 WEST CHEYENNE AVE.
Las Vegas, Nevada 89129
Fax No.: (702) 383-0701
*Attorneys for Plaintiff UNIVERSAL NORTH*
*AMERICA INSURANCE COMPANY*

[ ]  **(BY MAIL)**   On the ___ day of _____, 2016, I placed the document(s) in sealed envelope(s) addressed as set forth above and caused such envelope(s) to be deposited in the mail in Clark County, Nevada. The envelope(s) was/were mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing.  It is deposited with U.S. Postal Service on that same day in the ordinary course of business.

[ ]  **(BY OVERNIGHT MAIL)**   On the ___ day of _____, 2016, I placed the document(s) in sealed envelope(s) addressed accordingly and caused such envelope(s) to be deposited in the delivery box regularly maintained by OVERNITE EXPRESS, in an envelope package designated by OVERNITE EXPRESS with delivery fees paid or provided for addressed as set forth above.

[ ]  **(BY FACSIMILE SERVICE)**   On the ___ day of _____, 2016, from facsimile machine telephone number (702) 642-4300, I caused the above-listed document(s) to be transmitted by facsimile to the person(s) and number(s) listed above, and that transmission was reported as complete and without error.

[ X ]  **(BY ELECTRONIC SERVICE)**   On the 30th day of March, 2016, the foregoing document was served on  All Parties on the E-Service List.

I declare under penalty of perjury under the laws of the state of Nevada that the foregoing is true and correct.

Executed this 30th day of March, 2016, at Las Vegas, Nevada.

/s/ Jessica A. Lopez
_____
An Employee of Judd J. Balmer, Esq., Ltd.

- 31 -

JUDD J. BALMER, ESQ., LTD.
*A Nevada Professional Corporation*