# Exhibit 6A

# Condensed Transcript of the Testimony of

# **James R. Ketcham**
Volume I

**Date:** February 26, 2016

Universal North America Insurance Company v. Matthew A. Cathcart, et al.
Case No. 2:13-cv-01767-RCJ-GWF

Oasis Reporting Services, LLC
Phone:  702-476-4500
Fax:  888-529-5512
E-mail:  info@oasisreporting.com

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF NEVADA
 3
 4
 5  UNIVERSAL NORTH AMERICA      )
    INSURANCE COMPANY,           )
 6                               )
                 Plaintiff,      )
 7                               )
         vs.                     )    Case No.
 8                               )  2:13-cv-01767-RCJ-GWF
    MATTHEW A. CATHCART,         )
 9  individually; CHERYLE T.     )
    CATHCART, individually; and  )
10  JOHN DOES 1-100, inclusive; and )
    JANE ROES 1-20, inclusive,   )
11                               )
                 Defendants.     )
12  _____ )
13
14
15         DEPOSITION OF JAMES R. KETCHAM
16  [as FRCP 30(b)(6) designee for Universal North America
17             Insurance Company]
18        Taken on Friday, February 26, 2016
               by a Certified Court Reporter
19                  At 9:09 a.m.
         Held at the offices of Judd J. Balmer
20          6362 McLeod Drive, Suite 6
                Las Vegas, Nevada
21
22
23
24
25  Reported by:  Ellen A. Goldstein, CCR 829
```

## Page 2

```
 1  APPEARANCES:
 2
 3     For the Plaintiff:
 4        WALTER R. CANNON, ESQ.
          OLSON CANNON GORMLEY ANGULO & STOBERSKI
 5        9950 West Cheyenne Avenue
          Las Vegas, Nevada 89129
 6        Phone: (702)384-4012
          Fax: (702)383-0701
 7        wcannon@ocgas.com
 8
 9
10
11     For the Defendants:
12        JUDD J. BALMER, ESQ.
          LAW OFFICES OF JUDD J. BALMER
13        6362 McLeod Drive
          Suite 6
14        Las Vegas, Nevada 89120
          Phone: (702)642-4200
15        Fax: (702)642-4300
          jbalmer@balmerlawfirm.com
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                 I N D E X
 2
 3  WITNESS                        PAGE
 4  JAMES R. KETCHAM
 5     Examination by MR. BALMER      5
 6
 7
 8              E X H I B I T S
 9
10  NUMBER    DESCRIPTION           INTRODUCED
11  1    Amended Notice of Taking       10
          Deposition
12
     2    Resume of James R. Ketcham    19
13
     3    5-10-13 Handwritten doctor's  141
14        note (UNAIC 00470)
15  4    4-3-13 Notice of Intent to Lien 155
          (ALS 0016)
16
     5    4-3-13 E-mail chain (ALS 0094 - 156
17        ALS 0095)
18  6    4-18-13 Notice of Lien         162
          (ALS 0026 - ALS 0027)
19
     7    2-11-13 letter from Judd Balmer 163
20        to Jim Ketcham (UNAIC 000310 -
          UNAIC 000312)
21
     8    11-16-12 MSE Environmental invoice 182
22        (ALS 0098)
23   9    12-26-12 MSE Environmental invoice 184
          (ALS 0143)
24
25
```

## Page 4

```
 1  (I N D E X  Continued)
 2
 3  NUMBER    DESCRIPTION           INTRODUCED
 4  10    7-17-12 Nevada Mold Testing   189
           invoice (ALS 0106)
 5
     11    Notes Listing for Claim No.   192
 6         1201NV240020 (UNAIC 000356 -
           UNAIC 000385)
 7
     12    2-22-16 invoice from James Ketcham 299
 8         to Olson Cannon Gormley Angulo &
           Stoberski
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

1    FRIDAY, FEBRUARY 26, 2016 - LAS VEGAS, NEVADA
2         9:09 A.M.
3
4         JAMES R. KETCHAM,
5    called as a witness by and on behalf of the Defendants,
6    was first duly sworn by the Certified Court Reporter
7    and testified as follows:
8
9         EXAMINATION
10   BY MR. BALMER:
11   Q    Please state and spell your name for the record.
12   A    It's James R. Ketcham, K-e-t-c-h-a-m.
13   Q    What is your current home address?
14   A    4800 Waterbridge Down -- Waterbridge is one
15   word -- Sarasota, Florida 34235.
16   Q    How long have you been at that address?
17   A    Approximately six years.
18   Q    Who is your current employer?
19   A    I'm self-employed.
20   Q    Doing what?
21   A    1099 work for a couple of independent adjusting
22   firms.
23   Q    Mr. Ketcham, my name is Judd Balmer.  I
24   represent the Cathcarts concerning their claim with
25   Universal.  Do you understand that?

Page 6

1    A    Yes.
2    Q    You understand that the Cathcarts are litigants
3    in a suit brought by Universal --
4    A    Yes.
5    Q    -- in federal court?
6    A    Yes.
7    Q    Mr. Ketcham, have you ever been deposed before?
8    A    Yes.
9    Q    How many occasions?
10   A    I would guess ten.
11   Q    When was your last deposition?
12   A    It was about four, five years ago.
13   Q    The oath that you've taken today is the same
14   oath that you would take as if you were sitting in a
15   courtroom.  Do you understand that?
16   A    Yes.
17   Q    That means it's the same oath as if you were
18   sitting next to a judge and in front of a jury offering
19   testimony in the courthouse.  Do you understand that?
20   A    Yes.
21   Q    The oath that you've taken requires you to tell
22   the truth here today.  Do you understand that?
23   A    Yes.
24   Q    Are you prepared to tell the truth here today?
25   A    Yes.

Page 7

1    Q    As we move forward, I'm going to ask you
2    questions and I'll expect your best testimony and best
3    responses.  Do you understand that?
4    A    Yes.
5    Q    Is there any reason why we can't move forward
6    today with you giving your best testimony?
7    A    No.
8    Q    Are you prepared to give your testimony today?
9    A    Yes.
10   Q    Have you prepared for your deposition?
11   A    Yes.
12   Q    How did you prepare for your deposition?
13   A    I looked through the file at Mr. Walt Connor's
14   office.
15   MR. CANNON:  And also at Walt Cannon's office.
16   THE WITNESS:  Cannon, I'm sorry.
17   BY MR. BALMER:
18   Q    You looked through the file?
19   A    Yes.
20   Q    Are you prepared to testify today?
21   A    Yes.
22   Q    You're fully prepared to answer my questions?
23   A    The best I can.
24   Q    You're appearing today on behalf of Universal
25   North America Insurance Company as the witness to bind

Page 8

1    the company.  Do you understand that?
2    A    Yes.
3    Q    And you understand that you're the witness to
4    bind the company even though you don't work there
5    anymore?
6    A    Yes.
7    Q    As we move forward, if there's a question you do
8    not hear or understand, let me know please.  I'm happy to
9    repeat the question or rephrase it as many times as it
10   takes for you to fully hear and understand my question,
11   okay?
12   A    Okay.
13   Q    If you answer a question that is pending before
14   you, I will assume that you understood the question that
15   was asked of you then.  Is that fair?
16   A    Yes.
17   Q    As we move forward today, I may ask you to
18   estimate, but I don't want you to guess.  Do you know the
19   difference between an estimate and a guess?
20   A    Yes.
21   Q    Are you taking any medication that could
22   influence your ability to recall events and testify
23   truthfully?
24   A    No.
25   Q    Have you had any alcohol that would affect your

Page 9

1  ability to recall events and testify truthfully?
2  **A   No.**
3  Q   Is there any reason you can think of why we
4  can't move forward today with you giving your best most
5  truthful and most accurate testimony?
6  **A   No.**
7  Q   Do you promise that you'll be forthright in your
8  answers?
9  **A   As best as I can.**
10  Q   You brought with you some documents today, did
11  you not?
12  **A   Yes.**
13  Q   And one of those documents appears to be your
14  resume.
15  **A   Yes.**
16  Q   As well you brought with you today two binders
17  worth of documents.  Have you reviewed those?
18  **A   Yes.**
19  Q   In general what are -- what are those two
20  binders?
21  **A   In general they're file notes, estimates,**
22  **correspondence, suit papers, et cetera.**
23  Q   Do the two binders comprise the claims file in
24  this case?
25  **A   Yes.**

Page 10

1  Q   You also brought with you a couple of separate
2  documents, both entitled "Claims Operating Policies and
3  Handling Guidelines"?
4  **A   Yes.**
5  Q   Do you have any other documents with you today?
6  **A   No.**
7  Q   I see there's a stack of documents to your
8  right.  Are those Mr. Cannon's documents or are those
9  yours?
10  **A   These are just duplicates of what's in the two**
11  **binders there.**
12  Q   Have you made any marks on any of those papers
13  that sit there to your right?
14  **A   Yes, uh-huh.**
15  Q   All right.  I'm going to need to look at those,
16  but we'll do that shortly.
17  But where did you get the stack of documents
18  that's rubber-banded to your right?
19  **A   This was mailed to me from Mr. Cannon's office.**
20  Q   When was that mailed to you?
21  **A   Last week.**
22  Q   I'm going to show you what we'll mark as
23  Exhibit 1.  I know we're technically defendants, but I'm
24  going to go with 1.  This is the Amended Notice of Taking
25  Deposition.  Have you seen this document?

Page 11

1  **A   Yes, I think so.**
2  Q   The document required you to bring with you
3  certain documents today.  Do you recall that?
4  **A   Uh-huh.**
5  Q   Is that a "yes"?
6  **A   Yes.**
7  Q   All right.  As we move forward, I'll be asking
8  you questions and it's important that you answer in an
9  audible response, not an "uh-huh" or a "huh-uh," because
10  those don't come across well on the record.  Do you
11  understand that?
12  **A   Yes.**
13  Q   So a verbal response, "yes," "no," or some other
14  response that the court reporter can take down the
15  testimony accurately.  Is that fair?
16  **A   Yes.**
17  Q   I will also mention that following today's
18  proceedings you'll have an opportunity to review your
19  transcript, which will have all of my questions, all of
20  your responses, and any objections or questions that may
21  be made or asked by Mr. Cannon.  Do you understand that?
22  **A   Yes.**
23  Q   Have you ever reviewed a deposition transcript
24  before?
25  **A   Yes.**

Page 12

1  Q   And you understand that you'll have an
2  opportunity to make some changes to that transcript and
3  your testimony if you see fit.  Do you understand that?
4  **A   Yes.**
5  Q   However, you also probably understand, given
6  your experience in depositions, that if you do make a
7  substantive change on your testimony, that counsel can
8  comment on that at the time of trial and it would affect
9  your credibility.  Do you understand how that can happen?
10  **A   Yes.**
11  Q   So although you have an opportunity to amend
12  your testimony at a later time in private away from my
13  ability to cross-examine you, you understand that today
14  is the time that I'm expecting your best, most accurate
15  and most truthful testimony?
16  **A   Yes.**
17  MR. BALMER:  We'll go ahead and attach the
18  deposition -- Amended Notice of Taking Deposition as
19  Exhibit 1.
20  (Defendants' Exhibit 1 was marked for
21  identification by the Certified Court Reporter.)
22  BY MR. BALMER:
23  Q   So we've marked the Amended Notice of Taking
24  Deposition as Exhibit 1, and on page 2 there were some
25  documents that you were required to bring with you today.

Electronically signed by Ellen Goldstein (001-341-678-7457)   6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 13

1   I'm just going to run through those and you tell me if
2   you brought them with you or not, okay?
3     A   Okay.
4     Q   Number one, "Universal North America Insurance
5   Company's entire claims file for this case."  Did you
6   bring that with you today?
7     A   Yes.
8     Q   Is that the entire file that you brought with
9   you today?
10    A   Yes.
11    Q   Have you read through the materials that
12  comprise those binders before coming here today?
13    A   Yes.
14    Q   And can you confirm under oath, on behalf of
15  Universal North America Insurance Company, that the
16  materials that are set forth in those two binders
17  comprise the whole and complete claims file for the
18  Cathcart claim that's the subject of this litigation?
19    A   **Everything that was available is here.**
20    Q   What does that mean?
21    A   **That means that's the entire file that I have.**
22    Q   That you have.  My question --
23    A   **I mean that Universal has.**
24    Q   All right.  Is there something that you can
25  think of that was not available to produce as part of the

Page 14

1   claims file today?
2     A   **The only thing I can think of is a certificate**
3   **of clearance on the mold.**
4     Q   Certificate of clearance on the mold?
5     A   **Uh-huh.**
6     Q   By whom?
7     A   **I think it was -- I'm not sure.**
8     Q   Do you have any credentialing in mold?
9     A   **No.**
10    Q   You're not an industrial hygienist, are you?
11    A   **No.**
12    Q   When you say that a document that may be lacking
13  from the two binders of claims file that you brought
14  today would be a certificate of clearance on the mold,
15  can you be more specific?
16    A   **I remember getting a note in the file saying I**
17  **received some kind of clearance for the mold, and I**
18  **thought there was a certificate that goes with it but I**
19  **could never find it.**
20    Q   At what point in time were you notified that
21  there was a certificate of clearance for the mold, as you
22  say?
23    A   **That's what I was looking for in the file notes.**
24    Q   Before we started, that's what you were looking
25  for?

Page 15

1     A   **Yeah, uh-huh.**
2     Q   Any luck?
3     A   **No.  I couldn't find it.**
4     Q   Did you ever provide that certificate of
5   clearance on the mold to your insureds, the Cathcarts?
6     A   **No.**
7     Q   Other than the certificate of clearance on the
8   mold that you couldn't find in the claims file, what
9   other claims-file materials, whether it be electronic or
10  in paper format or audio or video, is there that is not
11  present in the claims file today?
12    A   **Everything should be there.**
13    Q   So other than the certificate of clearance on
14  the mold, if it's not in the claims file, it didn't
15  happen; is that right?
16    MR. CANNON:  Objection to the formation,
17  argumentative.
18    Go ahead.
19    THE WITNESS:  It just means I can't find it.
20  BY MR. BALMER:
21    Q   Are you the one that put together the claims
22  file?
23    A   **No.**
24    Q   Who put together the claims file?
25    A   **Not sure.  Someone at Universal.**

Page 16

1     Q   When did you leave Universal?
2     A   **October 16th, 2015.**
3     Q   Are you aware that I've been asking to take your
4   deposition for about ten months now?
5     A   **No.**
6     Q   So at the time that I started trying to get
7   dates for your deposition about ten months ago, you were
8   still with the company; is that true?
9     A   **Ten months ago, yes, I was still with the**
10  **company.**
11    Q   And so you were with the company during a large
12  part of the litigation that we're here to talk about
13  today; is that right?
14    A   **Yes.**
15    Q   And you never put together the complete claims
16  file and provided that to counsel before you left the
17  employ of Universal --
18    A   **No.**
19    Q   -- in October?
20    A   **No.**
21    Q   Why not?
22    A   **Because it was in litigation and it was in the**
23  **legal department.**
24    Q   So do you believe that was the responsibility of
25  someone in the legal department, to put together the

Electronically signed by Ellen Goldstein (001-341-678-7457)          6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 17

1  entire claims file and produce that in litigation?
2      **A    Yes.**
3      Q    In other words, that's not your responsibility;
4  it's somebody else's?
5      **A    Somebody else's.**
6      Q    And who is that somebody else that failed to
7  produce the claims file until recently?
8      **A    Probably the person that was in charge of the**
9  **file, Mark in litigation.  I cannot think of his last**
10 **name right now.**
11     Q    Mark in litigation?
12     **A    Yes.**
13     Q    Is there a separate department at Universal --
14     **A    Yes.**
15     Q    -- that's litigation?
16     **A    Yes.**
17     Q    What is that department called specifically?
18     **A    The litigation department.**
19     Q    Tricky.
20     **A    Uh-huh, yes.**
21     Q    Is Mark a lawyer?
22     **A    No.**
23     Q    An adjustor?
24     **A    He's an examiner.**
25     Q    What's the difference between an examiner and an

Page 18

1  adjustor?
2      **A    Not too much.  It's a higher level than an**
3  **adjustor.**
4      Q    What were you?
5      **A    I was a unit manager.**
6      Q    Is that an adjustor?
7      **A    Yes.**
8      Q    So Mark sits above you in terms of hierarchy of
9  adjustor versus examiner?
10     **A    In -- they're two separate departments, so the**
11 **claims department and he's an examiner in the litigation**
12 **department.  That's all I can tell you.**
13     Q    So Mark in the litigation department is an
14 examiner that looks after the interest of Universal in
15 terms of the litigation --
16     **A    Yes.**
17     Q    -- is that right?
18     **A    Yes.**
19     Q    And you as the adjustor look after the interest
20 of Universal in terms of the claim?
21     **A    Yes.**
22     Q    Let's go on to No. 2 on our notice:  "All
23 correspondence, including claims and electronic data,
24 regarding this case."  Have you brought all that with you
25 today?

Page 19

1      **A    That's in those files there, the two files.**
2      Q    So everything that I just read in No. 2 would be
3  comprised also in No. 1 and that's included in the two
4  binders that you brought with you today?
5      **A    Yes.**
6      Q    Except for the certificate of clearance on mold?
7      **A    Uh-huh.**
8      Q    Is that a "yes"?
9      **A    Yes.  Sorry.**
10     Q    No. 3 is, "Deponent's current resume or
11 curriculum vitae."  You brought that with you, didn't
12 you?
13     **A    Yes, I did.**
14     Q    And I'll show you the document that you -- that
15 appears to me to be responsive to that request.  What is
16 this document I'm showing you?
17     **A    It's my resume.**
18     Q    Okay.  When was the last revision to this
19 resume?
20     **A    Last week.**
21     Q    Did you revise your resume for purposes of this
22 deposition?
23     **A    Yes.**
24     Q    Why did you do that?
25     **A    I updated it.**

Page 20

1      Q    What did you update your resume to include?
2      **A    That everything was the same from Universal**
3  **North America on down, but I added what I'm currently**
4  **doing now as a 1099 field adjustor.**
5      Q    Prior to leaving Universal North America, when
6  was the last time that you had updated your resume?
7      **A    Probably sometime between the time I left**
8  **Universal October 16th and probably December of 2015.**
9      Q    When you left Universal on October 16, 2015,
10 were you leaving for another job?
11     **A    No.**
12     Q    You didn't have a job lined up when you left
13 Universal?
14     **A    No, I didn't.**
15     Q    When did you start working as a 1099 employee
16 for Johns --
17     **A    Johns Eastern.**
18     Q    -- Eastern Company?
19     **A    January 7th, 2016.**
20     Q    So you were out of work for about three months,
21 weren't you?
22     **A    About two and a half.**
23     Q    Is that a "yes"?
24     **A    Yes.**
25     Q    Why did you leave Universal on October 16, 2015?

Electronically signed by Ellen Goldstein (001-341-678-7457)      6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 21

1    A   Because I'm 66 years old and I wanted to slow
2  down.
3    Q   But you didn't retire, because you got another
4  job; right?
5    A   Correct.
6    Q   What was it about working at Universal that made
7  you believe that at 66 you needed to slow down?
8    A   I think it was a position that I did not want to
9  continue the rest of my career with.
10    Q   So it wasn't so much wanting to slow down; it
11  was that you were unhappy with the position and wanted to
12  do something else.  Is that right?
13    MR. CANNON:  Objection; argumentative.
14    THE WITNESS:  No.
15  BY MR. BALMER:
16    Q   Were you let go by Universal?
17    A   I resigned.
18    Q   Were you asked to resign from Universal?
19    A   No.
20    Q   What was the -- did you resign by way of letter?
21    A   Yes.
22    Q   Do you have a copy of that letter?
23    A   No.
24    Q   Tell me the contents of your resignation letter,
25  please.

Page 22

1    A   It was a one-sentence letter saying that I
2  resign my position at Universal North America on
3  such-and-such a date.
4    Q   Was that October 16, 2015?
5    A   No.  I believe -- you know, I can't remember.
6  It was about two weeks after that that they decided, for
7  security reasons, to let me go on the 16th -- no, I take
8  that back.  I take that back.  It was October 16th I
9  resigned officially, but they let me go a couple weeks
10  early.
11    Q   Were you expecting them to let you go?
12    A   No.
13    Q   So you got there and you were locked out?
14    A   They asked me for security reasons, because I
15  handled so much financial dealings with the company, that
16  they asked me to leave early.
17    Q   So you were asked to leave Universal before you
18  were ready to leave Universal.  Is that true?
19    MR. CANNON:  Objection; that mischaracterizes.
20    Go ahead.
21    THE WITNESS:  I was asked to leave before my official
22  resignation date.
23  BY MR. BALMER:
24    Q   And you believe it was approximately two weeks
25  before your official resignation date?

Page 23

1    A   I can't remember.  It's two or three weeks.
2    Q   Did you apply for unemployment after you left
3  Universal?
4    A   No.
5    Q   So your last day at Universal would have been
6  two weeks before October 16, 2015?
7    A   Two or three weeks, yes.
8    Q   Was it two or was it three weeks?
9    A   I think it's three weeks.
10    Q   Before you said two weeks, so now you're saying
11  three weeks?
12    A   I said between two and three weeks; and as I
13  recall now, my memory says it was three weeks.
14    Q   Thank you.
15    Did Universal provide you with any sort of
16  parachute?
17    A   No.  Just my saved-up vacation.
18    Q   When you left Universal, who was your
19  supervisor?
20    A   Otto Kieslich.
21    Q   Can you spell that please for the court
22  reporter.
23    A   K-e-i-s-c-h-l [sic], Kieslich.  It's a weird
24  name.
25    Q   In looking through some of the claims notes, I

Page 24

1  see that Mr. Kieslich was reviewing the Cathcart file on
2  occasion.  Is that right?
3    A   Yes.
4    Q   In fact he was involved with the adjustment of
5  the claim, wasn't he?
6    A   He just reviewed and offered some suggestions.
7    Q   So your testimony is -- other than being asked
8  to leave three weeks early, it's your testimony that your
9  departure from Universal was voluntary?
10    A   Yes.
11    Q   Did Mr. Kieslich express or imply to you that
12  you should resign?
13    A   No.
14    Q   Did your resignation have anything to do with
15  any sort of evaluation of your performance?
16    A   No.
17    Q   Are you doing now what you were doing at
18  Universal?
19    A   No.
20    Q   We'll go ahead and mark your resume as the next
21  exhibit in line, which is No. 2.
22    (Defendants' Exhibit 2 was marked for
23  identification by the Certified Court Reporter.)
24    MR. BALMER:  We'll come back to this.
25    Q   Let's move on to No. 4 on the notice, which is

Page 25

1    Exhibit 1, "All Universal North America Insurance
2    Company's claims manuals utilized in the investigation,
3    adjustment and handling of the claims involved in this
4    action." Did you bring those documents with you today?
5    A    Yes.
6    Q    And are those the documents that are these two
7    documents?
8    A    Yes.
9    Q    Are these the same document or is one -- are
10   they different?
11   A    One is dated two thousand -- was made in 2012
12   and one was updated 2013.
13   Q    I see.  So is it the same -- the same general
14   underlying Claims Operating Policies and Handling
15   Guidelines, just one is the 2012 version and the other is
16   a 2013 version?
17   A    Correct.
18   Q    Is there also a 2014 version?
19   A    Not that -- I don't believe so.
20   Q    So the 2013 revision would be the one that would
21   be in effect in 2014?
22   A    To the best of my knowledge, yes.
23   Q    And the 2013 revision would also be the Claims
24   Operating Policies and Handling Guidelines in effect for
25   2015?

Page 26

1    A    Yes.
2    Q    At the time that you left in October of 2015,
3    was this document that is entitled "Claims Operating
4    Policies and Handling Guidelines" with the 2013 written
5    in the upper right-hand corner -- was that the operative
6    Claims Operating Policies and Handling Guidelines?
7    A    Yes.
8    Q    Does Universal still do business in Nevada?
9    A    Yes.
10   Q    Still writes homeowners' policies?
11   A    Yes.
12   Q    What other types of policies does Universal
13   write in Nevada?
14   A    Just HO3s, homeowners'.
15   Q    Prior to today, when is the last time you were
16   in Nevada?  Have you ever been here?
17   A    Yes.
18   Q    When was the last time you were here?
19   A    I have to think about that.
20   Q    Take your time.
21   A    Put it this way:  It's been so long ago I can't
22   remember.  Probably 20 years ago.
23   Q    The work that you were doing at Universal
24   involved handling claims that were situate in Nevada.  Is
25   that true?

Page 27

1    A    Yes.
2    Q    Annually how many claims that were situate in
3    Nevada did you handle while you were at Universal?
4    A    Say that again.
5    Q    During your tenure at Universal, can you provide
6    to me an average annual number of claims that were
7    situate in Nevada that you handled while you worked at
8    Universal?
9    A    I supervised probably somewhere around 200 --
10   they fluctuated, so it's between 200 and 250 claims per
11   year.
12   Q    Out of Nevada?
13   A    Out of Nevada.
14   Q    And you hadn't been here for 20 years?
15   A    Huh-uh, no.
16   Q    What about, is there another -- strike that.
17        Were you the only adjustor handling claims that
18   were situate in Nevada during your time at Universal?
19   A    No.
20   Q    There were others?
21   A    Yes.
22   Q    Was there a department of adjustors handling
23   Nevada claims?
24   A    Yes.
25   Q    Where is Universal located?

Page 28

1    A    Sarasota, Florida.
2    Q    Where is that generally in Florida?
3    A    It's about 45 minutes south of Tampa.  It's the
4    next biggest town on the west coast.
5    Q    That's a long ways from Nevada, isn't it?
6    A    Yes.
7    Q    How long did it take you to fly here?
8    A    Five hours.
9    Q    During the time that you were at Universal and
10   handling Nevada claims, did you have any Universal
11   employees on the ground in Nevada handling claims?
12   A    No.
13   Q    How long were you with Universal?
14   A    From January -- almost four years, January 9th,
15   2011 through October 16th, 2015.
16   Q    So from January 9, 2011 to October 16, 2015,
17   Universal, that's based in Tampa -- or near Tampa --
18   Florida, did not maintain any physical employee adjustor
19   in the state of Nevada.  Is that true?
20   A    Correct.
21   Q    Did you have any input in putting together this
22   2013 Claims Operating Policies and Handling Guidelines?
23   A    No.
24   Q    Who put this Claims Operating Policies and
25   Handling Guidelines together?

Electronically signed by Ellen Goldstein (001-341-678-7457)                    6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 29

1  A  A gentleman by the name of Rich Hanlon.  He was
2  a director of claims at the time.
3  Q  Is he still with Universal?
4  A  No.
5  Q  When did he leave?
6  A  To the best of my knowledge, about two years
7  ago.
8  Q  Has Universal undergone some downsizing in
9  recent years?
10  A  No.
11  Q  Is it growing?
12  A  It's about the same.
13  Q  Tell me about the office building where
14  Universal is based in Sarasota, Florida.
15  A  It's at 101 Paramount Parkway, second floor, and
16  it occupies approximately half of the second floor.
17  Q  How many square feet would you estimate?
18  A  Probably 7-, 8,000 square feet.
19  Q  Are all of Universal's corporate activities
20  based in that 101 Paramount Parkway building in Sarasota,
21  Florida?
22  A  That is what they consider the home office; and
23  there's another underwriting department in California,
24  Sacramento, California, as well as claims department in
25  Sacramento, California; and there's also an underwriting

Page 30

1  building in Fort Worth -- I believe it's Fort Worth --
2  Texas.
3  Q  So there's a claims-handling office for
4  Universal in Sacramento?
5  A  Yes.
6  Q  Why were you handling Las Vegas, Nevada claims
7  out of Sarasota, Florida?
8  A  At the time this claim was made, there was no
9  claims operation in California.
10  Q  All right.  So that's -- the claims operation in
11  Sacramento is new?
12  A  New.
13  Q  Since when?
14  A  Oh, again this is guessing:  A year and a half
15  ago.
16  Q  At the time of the Cathcarts' covered water
17  loss, there was no claims department in California; is
18  that right?
19  A  Correct.
20  Q  Was there an underwriting office in California
21  at the time that the Cathcarts were insured with
22  Universal?
23  A  Yes.
24  Q  It was just later that they added the claims
25  portion?

Page 31

1  A  Correct.
2  Q  When Universal wrote the homeowners insurance
3  policy for the Cathcart residence, prior to writing that
4  policy, did Universal underwriting inspect the Cathcarts'
5  home?
6  A  Not an underwriter, but I would say we usually
7  do.
8  Q  And if the underwriting department for Universal
9  had inspected the Cathcart home at the time that the
10  Cathcarts took out the Universal insurance policy, given
11  the fact that Universal in fact produced a policy for the
12  Cathcarts, does that demonstrate that Universal found the
13  Cathcarts' home to be an acceptable risk?
14  A  Yes.
15  Q  Did you see anything in the claims file that
16  would indicate anything other than the Cathcarts' home
17  being an acceptable risk to Universal?
18  A  No, I didn't.
19  Q  Did you see anything in the claims file, from
20  underwriting or otherwise, that demonstrated any
21  documented defects with the Cathcart home?
22  MR. CANNON:  Objection; foundation.
23  Go ahead.
24  THE WITNESS:  I don't recall any.
25  ///

Page 32

1  BY MR. BALMER:
2  Q  What was the loss date for the Cathcart water
3  loss?
4  A  I believe it was May 12th of 2012.
5  Q  Are you sure?
6  A  No, I'm not.  The loss date, date of loss, I
7  have to get over here.
8  Q  Are you looking at something to refresh your
9  memory?
10  A  Yes.
11  Q  What are you looking at?
12  A  The file -- the two files I brought for the
13  deposition.
14  Q  All right.  Please do.
15  A  Okay.  May 22nd, 2012.
16  Q  Was there an insurance policy --
17  A  No -- I'm sorry -- May 21st, 2012.
18  Q  On May 21, 2012, did the Cathcarts have in force
19  with Universal a homeowners insurance policy?
20  A  Yes.
21  Q  And what were the -- what was the policy date of
22  the policy that governed the Cathcart claim?
23  A  The effective dates were March 11th, 2012 to
24  March 11, 2013.
25  Q  Recently counsel for Universal produced an

Page 33

1 insurance policy that was 2011 to 2012. Does that
2 insurance policy have any applicability to the Cathcarts'
3 claims?
4 **A Yes.**
5 Q What is the applicability?
6 **A From -- say that again. From two thousand --**
7 MR. CANNON: '11 to '12.
8 MR. BALMER: 2011 to 2012.
9 THE WITNESS: No. That policy would have expired on
10 March of 2012.
11 BY MR. BALMER:
12 Q The insurance policy that was produced recently
13 by counsel for Universal was for the policy period
14 March 11, 2011 through March 11, 2012. Is there any
15 applicability for that insurance policy to the Cathcarts'
16 claim of May 21, 2012?
17 **A Yes.**
18 Q What is that?
19 **A That's a policy that covers their dwelling and**
20 **personal property and additional living expense.**
21 Q The March 11, 2011 to March 11, 2012 policy is
22 the one that covers the claim for May of 2012?
23 **A No.**
24 Q Okay. So let me ask it again.
25 **A I'm sorry.**

Page 34

1 Q There was an insurance policy produced recently
2 by counsel for Universal that had the policy period
3 March 11, 2011 through March 11, 2012. My question to
4 you is, does that policy have any applicability to the
5 Cathcart claim with a date of loss May 21, 2012?
6 **A No.**
7 Q Thank you.
8 Is there any notation in the claims or
9 underwriting files for Universal that, prior to May 21,
10 2012, the Cathcart home had any water damage?
11 **A No.**
12 Q Is there any notation or information in the
13 claims file or underwriting file for Universal that,
14 prior to May 21, 2012, the Cathcart home had any mold
15 contamination?
16 **A No.**
17 Q Let's talk a little bit about your background.
18 Do you have any advanced degrees? In other
19 words, do you hold any Ph.D.'s in anything?
20 **A No.**
21 Q Do you hold any Master's degrees in anything?
22 **A No.**
23 Q Do you hold any Bachelor's level degrees in
24 anything?
25 **A Yes, a BS in business administration.**

Page 35

1 Q From what institution?
2 **A Bradley University.**
3 Q Where is Bradley located?
4 **A Peoria, Illinois.**
5 Q Are you from Illinois?
6 **A Yes.**
7 Q When did you obtain your Bachelor's level
8 degree?
9 **A 1975.**
10 Q After receiving your Bachelor's degree, did you
11 do any postgraduate studies?
12 **A No.**
13 Q Looking at your resume, there's indication here
14 that you served as a board member of Baywood Colony
15 Condominiums. Does that have any applicability to your
16 insurance work?
17 **A No.**
18 Q It also -- your resume also indicates that you
19 were a board member of Hacienda Del Mar Condominium.
20 Does that have any applicability to your insurance work?
21 **A Yes. I was in charge of securing insurance for**
22 **a property.**
23 Q You weren't in charge of doing any sort of
24 underwriting or claims for Del Mar Condominium; right?
25 **A Right.**

Page 36

1 Q Do you hold some sort of credentialing as an
2 Xactimate trainer?
3 **A No.**
4 Q On your resume it indicates you were an
5 Xactimate trainer. Is that just something you call
6 yourself?
7 **A Yes.**
8 Q There's no certification of any kind that backs
9 that up; is that true?
10 **A That's true.**
11 Q Are you a member of any insurance-related
12 organizations?
13 **A No.**
14 Q At the time that you handled work on the
15 Cathcart claim, were you a member of any
16 insurance-related organization?
17 **A No.**
18 Q From 2012 forward, have you been a member of any
19 organization?
20 **A No.**
21 Q Have you done any coursework with the Insurance
22 Institute?
23 **A Yes.**
24 Q What coursework have you done?
25 **A I have a designation as AIC, Associate in**

Electronically signed by Ellen Goldstein (001-341-678-7457)     6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 37

1  Claims. I've also taken some courses for the CPCU.
2  Q   Are you a Chartered Property Casualty
3  Underwriter?
4  A   No.
5  Q   What coursework have you done toward the CPCU?
6  A   I've done three of them and I cannot remember
7  the names of them right now.
8  Q   How many are there altogether?
9  A   There's now eight.
10  Q   And you don't remember which three of the eight
11  that you did?
12  A   No, I don't.
13  Q   How long ago was that?
14  A   Oh, probably -- long time ago, ten years ago.
15  Q   What insurance company were you working for at
16  the time that you completed the three of the units
17  towards your CPCU?
18  A   I probably did a couple at Great Central
19  Insurance and one at FCCI.
20  Q   You don't have any recollection of which of the
21  three you did?
22  A   No.
23  MR. CANNON:  Asked and answered.
24  BY MR. BALMER:
25  Q   Are you currently certified as an Associate in

Page 38

1  Claims?
2  A   Yes.
3  Q   When did you receive that certification?
4  A   Oh, it's been 15, 20 years ago, my best guess.
5  Q   Does that require any continuing education?
6  A   Not that I'm aware of.
7  Q   When is the last time you did any coursework
8  towards your Associate in Claims certification?
9  A   Not since I received that designation 15 or 20
10  years ago.
11  Q   Your resume indicates that you -- it says,
12  "Texas," comma, "Nevada," comma, "North and South
13  Carolina license."  Does that go along with AIC?
14  A   That is the licenses I have on my resume.
15  Q   What license are you referring to?
16  A   The state adjusting license.
17  Q   The state what?
18  A   State adjusting license.
19  Q   Are you currently licensed in the state of
20  Nevada as an adjustor?
21  A   I'm not sure when it expired.  I can't remember.
22  Q   Are you currently licensed in the state of
23  Nevada as an adjustor?
24  A   I don't know.  It may have expired.  I don't
25  remember.

Page 39

1  Q   When did you receive an adjusting license in
2  Nevada?
3  A   I don't know.  I'll have to go back and look at
4  my records.
5  Q   Prior to going to work for Universal in
6  Sarasota, Florida, did you handle any Nevada claims for
7  any of the other insurance companies you worked with?
8  A   No.
9  Q   Would you have had a Nevada adjusting license
10  then prior to going to work for Universal?
11  A   No.
12  Q   And we know that you started working at
13  Universal on January 9, 2011?
14  A   Yes.
15  Q   So prior to 2011 you did not have a Nevada
16  adjusting license; is that true?
17  A   Correct.
18  Q   How long did it take you to obtain your Nevada
19  adjusting license following your hire at Universal?
20  A   I don't remember the exact date, but I received
21  most of my licenses in March and April of 2011.
22  Q   What was involved with getting a Nevada
23  adjusting license in -- likely in March or April of 2011?
24  A   Paying them money and applying.
25  Q   Was there a test?

Page 40

1  A   No.
2  Q   How much was it?
3  A   I don't remember.
4  Q   Who paid the money, you or Universal?
5  A   Universal.
6  Q   Who was the issuing authority for the license in
7  Nevada?
8  A   Nevada's Department of Insurance.
9  Q   Did you fill out the application?
10  A   I probably did, yes.
11  Q   What information was sought on the application
12  for a Nevada adjusting license?
13  A   I think they just wanted to know -- it's a
14  reciprocal state, so they want to know my Florida license
15  and just basic information of my address and if I've ever
16  been charged with a felony, that type of thing.
17  Q   Have you ever been charged with a felony?
18  A   No.
19  Q   Have you ever been charged with a misdemeanor
20  involving dishonesty?
21  A   No.
22  Q   The first adjusting license that you had was a
23  Florida license?
24  A   Yes.
25  Q   It says on your resume, "Florida 620 all-lines

Electronically signed by Ellen Goldstein (001-341-678-7457)          6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 41

1  adjustor license." What does that mean?
2      A   That means I can handle any type of insurance
3  claim.
4      Q   When did you receive that license?
5      A   In 2002.
6      Q   Did you hold any type of insurance adjusting
7  license during your work with insurance companies in
8  Illinois?
9      A   No.
10     Q   Is your Florida 620 all-lines adjustor license
11  still active?
12     A   Yes, it is.
13     Q   Is that the only of your adjusting licenses that
14  remains active?
15     A   No. My Texas, South Carolina, North Carolina
16  still remain active.
17     Q   Just Nevada has expired you believe?
18     A   I don't know. It could be in effect. I don't
19  know. It's a license that I'm not going to use, so I
20  don't pay any attention to it. If it expires it expires.
21     Q   Why is the Nevada license not one that you will
22  use?
23     A   Because I don't plan on handling any Nevada
24  claims in the future.
25     Q   Why?

Page 42

1      A   Because I'm domiciled and want to work out of
2  Florida.
3      Q   Well, weren't you domiciled and working out of
4  Florida at the time you were handling Nevada claims for
5  Universal?
6      A   Yes.
7      Q   So what's changed?
8      A   The outfit that I'm working for just wants me to
9  work in Florida.
10     Q   So why would you keep your Texas and North and
11  South Carolina licenses?
12     A   I'll let them expire probably.
13     Q   Has the Cathcart claim soured your taste for
14  handling claims in Nevada?
15     A   No.
16     Q   Just decided you don't want to handle any more
17  claims here; is that right?
18     MR. CANNON: I'll object; that mischaracterizes what
19  he's testified to.
20     Go ahead.
21     THE WITNESS: Say the question again.
22     MR. BALMER: Go ahead and read it back.
23     (The record was read as follows:
24         "QUESTION: Just decided you don't
25         want to handle any more claims here; is

Page 43

1         that right?")
2
3      THE WITNESS: No. It's just that I don't have any
4  need for a Nevada license anymore.
5  BY MR. BALMER:
6      Q   The Florida adjustor license, how did you go
7  about getting that license?
8      A   You take a test.
9      Q   How long did the test last? How long did it
10  take?
11     A   It was probably an hour, hour and a half. I
12  don't remember. That was a long time ago.
13     Q   Did you pass the first time you took it?
14     A   Yes.
15     Q   Did you ever take any test for any of your other
16  licenses, those in Texas, North and South Carolina, and
17  Nevada?
18     A   No.
19     Q   So just the one- to one-and-a-half-hour test in
20  Florida is the only test you take, and the rest of the
21  licenses you've gotten through reciprocity?
22     A   Correct.
23     Q   And by paying a fee?
24     A   Correct.
25     Q   How did you demonstrate to the Nevada

Page 44

1  license-issuing authorities that you had any
2  understanding of Nevada insurance law?
3      A   There were no questions about specific Nevada
4  adjusting laws.
5      Q   So is it fair to say that you never had to
6  demonstrate to the Nevada insurance commission any
7  understanding of Nevada law relating to insurance claims?
8      A   I'd say that's correct.
9      Q   Did you ever have to demonstrate to the Nevada
10  issuing authorities for your adjusting license that you
11  had any understanding of the Nevada Administrative Codes
12  dealing with insurance claims?
13     A   No. It would be the same for South Carolina,
14  North Carolina and Texas.
15     Q   The Nevada Administrative Code is -- in terms of
16  claims handling -- is exactly the same as the other
17  states that you mentioned?
18     A   No.
19     Q   Have you ever read the Nevada Administrative
20  Codes concerning claims handling?
21     A   No.
22     Q   Let's talk about your insurance-work background.
23  I'm looking at your resume and I think you've got a copy
24  of it there in front of you as well and of course your
25  resume is attached as Exhibit No. 2.

Page 45

1        Who was your first insurance job?
2    A    That was with Farmers Insurance Group.
3    Q    That was in Illinois?
4    A    Correct.
5    Q    What was your position there?
6    A    I was called a fire specialist.
7    Q    What's a fire specialist?
8    A    That would handle large losses over 10,000,
9    large first-party property losses over 10,000.
10   Q    And you were handling those claims without any
11   Illinois adjusting license; is that right?
12   A    Correct.
13   Q    What type of training did Farmers provide to
14   you?
15   A    On-the-job training, ride-alongs, and then
16   formal training in Los Angeles.
17   Q    Formal training on what?
18   A    First-party property claims for residential and
19   commercial.
20   Q    Why did you leave Farmers?
21   A    I accepted a supervisor position at American
22   Family Insurance.
23   Q    What was your position at Farmers, just an
24   adjustor?
25   A    A fire specialist.  They called it fire

Page 46

1    specialist or property specialist.
2    Q    Were you a field adjustor?
3    A    Yes.
4    Q    What other kind of adjustors are there?
5    A    There's inside adjustors, field adjustors, and
6    auto adjustors and liability adjustors.
7    Q    Was there anybody lower than you on the totem
8    pole at Farmers?
9    A    No.
10   Q    Were you ever promoted during your nine or ten
11   years at Farmers?
12   A    No.
13   Q    Why not?
14   A    I don't know.
15   Q    How did you come to be employed by American
16   Family?
17   A    I applied for their position.
18   Q    That was also in Peoria, Illinois?
19   A    Correct.
20   Q    So by moving to American Family, you got the
21   promotion that Farmers never gave to you?
22   A    I applied for the job for supervisor job and I
23   got it.
24   Q    Which was a higher level position than what you
25   were at with Farmers; is that true?

Page 47

1    A    Correct.
2    Q    What were your duties and responsibilities as
3    supervisor at American Family?
4    A    I was -- supervised several inside and field
5    adjustors, inside adjustors and field adjustors, audited
6    their claims, helped train them.
7    Q    When you were with Farmers, did you handle any
8    Nevada claims?
9    A    No.
10   Q    When you were with American Family, did you
11   handle any Nevada claims?
12   A    No.
13   Q    What were the types of claims that you handled
14   at American Family?
15   A    They were mostly homeowners and small-business
16   claims as well as rental-property claims, first party.
17   Q    What kind of training did American Family
18   provide to you?
19   A    Mostly on-the-job training, and I know I did go
20   to Madison a couple -- Madison, Wisconsin -- a couple
21   times for some training.  I can't remember exactly what
22   it was.
23   Q    When you say you managed large and complex
24   first-party claims, define "large," please.
25   A    Back then it was probably any claim over 10,000.

Page 48

1    Q    Define your use of the term "complex," please.
2    A    Okay.  It would probably be for ones that
3    required investigation as to the cause of the fire or
4    loss and also business-interruption losses.
5    Q    Concerning the investigation of cause of loss,
6    were you doing that yourself or you were just involved in
7    coordinating with experts and things?
8    A    Supervising, coordinating.
9    Q    In other words, you weren't going out to the
10   loss yourself and investigating.  You were hiring people
11   to do that; right?
12   A    Correct.
13   Q    At American Family it says that you developed a
14   responsive organizational structure with clear
15   definitions of authority and responsibility.  What does
16   that mean?
17   A    There was no defining instructions or -- for
18   each person's authority or their -- what areas they
19   handled, and I developed that.
20   Q    So at the time you started working for American
21   Family Insurance -- which is a big company, isn't it?
22   A    It is.
23   Q    -- it didn't have any sort of organizational
24   structure and definitions of authority and
25   responsibility?

Page 49

1   A   It had an organizational structure, but the
2   people I was supervising did not know exactly what areas
3   they were supposed to be handling as far as territory or
4   their responsibilities.
5   Q   Why did you leave American Family?
6   A   I accepted a manager's job at Great Central
7   Insurance in Peoria.
8   Q   How was that any different than the manager's
9   job that you were just doing at American Family?
10   A   It was working with commercial, 100 percent
11   commercial claims, and I started out as a supervisor and
12   became the director.
13   MR. BALMER: Why don't we take five minutes.
14   (Brief recess taken.)
15   BY MR. BALMER:
16   Q   Sir, you understand, after our bathroom break,
17   that you are still under oath?
18   A   Yes.
19   Q   And you're still required to tell the truth here
20   today. You understand that?
21   A   Yes.
22   Q   Before our break we were talking about your move
23   to Great Central Insurance Company after you left
24   American Family, and you indicated that you started as a
25   supervisor and ended as director?

Page 50

1   A   Correct.
2   Q   Director of what?
3   A   Property-claims unit.
4   Q   During your time at Great Central Insurance
5   Company, you handled only commercial claims; is that
6   true?
7   A   Correct.
8   Q   During your time at Great Central Insurance
9   Company, did you handle any claims that were situate in
10   the state of Nevada?
11   A   No.
12   Q   It indicates, "Responsible for all commercial
13   first-party claims for 24 states." Those 24 states did
14   not include Nevada; true?
15   A   Correct.
16   Q   Your resume indicates under Great Central
17   Insurance Company that you were responsible for state
18   compliance reporting, including California. What does
19   that mean?
20   A   They required an SIU -- what's the word --
21   status that I was in charge of, making sure that we were
22   compliant with the California SIU requirements.
23   Q   SIU stands for?
24   A   Special investigations unit.
25   Q   Have you ever provided any state compliance

Page 51

1   reporting for the state of Nevada?
2   A   No.
3   Q   At any of your jobs?
4   A   At any of my jobs, correct.
5   Q   You left Great American in -- I'm sorry. You
6   left Great Central Insurance Company in 2002?
7   A   Correct.
8   Q   And you went to work for what company?
9   A   FCCI Commercial Insurance Company.
10   Q   Why did you move?
11   A   Because I was called by a headhunter that told
12   me about the job in Sarasota and I decided to move.
13   Q   Was that your first time living outside of
14   Illinois?
15   A   Except when I was in the service, yes.
16   Q   Where were you based in the service?
17   A   San Antonio, Texas and Denver.
18   Q   What branch?
19   A   Air Force.
20   Q   Were you honorably discharged?
21   A   Yes.
22   Q   What rank?
23   A   E-5.
24   Q   You enlisted?
25   A   Yes.

Page 52

1   Q   Was that after college?
2   A   1969 when I was in college.
3   Q   How long did you serve?
4   A   Five years.
5   Q   What was your specialty?
6   A   Forward radioman, I guess you call them.
7   Q   All right. So back to FCCI Commercial Insurance
8   Company, you were contacted by a headhunter telling you
9   of the opportunity. What did you do?
10   A   I flew down there, applied for the job, and they
11   hired me.
12   Q   Did you apply for the job then you flew down or
13   you flew down to apply for the job?
14   A   No. I applied for the job through the
15   headhunter and they arranged a meeting and they hired me
16   soon after that.
17   Q   What was your role at FCCI Commercial Insurance
18   Company?
19   A   I handled the first-party property unit.
20   Q   Commercial?
21   A   All commercial.
22   Q   No residential at FCCI?
23   A   None.
24   Q   And no residential at Great Central Insurance
25   Company?

Page 53

1    A   Correct.
2    Q   So for almost 20 years from 1993 to 2010 you
3   handled no residential claims?
4    A   Correct.
5    Q   Did your work at FCCI Commercial Insurance
6   Company involve claims that were situated in Nevada?
7    A   No.
8    Q   What were the positions then that you held at
9   FCCI Commercial Insurance?
10    A   I started out as supervisor and later was
11   promoted to manager.
12    Q   When you left in 2010 you were manager?
13    A   Yes.
14    Q   A manager of what?
15    A   First-party property claims for the property
16   unit.
17    Q   Why did you leave FCCI Commercial Insurance
18   Company in 2010?
19    A   I was laid off.
20    Q   Now, "laid off" can mean a couple different
21   things.  Was there downsizing going on at FCCI or were
22   you fired?
23    A   Downsizing.
24    Q   What was the reason given for your termination?
25    A   Laid off.

Page 54

1    Q   "Laid off" carries with it the connotation that
2   it's temporary.  Did you have the understanding that you
3   were being temporarily suspended from activities at the
4   company or did you understand that that was the end of
5   your time there?
6    A   That was pretty much the end.  I realized it was
7   the end of my time there along with about -- many other
8   people got laid off the same time.
9    Q   Can you estimate for me the number of people
10   that were laid off when you were laid off?
11    A   The day I was laid off, probably four people,
12   and after that, probably another five to six.
13    Q   How big was the office in terms of number of
14   employees?
15    A   As far as claims or as far as the whole company?
16    Q   Let's talk claims.
17    A   I have to think about that.  It was probably 25
18   or so.
19    Q   Were times just exceptionally good for FCCI
20   Commercial Insurance Company in terms of luck in having
21   no claims?  How do you let go 8 people out of your 25 in
22   the claims department?
23    A   It's a good question.
24       They specialized in work comp for contractors.
25   They specialized in contractors mainly in Florida; and I

Page 55

1   think you are aware of what happened to Florida in the
2   2007, 2008, that area.  They lost -- their book of
3   business went from like 575 million in premiums down to
4   close to the high 300s.
5    Q   So your role at FCCI Commercial Insurance
6   Company was handling first-party property claims for the
7   contractors that had insurance with the company?
8    A   Yes.
9    Q   In terms of first-party property claims, what
10   are we talking about, like cars?  Work trucks?
11    A   Trucks and also liability claims for -- property
12   liability claims like construction defect.
13    Q   So you were a -- primarily a construction-defect
14   adjustor for FCCI Commercial Insurance?
15    A   That wasn't the primary, but that was part of
16   it, yeah; and they would also have hurricanes go through
17   their buildings and packing plants, stuff like that.
18    Q   How long did it take you to find another job
19   after you were laid off from FCCI?
20    A   Took about -- let's see -- probably about four
21   or five months.  I can't remember, to tell you the truth.
22   Somewhere around there.
23    Q   Four to six months; is that fair?
24    A   Four to six months, yeah.  FCCI had provided a
25   nice severance package though.

Page 56

1    Q   In terms of what, your nice severance package?
2    A   Oh, they gave me about six months of pay, five,
3   six months.
4    Q   If you would have found a job right away, it
5   would have been basically a six-month raise?
6    A   That is correct.
7    Q   Were you actively looking for a job?
8    A   Part of the time.
9    Q   Where did you ultimately land?
10    A   At Universal North America.
11    Q   Are you sure?
12    A   Universal Insurance Company of North America.
13    Q   Are you sure?
14    A   Oh, I'm sorry.  I did an interim with Provencher
15   & Company there, an independent adjusting firm.
16    Q   How long were you at Provencher & Company?
17    A   Roughly six to eight months.
18    Q   Did you move up to Salem?
19    A   I did temporarily.
20    Q   Well, did you understand that that was going to
21   be a temporary move for you?
22    A   Yes.
23    Q   Why did you take a job in Salem, Massachusetts
24   when you were living down in Sarasota, Florida?
25    A   Because that was a good temporary job.

Electronically signed by Ellen Goldstein (001-341-678-7457)                        6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 57

1    Q   Did you understand that that was going to be
2  temporary for you?
3    A   **Absolutely.**
4    Q   Did Provencher & Company understand that your
5  work there was going to be temporary --
6    A   **Yes, they did.**
7    Q   -- when you took the job?
8    A   **Yes, they did.**
9    Q   You lived in Salem, Massachusetts for about six
10  to eight months?
11    A   **Yeah, about five months I guess really.  I said**
12  **six there in the resume, but it's closer to five.**
13    Q   Why did you say six months in your resume when
14  it's actually five months?
15    A   **It was somewhere between five and six.  I just**
16  **rounded it up.**
17    Q   Does it sound better if you do that?
18    A   **I don't know.**
19    Q   What was your role at Provencher & Company?
20    A   **I was a general adjustor.**
21    Q   What does that mean?
22    A   **That's a higher level adjustor that can handle**
23  **just about anything from first-party property to**
24  **liability claims.**
25    Q   It looks like you had another bullet point ready

Page 58

1  to go under Provencher & Company but there's nothing
2  there.  Was there something at that bullet point that you
3  took out?
4    A   **That's just an error.**
5    Q   Just a carry-over bullet?
6    A   **Yes.**
7    Q   During your time at Provencher & Company, did
8  you handle any Nevada claims?
9    A   **No.**
10    Q   At Provencher & Company did you handle any
11  residential claims?
12    A   **Yes.**
13    Q   What type of residential claims did you handle?
14    A   **They were mostly rental property, large**
15  **rental-property residential claims.**
16    Q   Meaning what?
17    A   **They would be anywhere from -- I supervised the**
18  **people that were handling the claims.  I didn't actually**
19  **handle them myself.**
20    Q   What's the difference between supervising others
21  who are handling claims and actually handling a claim?
22  What's the difference?
23    A   **I would not go out to the sites.  The field**
24  **people would go out to the sites and then they'd send in**
25  **the reports and I'd approve them or disapprove them or**

Page 59

1  change them and review them; and if they needed to go up
2  higher, I would review them so they could get authority
3  to pay for a certain level.
4    Q   Up to 2011 is it true that the last time you had
5  ever really done a first-party residential loss adjusting
6  was 1993 when you were with American Family Insurance?
7    A   **That's correct.  Now, I would get involved on a**
8  **commercial basis with residential losses.**
9    Q   What does that mean?
10    A   **Well, we insure a lot -- at FCCI there were a**
11  **lot of contractors that were insured and they would**
12  **damage a residential home, so I would be involved in**
13  **supervising those claims.**
14    Q   That's a third-party claim?
15    A   **Third-party claim, that's correct.**
16    Q   In terms of first-party residential claims, you
17  had not served as an adjustor on one of those claims
18  since 1993?
19    A   **Correct.**
20    Q   Now, it looks like, according to your resume,
21  that you stopped working for Provencher & Company in
22  2011. Is that true?
23    A   **Correct.**
24    Q   You next started with another insurance company
25  in 2012. Was there a time where you were unemployed

Page 60

1  between Provencher and Universal?
2    A   **Yes.**
3    Q   How long were you unemployed between Provencher
4  and Universal?
5    A   **Probably about two or three months.**
6    Q   Why were you unemployed during that period of
7  time?
8    A   **I was seeking another job with an insurance**
9  **company as a staff person.**
10    Q   I don't understand what you mean by that.
11      So you were with Provencher & Company.  You took
12  that as a -- basically a stopgap job, did you not,
13  between being laid off at FCCI and finding something
14  else?
15    A   **Correct.**
16    Q   So were you actively looking for another
17  insurance job from the time that you were laid off of
18  FCCI and the time -- in 2010 -- and the time that you
19  landed with Universal in 2012?
20    A   **Some of the time, yeah.**
21    Q   About two years?
22    A   **Some of the time, yeah.**
23    Q   Were insurance companies just not hiring during
24  that period of time or was there something about your
25  qualifications that you believe made it difficult for you

Electronically signed by Ellen Goldstein (001-341-678-7457)                                          6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 61

1   to find a job?

2      A   I don't know.  Ask me that again.

3      MR. BALMER:  Can you read it back.  I don't think I

4   could.

5      THE WITNESS:  Okay.

6      (The record was read as follows:

7         "QUESTION:  Were insurance

8         companies just not hiring during that

9         period of time or was there something

10        about your qualifications that you

11        believe made it difficult for you to

12        find a job?")

13

14     THE WITNESS:  I don't know about if insurance

15  companies were hiring during that time or not.  I wasn't

16  actively looking that whole time because I was involved

17  with Provencher for, you know, five or six months.  So I

18  was pretty satisfied with what I was doing with them.

19  BY MR. BALMER:

20     Q   Why did you stop working for Provencher?

21     A   Because my assignment in -- that they had me,

22  that temporary assignment was over and I wanted to get a

23  full-time job.

24     Q   So your time with Provencher, were you working

25  basically part time?

Page 62

1      A   No.  I was full time, but it was a temporary

2   assignment.

3      Q   Was somebody out like on maternity leave or

4   something?

5      A   No.

6      Q   What was the nature of the temporary assignment?

7      A   It was due to the ice storms in New England.

8   They needed extra help, and then Irene -- I think it was

9   Irene -- came along.  I could have my names mixed up with

10  the hurricane, and they needed help with that too.

11     Q   So --

12     A   I was really only supposed to be there about 30

13  to 60 days and they extended it.

14     Q   So how much of the time, if you can estimate for

15  me in months, between the time you were laid off at FCCI

16  Commercial Insurance Company and the time that you landed

17  at Universal North America, were you actively looking for

18  a job?

19     A   Probably five to six months I would guess.

20     Q   How did you support yourself during that time?

21     A   Well, like I said, from FCCI they gave me a very

22  nice severance package and then I was working for

23  Provencher during that time.

24     Q   How did you come upon a job at Universal North

25  America?

Page 63

1      A   I saw it online and applied for it.

2      Q   Where did you see it online?

3      A   I don't remember.  Probably -- there's a

4   Great -- there's a Web site called Great Insurance Jobs.

5      Q   Did that require a membership by you?

6      A   No.

7      Q   What about the Universal North America

8   opportunity stood out to you on that Web site other than

9   maybe being located in Sarasota, Florida?

10     A   Yeah.  Well, I certainly liked the idea of

11  staying in Sarasota and the office was three miles from

12  my home.

13     Q   Was it the short commute time that made the job

14  at Universal North America attractive to you?

15     A   It was part of it.

16     Q   What was the other part of it?

17     A   It was a position that I knew I could handle

18  very well for them and would be good for them and good

19  for me.

20     Q   What was the position?

21     A   Property unit manager.

22     Q   What is a property unit manager at Universal

23  North America?

24     A   Supervises the inside adjustors and also

25  independents.

Page 64

1      Q   Independent what?

2      A   Independent adjustors.

3      Q   What was your hire date at Universal North

4   America?

5      A   January 9th, 2012.

6      Q   What was your starting position?

7      A   E property unit manager.

8      Q   Say that again.

9      A   Property unit manager.

10     Q   Did the property unit that you worked in handle

11  first-party homeowner claims?

12     A   Yes, it did.

13     Q   Did the property unit that you worked in handle

14  commercial claims?

15     A   Yes.

16     Q   Can you estimate for me, please, in your time at

17  Universal North America, the percentage of your time

18  spent on first-party homeowner claims versus commercial

19  claims?

20     A   I would guess that 95 percent was homeowners and

21  5 percent was commercial.

22     Q   And was the breakdown of 95 percent homeowners,

23  5 percent commercial -- did that remain the same or

24  similar throughout your three or so years with Universal?

25     A   Correct.

Electronically signed by Ellen Goldstein (001-341-678-7457)

6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 65

1    Q    When you left Universal, what was your position?
2    A    Property unit manager.
3    Q    So from the time that you were hired in 2012 and
4  the time that you left in 2015, you had not seen any sort
5  of a promotion; is that true?
6    A    Correct.
7    Q    By the time that you were hired in 2012 by
8  Universal, the last job wherein you worked on adjusting
9  first-party residential claims was nearly 20 years before
10  at American Family; is that right?
11    MR. CANNON:  Mischaracterizes, objection.
12        Go ahead.
13    THE WITNESS:  I handled residential claims up until
14  1993, from 1981 to 1993, about 12 years.
15  BY MR. BALMER:
16    Q    And then from 1993 to the time that you were
17  hired in 2012, you did not handle first-party residential
18  claims; is that true?
19    A    That's true.
20    Q    So although you'd been working in insurance
21  since 1990 -- I'm sorry -- since 1981, by the time you
22  were hired at Universal North America in 2012, only 12 of
23  those adjusting years were done on first-party
24  residential claims; true?
25    A    I think that's what I just answered, yes.

Page 66

1    Q    Let's talk about your duties at Universal North
2  America.  You've got four bullet points listed here on
3  your resume.  It said that you're responsible for timely
4  and effective handling of all assigned homeowner and
5  commercial property claims in the technical property
6  unit.  Is that true?
7    A    Correct.
8    Q    What is a technical property unit?
9    A    The technical property unit would get the larger
10  claims.
11    Q    What does the word "technical" mean?
12    A    Oh, it's ones that would involve a person, an
13  examiner, that would have superior knowledge over a
14  regular adjustor, I guess for lack of a better word.
15    Q    You were just a regular adjustor; right?
16    A    I was a property unit manager.
17    Q    But you were not an examiner?
18    A    No.
19    Q    You indicate, "responsible for timely handling
20  of all assigned homeowner property claims."  What does
21  that mean, "timely"?
22    A    That they are handled as efficiently and as
23  quickly as possible and concluded as quickly as possible.
24    Q    In that same bullet point you indicate that you
25  were responsible for effective handling of homeowner

Page 67

1  property claims.  What does the word "effective" mean?
2    A    Concluding the claim as quickly and as fairly as
3  possible.
4    Q    In general what's the job of an adjustor at an
5  insurance company?
6    A    To receive a claim, determine coverage, pay out
7  and/or deny the claim as quickly as possible.
8    Q    How were adjustors at Universal evaluated on
9  their performance during the time that you were there?
10    A    We would do a performance review once a year and
11  then we'd do audits on a quarterly basis and present
12  those audit results to the adjustor in a session.
13    Q    And what?
14    A    In a session.
15    Q    What does that mean?
16    A    A meeting.
17    Q    What were the things that you looked for in the
18  performance review of an adjustor?
19    A    If they made quick contact with the insured, if
20  they made followup -- timely follow-up calls to the
21  insured or other parties involved in the claim; and if
22  they paid the claim, once they had the information in,
23  did they pay it promptly; and if there was a problem with
24  the file, did they escalate it to the unit manager or --
25  that's just to give a few examples.

Page 68

1    Q    How were adjustors evaluated on claim payments?
2    A    If they were correctly paid, not overpaid or
3  underpaid, and if they're paid timely.
4    Q    Who determined whether a claim was overpaid or
5  underpaid?
6    A    That would be through an audit by me or some
7  other unit manager.
8    Q    Who audited your claims work?
9    A    No one audited my claims work.  I was supervised
10  by Otto and he would review the claim periodically.
11    Q    So whereas adjustors had you looking over their
12  shoulder regularly in the payment of claims, you did not
13  have somebody looking over your shoulder regularly but
14  only at times by Otto; is that right?
15    A    Otto would over -- supervise my files, yes.
16    Q    But Otto didn't supervise your files the same
17  way you supervised the adjustors; is that true?
18    A    That's correct.
19    Q    In fact Otto spent a lot less time supervising
20  your files than you did the adjustors below you; is that
21  true?
22    A    I'd say that's correct.
23    Q    And it's your testimony that your claims were
24  not the subject of audits the same as the adjustors below
25  you.  Is that right?

Page 69

1   A   That would be correct.
2   Q   Did you ever have a performance of your -- I'm
3  sorry -- an evaluation of your performance in writing
4  concerning your claims handling --
5   A   Yes.
6   Q   -- at Universal?
7   A   Yes.
8   Q   And who did that performance review?
9   A   It would be the director of claims.
10   Q   Who was that?
11   A   It would have been, when he was there, Rich
12  Hanlon or Otto.
13   Q   Were those performance reviews in writing?
14   A   Yes.
15   Q   When you were auditing adjustors' payments, how
16  did you determine whether the adjustor over- or underpaid
17  a claim?
18   A   Well, you look at the estimate provided by the
19  independent adjustor to see if there's any errors on the
20  estimate, if they had something on there twice or had the
21  improper scope of loss or something along that nature.
22   Q   Is Universal publicly traded?
23   A   No.
24   Q   Did you ever have an opportunity to see a
25  Profit & Loss for Universal while you were there?

Page 70

1   A   Did I ever see the Profit & Loss Statements?
2  No.
3   Q   Describe for me how Universal was configured on
4  a corporate basis.  Do you understand what I'm asking?
5  Give me the hierarchy of how it was set up.
6   A   It's an entity owned by a Puerto Rican family
7  and this is their -- they have an insurance company in
8  Puerto Rico and they expanded to the United States by
9  starting Universal Insurance Company of North America.
10   Q   What's the name of the Puerto Rican insurance
11  company?
12   A   I forgot.
13   Q   So it's privately owned, the insurance company?
14   A   Yes.
15   Q   So all the profits then flow to the Puerto Rican
16  family that owns it?
17   A   Correct.
18   Q   Did you engage in any profit sharing while you
19  were there?
20   A   No.
21   Q   Did you receive any, or have the opportunity to
22  receive any, performance bonuses while you were there?
23   A   Yes.
24   Q   Tell me about your performance bonus, how that
25  worked.

Page 71

1   A   We get a performance bonus twice a year.
2   Q   What is the basis of the performance bonus?
3   A   It was based on your performance and the
4  company's profitability.
5   Q   Would you agree that the company's profitability
6  is a function of premiums collected minus claims paid
7  minus overhead?
8   A   Correct.
9   Q   Would you agree that the less Universal paid out
10  on claims, the higher the company's profitability?
11   MR. CANNON:  Objection; incomplete hypothetical,
12  calls for speculation.
13      You can answer.
14   THE WITNESS:  There's so many factors that factor
15  into the profitability of a company.
16  BY MR. BALMER:
17   Q   Would you agree that the amount paid out in
18  claims is a factor in profitability?
19   A   A small part, yes, a part of it.
20   Q   So if the amount of claims paid is a part of
21  profitability, you would agree with me that the less
22  amounts paid on claims, the more profitable the company
23  will be?
24   MR. CANNON:  Same objection; incomplete hypothetical,
25  lack of foundation, calls for a legal conclusion.

Page 72

1      Go ahead.
2   THE WITNESS:  There's so many factors that are
3  involved.  It's the financial return on our investments
4  that we have in our cash reserves.  There's -- if we're
5  getting the proper amount of premium on our underwriting
6  and our overhead as far as employees, and there's just a
7  huge amount of factors that determine the profitability
8  of the company.  Yes, claims is part of that company --
9  part of that profitability or loss.
10  BY MR. BALMER:
11   Q   So the less money paid out on claims impacts
12  positively the company's bottom line; true?
13   A   I'd say that's true.
14   Q   And so what I said was true, that the less paid
15  out in claims, the more profitable the company is?
16   MR. CANNON:  Incomplete hypothetical, same objection.
17   THE WITNESS:  I don't agree with that.  There's so
18  many factors that could determine what makes a company
19  profitable or unprofitable.  You could have a year where
20  they paid out more or less, but it doesn't necessarily
21  have an impact on the profitability of the company.  It
22  may or may not.
23  BY MR. BALMER:
24   Q   So what portion of the company's profitability
25  would you receive in terms of your biannual performance

Page 73

1  bonus?  And maybe that's not the right word.  Twice a
2  year.
3     A   I'm thinking I misspoke.  It was -- we received
4  a bonus once a year and then we got a raise once a year.
5  I was thinking -- I was incorrect.  It should be we got a
6  bonus once a year and a raise once a year.
7     Q   Okay.  So the performance bonus you indicated
8  was based in part on the company's profitability; right?
9     A   Yes.
10    Q   And part of the profitability is determined by
11 claims payment; true?
12    MR. CANNON:  Same objection.
13       Go ahead.
14    THE WITNESS:  No.  Again it's what it cost -- if they
15 made a favorable reinsurance, you know, acquisition of
16 reinsurance could be a huge factor in profitability of
17 the company.
18 BY MR. BALMER:
19    Q   Let's talk about it in this way:  You've got a
20 wallet.  Do you have a wallet?
21    A   Yes.
22    Q   You got a lot of bills, don't you, house
23 payments, maybe car payments, insurance payments?
24    A   Uh-huh.
25    Q   Food bills; right?  You've got all these bills

Page 74

1  for yourself; true?
2     A   Yes.
3     Q   And you've got a finite amount of money in your
4  wallet, do you not?
5     A   Correct.
6     Q   If you paid $10 out of your wallet for some
7  expense, would you agree with me that you now have $10
8  less in your wallet to apply to your other bills or even
9  to your savings?
10    A   Yes.
11    Q   Same example:  Let's say you pull $20 out of
12 your wallet to pay some expense.  Would you agree with me
13 that, as it relates to pulling out just $10, pulling out
14 $20 leaves you with even less money in your wallet to pay
15 for expenses and perhaps even contribute to savings?
16    A   Correct.
17    Q   When the insurance company pays claims, where
18 does that money come from, the insurance company's
19 wallet?
20    A   The premiums collected.
21    Q   And the premiums collected are money that the
22 insurance company has in its figurative wallet; true?
23    A   Right.  It comes from premiums and also interest
24 earned on their assets.
25    Q   And so like in our example, when the insurance

Page 75

1  company reaches into its wallet to pull out $20 on a
2  claim instead of 10, it leaves the insurance company with
3  less money with which to pay expenses and perhaps
4  contribute to savings; true?
5     A   True.
6     Q   Did you ever receive a performance bonus?
7     A   Yes.
8     Q   Did you receive a performance bonus each year
9  you were at Universal?
10    A   Correct.
11    Q   Was Universal profitable each year you worked
12 there?
13    A   I believe so.
14    Q   And that means that the Puerto Rican family that
15 owns Universal made money; true?
16    A   True.
17    Q   How was the amount of the performance bonus
18 determined?
19    A   I don't know.  It was kind of arbitrary.
20    Q   Who decided who got what bonus?
21    A   The managers of the people.
22    Q   Weren't you a manager?
23    A   Yes.
24    Q   So would you characterize your determination of
25 the people below you, how much they got in performance

Page 76

1  bonus, as arbitrary?
2     A   It was based -- I'm sorry, I shouldn't say
3  arbitrary.  We were given a pool of money and we gave it
4  out as to who was performing better or worse.
5     Q   And did you hand out the bigger bonuses to the
6  better company employees?
7     A   Correct.
8     Q   Who determined the amount of bonus pool to which
9  you were able to draw from?
10    A   I don't know.  That was above me.
11    Q   So were people above you given a pool of money
12 to trickle down to people in your position?
13    A   I am not sure how they did it.
14    Q   So the more profitable the company, the bigger
15 your bonus; true?
16    MR. CANNON:  Objection; same objection as before,
17 incomplete hypothetical, calls for speculation on the
18 part of this witness.
19       Go ahead.
20    THE WITNESS:  As far as I understood it, it was based
21 on the profitability and your performance.
22 BY MR. BALMER:
23    Q   So the more profitable the company was, the
24 better bonus that you had the opportunity to receive;
25 true?

Electronically signed by Ellen Goldstein (001-341-678-7457)                    6e9ccab9-8597-4f64-ab5d-08013443abc5