# Exhibit 6B

Page 77

1    MR. CANNON:  Same objection.
2    Go ahead.
3    THE WITNESS:  That's basically the way I understood
4  it.
5  BY MR. BALMER:
6    Q   Did you work hard for the company when you
7  worked for them, Universal?
8    A   Yes.
9    Q   Did you consider yourself a good company
10  employee?
11    A   Yes.
12    Q   Did you expect to be rewarded for being a good
13  company employee in terms of salary and bonuses?
14    A   Yes.
15    Q   Do you feel that you were in a position, as
16  property unit manager, to impact the bottom line of the
17  company?
18    A   I think every employee, including me, has an
19  impact on the company.
20    Q   And its bottom line?
21    A   Yes.
22    Q   So on your resume you indicate that your duties
23  included overseeing large losses, mediation, appraisals,
24  sinkhole, foreclosure claims.  Did you write that?
25    A   Yes.

Page 78

1    Q   Is that true?
2    A   Yes.
3    Q   During your time at Universal, what was
4  considered a large loss?
5    A   That would be a loss over 50,000.
6    Q   Duties included overseeing mediation.  What is
7  your understanding of mediation?
8    A   We would often get called to -- especially in
9  Florida, there's a -- Florida has a built-in Department
10  of Insurance mediation system and we'd often be called
11  upon to try and mediate claims.
12    Q   Did you participate in mediations?
13    A   Once in a while.
14    Q   How often would you estimate?
15    A   Oh, about once a year, once or twice a year,
16  mainly just for training purposes.
17    Q   Training for who?
18    A   The people I supervised.
19    Q   Would the people you supervised attend
20  mediations more frequently than you?
21    A   Yes.
22    Q   Was that in their job description to attend the
23  mediations?
24    A   Yes.
25    Q   And then that didn't fall under your job

Page 79

1  description because you sat above and supervised them; is
2  that true?
3    A   Correct.
4    Q   In terms of those mediations that were attended
5  by the adjustors below you, did you assist the adjustor
6  in determining what the authority would be for the
7  mediation?
8    A   Yes.
9    Q   In fact was that your job, to set authority for
10  mediation?
11    A   Yes.
12    Q   Were the mediations run in such a way that you
13  were required to be available by telephone as the person
14  with the power of the pen, so to speak?
15    A   Sometimes, sometimes no.
16    Q   Depending on the authority that you provided
17  your adjustor?
18    A   Yes.
19    Q   How did you go about determining what authority
20  would be granted to an adjustor going to a mediation?
21    A   I'd look at the merits of the claim and draw on
22  my experience and authorize what I believed would be
23  adequate to settle the claim.
24    Q   Your last experience to draw upon first-party
25  residential claims adjusting in setting of authority was

Page 80

1  back in 1993 when you were hired at Universal; is that
2  right?
3    A   For residential I would say that's correct.
4    Q   Would you agree that residential claims are
5  different from commercial claims?
6    A   In different ways, yeah.
7    Q   Would you agree that whereas people may work in
8  a commercial environment, people actually live in their
9  homes?  True?
10    A   The -- yeah.
11    Q   So a displacement from an office building is not
12  on the same level as being displaced from your home?
13    MR. CANNON:  Objection; vague.
14    Go ahead.
15    THE WITNESS:  I could not disagree more.
16  BY MR. BALMER:
17    Q   You could not disagree more?
18    A   Correct.
19    Q   Do you agree that it's harder to be away from an
20  office building or your home?
21    A   Most businesspeople that I run into would much
22  rather see their business up and going before they fix
23  their house in a hurricane.
24    Q   In terms of nonhurricane situations, is it your
25  position that a dislocation from a home is easier than a

Page 81

1  dislocation from a place of employment?
2  MR. CANNON:  Objection; lacks foundation, calls for
3  speculation.
4  THE WITNESS:  I have no idea.  You'd have to take it
5  on an individual basis.
6  MR. BALMER:  I see.
7  Q   Have you ever been dislocated from your home?
8  A   No.
9  Q   Do you know of any adjustors at Universal who
10  worked on the Cathcart case that had ever been dislocated
11  from their home?
12  A   No.
13  Q   You understand the Cathcarts were dislocated
14  from their home for a long time, don't you?
15  A   Yes.
16  Q   Do you understand that was hard on them?
17  A   Yes.
18  Q   You don't dispute that the Cathcarts being out
19  of their home was a difficult experience for them, do
20  you?
21  A   No.
22  Q   But you've got no personal experience upon which
23  to draw to understand just how difficult that is, being
24  displaced from a home; isn't that right?
25  A   I haven't personally been displaced.

Page 82

1  Q   When is the last time you participated in a
2  mediation?
3  A   It was probably July of 2015.
4  Q   While you were with Universal?
5  A   Yes.
6  Q   What kind of case was that?
7  A   It was a homeowner's water-loss claim.
8  Q   Where was that located?
9  A   New Smyrna Beach, S-m-y -- S-m-y-r-n-a, Smyrna
10  Beach.
11  Q   Is that in Florida?
12  A   Yes.
13  Q   What was the outcome of that mediation?
14  A   It went to litigation, could not be settled.
15  Q   Did you initiate litigation against your
16  insureds?
17  A   No.
18  Q   What's the status of that case currently?
19  A   I don't know.
20  Q   You understand in this case that Universal sued
21  the Cathcarts?
22  A   They filed a dec action, correct.
23  Q   Let me ask it again.
24     You understand in this case that Universal sued
25  its insureds, the Cathcarts?

Page 83

1  A   Correct.
2  MR. CANNON:  Asked and answered.
3  BY MR. BALMER:
4  Q   What's an appraisal?
5  A   Appraisal is when the insureds demand or we
6  demand -- have a disputed claim and either one files for
7  an appraisal.
8  Q   What's the purpose of an appraisal?
9  A   To have a third party look at the damages and
10  try and come to an -- what was that?
11  Q   I don't have any idea.
12  A   Okay.  The purpose of an appraisal is to try and
13  bring -- have a third party look at the damages and
14  factors in the claim and try to bring it to a successful
15  conclusion, agreeable conclusion.
16  Q   How often do you do appraisals at Universal?
17  A   Well, we used to do them a lot, but the laws
18  changed in Florida so we don't do hardly any.
19  Q   What changed about the law in Florida?
20  A   It became prima facie that if you lost on
21  appraisal even by one dollar, that they could file suit
22  against the insurance company, prima facie evidence.
23  Q   When did that law change in Florida?
24  A   About a year ago.
25  Q   What's the law concerning appraisal in Nevada?

Page 84

1  A   Not sure.
2  Q   Did you ever participate in any appraisals in
3  Nevada?
4  A   No.
5  Q   Why not?
6  A   There was never any need for them.
7  Q   Why?
8  A   It never had an opportunity to use that
9  appraisal clause in the policy.  It just wasn't needed.
10  Q   Did you ever offer the Cathcarts an opportunity
11  to appraise?
12  A   No.
13  Q   Why not?
14  A   Because it wasn't needed at the time.
15  Q   Did you ever offer the Cathcarts the opportunity
16  to mediate?
17  A   No.
18  Q   Why not?
19  A   We were trying to conclude it without appraisal
20  or mediation.
21  Q   Was that by filing a federal lawsuit against the
22  Cathcarts, that you were trying to resolve the case?
23  MR. CANNON:  Objection; argumentative.
24     Go ahead.
25  THE WITNESS:  It came to the point where we decided

Page 85

1  that was the best route to go, try and get this
2  concluded.
3  BY MR. BALMER:
4     Q    And was that the best route to go to protect the
5  insurance company or to protect its insureds?
6     **A    Try and bring it to a successful conclusion for**
7  **both.**
8     Q    Have you read the federal declaratory action
9  Complaint?
10    **A    A long time ago, yeah.**
11    Q    Yeah. I wonder if you could explain to me what
12  relief in the -- sought in the federal declaratory relief
13  action filed by Universal against the Cathcarts would
14  draw it to any sort of fair or positive conclusion for
15  the Cathcarts. Could you explain that to me.
16    **A    It was a way to bring this claim to a**
17  **conclusion. That was our -- that's our goal.**
18    Q    You weren't trying to beat the Cathcarts to the
19  courthouse?
20    **A    No.**
21    Q    If your claims note said the exact opposite of
22  how you just testified, would you change your testimony?
23    **A    I have to read them, and if I did say that, I**
24  **would.**
25    Q    So you would agree that the filing of a

Page 86

1  declaratory relief action by Universal against the
2  Cathcarts was a mechanism to protect the insurance
3  company, not the Cathcarts. Is that true?
4     MR. CANNON: Objection; asked and answered.
5        Go ahead.
6     THE WITNESS: I already told you it would be to bring
7  this claim to a successful conclusion, and that would
8  help the Cathcarts and the insurance company.
9  BY MR. BALMER:
10    Q    So is it your testimony that Universal sued the
11  Cathcarts to help the Cathcarts?
12    MR. CANNON: Objection; he's already answered that
13  question.
14       Go ahead.
15    THE WITNESS: It was a mechanism for us to bring this
16  claim to a conclusion 'cause there was a dispute. It
17  became a disputed claim.
18  BY MR. BALMER:
19    Q    And so when you say, "It was a mechanism for us
20  to bring the matter to a conclusion," when you say "us,"
21  are you referring to Universal North America Insurance
22  Company?
23    **A    Yes.**
24    Q    Do you understand that the actions of Universal
25  North America Insurance Company resulted in a lien being

Page 87

1  put on the Cathcarts' home by Paul Davis Restoration?
2     **A    Yes.**
3     Q    And did you understand that the failure of
4  Universal North America Insurance Company to pay the
5  amounts owe and due-ing to -- owing and due -- to Paul
6  Davis Restoration ultimately resulted in Paul Davis
7  Restoration suing the Cathcarts to foreclose on the lien?
8     **A    Yes.**
9     Q    Do you understand what a Notice of Lien is?
10    **A    Uh-huh, yes.**
11    Q    What is it?
12    **A    It's an encumbrance upon your real estate.**
13    Q    And what happens if Paul Davis were to be
14  successful in its lawsuit to foreclose on the mechanic's
15  lien on the Cathcart home?
16    **A    Then they'd have a mechanic's lien on their**
17  **home.**
18    Q    Do you understand legally what a foreclosure on
19  a mechanic's lien is?
20    **A    Not all the ins and outs of it, no.**
21    Q    What is your general understanding of that?
22    **A    That they could put a lien on their house, and**
23  **if the house was ever sold, they could collect their**
24  **money.**
25    Q    Did you understand that a lawsuit to foreclose

Page 88

1  on a mechanic's lien actually, if favorable to the
2  contractor, would allow the contractor to, by way of
3  judgment, seize and sell the home from the Cathcarts?
4     **A    No.**
5     Q    Did you ever ask anybody about that?
6     **A    No.**
7     Q    Did you understand that Paul Davis was
8  threatening to put a mechanic's lien on the Cathcart
9  home?
10    **A    I'd have to go back and look at my notes on that**
11  **one, but I think I had -- they discussed it. I don't**
12  **know if they actually did or not.**
13    Q    You don't know if Paul Davis put a --
14    **A    I don't --**
15    Q    -- filed a Notice of Lien on the Cathcarts'
16  home? You don't know that?
17    **A    I know that now.**
18    Q    We'll get to some documents later and some
19  E-mails and things that were sent to you.
20       How does that -- how does that affect your
21  claims handling, if at all, to understand that once a
22  mechanic's lien is perfected on a house, that that
23  actually can result in the contractor taking and selling
24  the house from your insured?
25    **A    Well, that's certainly not favorable for the**

Page 89

1  insured, but Universal didn't file the suit against the
2  Cathcarts.
3      Q    But you would agree that Universal did not pay
4  Paul Davis?
5      A    Because we had a dispute on the amount that was
6  owed.
7      Q    And the dispute on the amount that's owed really
8  was a dispute between Universal and Paul Davis; true?
9      A    No.  It was a dispute between the Cathcarts
10  and -- well, yeah, I suppose it was, yeah.
11     Q    Yeah.  So it was -- the dispute that you're
12  talking about was a dispute between Universal and Paul
13  Davis over the amount of Paul Davis' bill?
14     A    That and coverages that was owed to the
15  Cathcarts.
16     Q    Coverages for work that you expressly authorized
17  Paul Davis to perform in the house?
18     A    I think the Cathcarts signed the contract with
19  them, not me.
20     Q    Are you aware of the communications, in the
21  claims file and elsewhere, wherein you personally were
22  expressly giving permission to Paul Davis to undertake
23  work in the Cathcart home?
24     A    Yes.
25     Q    What was the fight over between Universal and

Page 90

1  Paul Davis in terms of the money?
2      A    Well, there was a policy limit on mold.  That
3  was a big factor.  There was differences in how much
4  was -- might have been some overlapping charges.
5      Q    And so you were making this inquiry on behalf of
6  Universal North America after you had already approved
7  Paul Davis to do the work?  So you approved them to do
8  the work and then later on you go back and try to dispute
9  whether or not you actually have to pay them?  Is that
10  the position taken by Universal here?
11     MR. CANNON:  Object to the question; it's
12  argumentative.
13     Go ahead.
14     THE WITNESS:  We did pay the Cathcarts for Paul
15  Davis' work.
16  BY MR. BALMER:
17     Q    Oh, you did?
18     A    Uh-huh.
19     Q    Are you sure about that?
20     A    Yeah, for the -- based on the estimate that we
21  made and also Absolute Water Extraction and the kitchen
22  cabinets and the estimate that we -- that was provided by
23  the adjustor, we paid them.
24     Q    You believe that you paid the Cathcarts for Paul
25  Davis' bill?

Page 91

1      A    Probably not all of it.
2      Q    Well, how much of it?
3      A    I have to go back and calculate it.
4      Q    Do you understand that the amount of the Paul
5  Davis lien was over $40,000?
6      A    Yes.
7      Q    Do you understand that Universal never paid Paul
8  Davis the $40,000?
9      A    Correct.
10     Q    And as a result of Universal not paying Paul
11  Davis the $40,000, Paul Davis perfected a Notice of Lien
12  on the Cathcart home?
13     A    Yes.
14     Q    And because Universal had failed to pay Paul
15  Davis, Paul Davis initiated a lawsuit against the
16  Cathcarts to foreclose on that mechanic's lien to take
17  and sell their home to pay the 40,000.  Do you understand
18  that?
19     A    Yes.
20     Q    On your North -- Universal North America section
21  of your resume, you indicate that you supervised six
22  inside claims representatives.  Is that right?
23     A    For Universal?
24     Q    Yes, sir.
25     A    Yes.

Page 92

1      Q    Who were they?
2      A    Carter Inman, Brenda Jenkins, Marina Rivera,
3  Rudy Heller -- I'm drawing a blank -- Heather Howard, and
4  there was another one that was a temp.  I can't think of
5  his name.  I can't think of the name right now.
6      Q    It says you also supervised one to four
7  temporary inside claims and independent adjustors.  What
8  independent adjustors did you supervise?
9      A    They would bring in extra help from time to time
10  and I would -- they were temporary independent adjustors
11  that I would manage.  They would come and go.
12     Q    I'm going to read something to you and I want
13  you to tell me if you agree or disagree.
14     A    Okay.
15     Q    "An insurance policy is not an ordinary
16  contract.  It is a complex instrument unilaterally
17  prepared and seldom understood by the insured."
18     Do you agree with that?
19     A    No.
20     Q    "The parties are not similarly situated.  The
21  company and its representatives are expert in the field.
22  The insured is not."
23     Do you agree with that?
24     A    I would say that's correct.
25     Q    You would agree that the parties are not

Electronically signed by Ellen Goldstein (001-341-678-7457)      6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 93

1 similarly situated; true?
2 **A   Well, it depends.  Are you talking about**
3 **commercial or are you talking about residential?**
4 Q   Fair enough.  I am talking about in terms of
5 residential claims.
6 **A   That's probably true.**
7 Q   "When notified of a claim, it -- the insurance
8 company -- should investigate with reasonable dispatch"?
9 **A   Correct.**
10 Q   "Demand arbitration if that is its desire and
11 settlement can't be reached"?
12 **A   That's one avenue.**
13 Q   "In short, the insurance company may not ignore
14 its insured and then seek refuge in the fine print of its
15 policy."
16   Do you agree with that?
17 **A   I disagree with that.**
18 Q   These statements came from the Nevada Supreme
19 Court in the case of "Pemberton versus Farmers Insurance
20 Exchange" at 109 Nev. 789, 792 to 793, 1993.  That's a
21 little Nevada law on insurance-company conduct.  Have you
22 ever heard that before?
23 **A   No.**
24 Q   Do you know how the Nevada Administrative Code
25 defines first-party claimant?

Page 94

1 **A   No.**
2 Q   Do you know how the State of Nevada defines
3 notice of claim?
4 **A   No.**
5 Q   Do you know how the State of Nevada requires the
6 investigation of claims?
7 **A   No.**
8 Q   Do you know the State of Nevada's statutory
9 policy on misrepresentation of provisions of an insurance
10 policy?
11 **A   No.**
12 Q   I'm going to ask you if you agree or disagree
13 with this statement:  The duty owed by an insurance
14 company to an insured is fiduciary in nature.
15 **A   Correct.**
16 Q   What does that mean?
17 **A   That means we owe the monetary obligation if**
18 **they have a damage.**
19 Q   Is it your understanding that the insurance
20 company can't place its own interest in turning a profit
21 above the needs or interest of its insureds?
22 **A   Correct.**
23 Q   Agree or disagree:  A fiduciary relationship
24 exists when one has the right to expect trust and
25 confidence in the integrity and fidelity of another.

Page 95

1 **A   That's true.**
2 Q   Tell me if you agree or disagree with this
3 statement:  The special relationship between an insurance
4 company and an insured exists in part because, as
5 insurers are well aware, consumers contract for insurance
6 to gain protection, peace of mind, and security against
7 calamity.
8   MR. CANNON:  Does he agree or disagree with that
9 statement?
10   MR. BALMER:  I want him to either agree or disagree
11 with that statement.
12   THE WITNESS:  Yeah, I agree with it.
13 BY MR. BALMER:
14 Q   Let's talk about Johns Eastern Insurance
15 Company.  You started work there in January of this year,
16 2016?
17 **A   Correct.**
18 Q   And what is your position?
19 **A   I'm an independent field adjustor.**
20 Q   Now, field adjustor is a step down from the
21 management positions that you had most recently served in
22 your employment with Universal, Provencher, FCCI, Great
23 Central Insurance Company, and American Family; isn't
24 that right?
25 **A   Correct.**

Page 96

1 Q   So the field-adjustor position that you're
2 currently in is basically the same or similar position
3 you held back in 1990 for Farmers Insurance Group; right?
4 **A   Correct.**
5 Q   So 26 years ago was when you were last in that
6 field-adjustor position?
7 **A   Correct.**
8 Q   What kind of claims are you doing for Johns
9 Eastern?
10 **A   Residential and commercial, first-party claims**
11 **and liability claims.**
12 Q   Does Johns Eastern Company do any work in
13 Nevada?
14 **A   No.**
15 Q   So the only company that you've worked for that
16 has done any claims work in the state of Nevada is
17 Universal; is that right?
18 **A   Correct.**
19   MR. BALMER:  Why don't we take a 5-minute break and
20 then we'll come back and go just maybe 20, 25 minutes and
21 then we'll take a lunch break, okay?
22   MR. CANNON:  That's fine.
23   (Brief recess taken.)
24 BY MR. BALMER:
25 Q   Sir, you understand that after our short break

Electronically signed by Ellen Goldstein (001-341-678-7457)                                    6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 97

1 that you're still under oath?
2   A   Yes.
3   Q   And you're still required to tell the truth?
4   A   Yes.
5   Q   In response to one of the questions I asked you
6 earlier, you indicated that you'd been deposed a few
7 times and the last time was -- I don't know what you
8 said -- five years ago; is that right?
9   A   Four or five, yeah.
10   Q   Can you estimate for me the number of times that
11 you've been deposed?
12   A   Well, I think I answered that 10. It's over a
13 35-year period. I can't remember them all, but I would
14 say somewhere between 5 and 10 for sure.
15   Q   Were you ever deposed in your capacity as an
16 employee or adjustor for Universal?
17   A   No.
18   Q   Have you ever been involved in a deposition
19 where claims of bad faith have been leveled against the
20 insurance company?
21   A   One time, yes.
22   Q   When was that?
23   A   I tell you it's so long ago I can't remember. I
24 can't remember what company I was working for at the
25 time.

Page 98

1   Q   Did the allegations in that case involving
2 alleged bad faith have to do with your handling of the
3 claim file?
4   A   You know, I take that back. I was never deposed
5 on a claim involving bad faith. Of course over 35 years
6 bad faith has been alleged, but I don't think I was
7 deposed on any case. I have to really stop and think
8 about that one. I'm not trying to be evasive. I just --
9 you know, over 35 years you just forget.
10   Q   What jurisdictions were you deposed in?
11   A   Oh, a lot of -- a few times in Illinois,
12 Louisiana, Florida.
13   Q   Were all of those depositions that you've
14 given -- did they all involve the insurance company's
15 claim handling?
16   A   Probably, yes, I would say that.
17   Q   Have you ever been deposed in a case involving
18 water damage?
19   A   Yes.
20   Q   How many times?
21   A   Once I can recall for sure.
22   Q   When was that?
23   A   When I worked for Great Central, you know, back
24 in -- before 2002.
25   Q   Have you ever been deposed in a case involving

Page 99

1 mold contamination --
2   A   No.
3   Q   -- related to water damage?
4   A   No.
5   Q   To your right you have some documents that you
6 indicate that Mr. Cannon's office sent to you last week.
7 How long did you spend reviewing those documents?
8   A   Oh, probably about three or four hours.
9   Q   How are you being compensated for your time for
10 the work you are currently doing on this case?
11   A   I presented an invoice to him for fees and
12 they're paying the travel expenses.
13   Q   Do you have a copy of that invoice?
14   A   No.
15   Q   Can you tell me the contents of the invoice,
16 please?
17   A   I think I put in there $1400.
18   Q   Did you establish an hourly rate for yourself?
19   A   No.
20   Q   How did you come up with the amount of $1400?
21   A   It was $200 per day for travel and $500 a day
22 for actually being here and preparing for the deposition
23 itself.
24   Q   So break down the $1400 for me, please.
25   A   Okay. So it's Wednesday 200, today 500,

Page 100

1 yesterday 500, and Saturday travel home 200; so it's
2 1400, pretty cheap.
3   Q   I'm sure Universal has spent more for testimony.
4   A   Yes.
5   MR. CANNON:  It's not for his testimony. I'll object
6 to the form of the question.
7 BY MR. BALMER:
8   Q   You came into town on Wednesday?
9   A   Yes.
10   Q   What time did you get here?
11   A   I think it was around 5:30 your local time.
12   Q   P.m. or a.m.?
13   A   P.m.
14   Q   What did you do then?
15   A   Went to the hotel.
16   Q   Did you rent a car?
17   A   Yes.
18   Q   Who is paying for your rental car?
19   A   I'm supposed to get reimbursed by Universal.
20   Q   How much is your rental car going to be?
21   A   $110 that I know of.
22   Q   Where are you staying?
23   A   The Golden Nugget.
24   Q   Who is paying for the Golden Nugget?
25   A   It was paid for through the attorney's office.

Page 101

1   Q   How much is the Golden Nugget?
2   A   I think it's 345, but I'm not sure. Since I
3   didn't pay for it, I didn't pay a lot of attention to it,
4   but I think I saw 345.
5   Q   What did you do on Thursday?
6   A   I went to the attorney's office, Walt Cannon
7   office.
8   Q   What time did you arrive?
9   A   I arrived there about 10:00 o'clock.
10  Q   A.m.?
11  A   Yes.
12  Q   How long did you stay?
13  A   About three or four hours.
14  Q   What was the purpose of your visit?
15  A   To go over the file documentation.
16  Q   What file documentation did you review?
17  A   The books that Mr. Cannon brought, the Volumes 1
18  and 2 at the end of the table there.
19  Q   Did you bring any materials with you from
20  Florida to Las Vegas?
21  A   Only the items here in front of me that the
22  attorney's office mailed to me.
23  Q   As far as the transfer of the claims-file
24  documents to Las Vegas, that was handled by somebody at
25  Universal, not you?

Page 102

1   A   No, I didn't handle it.
2   Q   And of course today is Friday.
3   A   Yes.
4   Q   You leave tomorrow?
5   A   Yes.
6   Q   What time do you leave?
7   A   Flight leaves at 8:30.
8   Q   Morning or evening?
9   A   A.m.
10  Q   Who is paying for your food?
11  A   I'm supposed to get reimbursed by Universal.
12  Q   Are there any other expenses that you expect to
13  be reimbursed for that we haven't talked about?
14  A   The airline fee is paid for by the attorney's
15  office.
16  Q   How much was that?
17  A   It was right around a thousand dollars.
18  Q   Before leaving for Las Vegas, did you meet with
19  anyone at Universal to discuss your testimony?
20  A   No.
21  Q   You didn't meet with Otto or any of the other
22  adjustors or supervisors at Universal?
23  A   I did not meet with anybody or talk to anybody.
24  Q   When was the last time you spoke to anyone at
25  Universal about this claim?

Page 103

1   A   I don't know. It's probably six months to a
2   year ago.
3   Q   Who at Universal was handling this claim when
4   you left?
5   A   It was in the litigation department and it was
6   Mark and I cannot think of his last name right now.
7   Q   You gave me your home address. I don't recall
8   if I asked you how long you've lived there.
9   A   You did. It's about six years.
10  Q   Since leaving Universal, you've continued to
11  live at the same house?
12  A   Yes.
13  Q   You've not disappeared for any period of time,
14  have you?
15  A   No.
16  Q   When you left Universal, did you leave Universal
17  your home address?
18  A   Yes.
19  Q   Have you gotten any communications from
20  Universal at your home address since you left?
21  A   Just the usual HR stuff for your insurance and
22  all that kind of stuff.
23  Q   Prior to receiving the materials last week from
24  Mr. Cannon's office that you have here with you, when was
25  the last time that you had reviewed the claims file prior

Page 104

1   to that?
2   A   Probably six months to a year ago.
3   Q   Now, the documents that were provided to you
4   last week that you have here with you, that was not the
5   entire claims file --
6   A   No.
7   Q   -- is that right?
8   A   That is correct.
9   Q   And so the first time that you reviewed the
10  entire claims file in the last 6 to 12 months was
11  yesterday?
12  A   Correct.
13  Q   Was there anything, when you were going through
14  the claims file yesterday, that you noticed in the file
15  that you'd never seen before?
16  A   Just some updated litigation stuff I had never
17  seen before.
18  Q   Like what?
19  A   Some motions back and forth. I haven't seen
20  that before.
21  Q   Which motions?
22  A   I don't remember.
23  Q   Other than the certificate of mold clearance,
24  did you notice anything missing from the claims file that
25  you remember there having been in the claims file

Electronically signed by Ellen Goldstein (001-341-678-7457)   6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 105

1 previously?
2   A. That looked like the complete file.
3   Q. Are there any codes of ethics for insurance
4 adjustors?
5   A. Yes.
6   Q. What are they?
7   A. Oh, I don't recall them all right now, but
8 basically is to treat insureds fairly and without
9 prejudice and treat them as if you would treat yourself.
10   Q. You indicate that the codes of ethics include
11 the requirement that the adjustor treat insureds fairly.
12 What does that mean to you?
13   A. It means that you pay what's due and pay it as
14 promptly as you can, if the policy covers it, and deny
15 the claim properly if it's not covered.
16   Q. Did you ever deny the Cathcarts' claim?
17   A. For about 24 hours I denied part of it.
18   Q. Which part?
19   A. About the mold coverage.
20   Q. Right. And in fact in the claims file it
21 indicates that you took a pretty hard line with the
22 Cathcarts initially on whether the mold was covered or
23 not, saying it didn't, and then the next day you changed
24 your mind. Is that right?
25   A. I don't know if I'd talk about it being a hard

Page 106

1 line, but I told them that it wasn't covered, and the
2 next -- within 24 hours I called them back, after
3 reviewing the policy, and told them it was covered.
4   Q. Why was your initial impulse to tell them it
5 wasn't covered when it was?
6   A. The way the policy reads as far as the damage
7 had to be -- it had to be caused by a covered cause of
8 loss, and I had to read the policy. Each states a little
9 bit different on if it's hidden or not hidden, and I read
10 the policy and I made a mistake and it wasn't -- their
11 policy would cover them if the water damage was hidden.
12 In this case it was.
13   Q. How come you didn't review the policy before
14 making your initial opinion to the Cathcarts about
15 whether it was covered or not?
16   A. I was pretty familiar with the coverage and I
17 may have looked at it, but I looked at it more after I
18 started thinking about it. I thought, well, maybe
19 that's -- I better check this, so I did.
20   Q. So is that an example of where you were mistaken
21 about whether the policy provided coverage?
22   A. That was an error on my part for the first 24
23 hours, yeah.
24   Q. You indicate that part of the code of ethics is
25 to treat the insureds without prejudice. What does that

Page 107

1 mean?
2   A. Treat them fairly and as best you can without
3 jeopardizing their position or the company's position or
4 just taking care of them.
5   Q. What do you mean by "jeopardizing the company's
6 position"?
7   A. By giving them coverage or allowing them
8 coverage for something that isn't covered like wear and
9 tear.
10   Q. And if I wanted to look up the code of ethics
11 that you referred to for insurance adjustors, where would
12 I find it?
13   A. You could find it online with the Department of
14 Insurance.
15   Q. Whose Department of Insurance?
16   A. Florida Department of Insurance.
17   Q. Does the State of Nevada Department of Insurance
18 have a code of ethics for insurance adjustors?
19   A. I don't know. I would guess it does. All
20 states have them.
21   Q. Do you make determinations, in adjusting files,
22 based on guesses?
23   A. No.
24   Q. Do you think it would be an important thing for
25 insurance adjustors adjusting claims in Nevada to know

Page 108

1 what Nevada's codes of ethics are for insurance
2 adjustors?
3   A. Yes.
4   Q. Do you agree that it would be important for an
5 insurance adjustor adjusting claims in Nevada to have at
6 least read the administrative codes dealing with
7 insurance adjusting?
8   A. Yes.
9   Q. And do you believe that it would be important
10 for an insurance adjustor adjusting claims in the state
11 of Nevada to be familiar with Nevada statutes on
12 insurance claims?
13   A. Yes.
14   Q. Did you ever receive any training from Universal
15 on how to conduct yourself in a deposition?
16   A. No.
17   Q. Did you ever receive any training on how to
18 conduct yourself in a deposition from anywhere?
19   A. Well, I've spoken with counsel and his
20 representatives in preparing for a deposition.
21   Q. Have you watched any videotapes concerning the
22 deposition process?
23   A. No.
24   Q. Listened to any audio cassettes, anything like
25 that?

Page 109

1    A   No.
2    Q   Have you ever received any training on an
3  insurance company's obligation of good faith and fair
4  dealing towards its insureds?
5    A   Yes.
6    Q   Where did you receive that training?
7    A   In Florida, Illinois.
8    Q   What training did you receive on an insurance
9  company's obligation of good faith and fair dealing
10  towards its insureds?
11    A   In the state of Florida we're required to take a
12  certain amount of hours of CE credits, continuing
13  education, to maintain our license, and part of that is
14  ethics, which includes discussion of bad faith.
15    Q   What is the insurance company's obligation of
16  good faith and fair dealing toward its insureds?
17    A   Treat the insureds fairly as if they were you.
18    Q   While you were at Universal, can you tell me
19  what reference materials and manuals you kept on your
20  desk?
21    A   We didn't keep hardly anything on our desk
22  because it's all electronic now, but the claims
23  adjustor's guide and the -- mainly just policies,
24  different policy forms.
25    Q   And when you say, "the claims adjustor's

Page 110

1  guides," is that the documents that you brought with you
2  here today?
3    A   Yeah.  We wouldn't put it on our desk, but we
4  had it available electronically.
5    Q   When is the last time you read the Claims
6  Operating Policies and Handling Guidelines for Universal?
7    A   Yesterday.
8    Q   Prior to yesterday's preparation for today's
9  proceedings?
10    A   Probably been a year or so since I looked at it.
11    Q   Do you have any experience in Nevada dealing
12  with claims similar to the Cathcarts' claims?
13    A   Sure.
14    Q   How many?
15    A   Many.  I don't know.  I don't have a
16  quantitative number on that.
17    Q   Can you estimate for me?
18    A   Well, if we bring in -- usually 50 percent of
19  the claims that we get are -- right around 50 percent,
20  45, 55, is then -- are water-damage claims.  That's the
21  lion's share of our claims.  So if we're bringing in 250
22  claims a year for Nevada, you can figure roughly half of
23  them are water, just ballparking it.
24    Q   And of those 125 claims, how many of those would
25  you estimate are large loss?

Page 111

1    A   I'm just guessing 10 percent.
2    Q   So 12, 13 claims per year deal with large-loss
3  water-damage claims?
4    A   Yes, just a guess.
5    Q   Well, I want your best estimate.  I don't want
6  you to guess.  You've given me kind of a 10 percent
7  number and you've given me a "125 water-damage claims per
8  year" estimate.  Is 12 or 13 a good estimate?
9    A   I would say around 10, yeah.
10    Q   Of those 10 claims per year that deal with
11  large-loss water-damage claims, what percentage of those
12  deal also with mold issues?
13    A   I don't want to speculate.
14        When you get to a large loss, if the
15  water-extraction people have done their job correctly,
16  there is no mold, so -- but then there -- I'm not saying
17  all of them don't have mold.  I don't know without -- I
18  don't want to speculate on that.
19    Q   In 2012 did Universal have a preferred-vendor
20  program?
21    A   In 2012, no.
22    Q   In 2013 did Universal have a preferred-vendor
23  program?
24    A   We did bring on preferred vendors, but I can't
25  remember which year, but I know it definitely wasn't at

Page 112

1  the time of the Cathcart claim.
2    Q   So if the claims notes refer to Paul Davis
3  Restoration as Universal's preferred vendor, how did that
4  happen?
5    A   Paul Davis is a nationally insurance -- they
6  work for a lot of insurance companies.  Paul Davis is big
7  for insurance providers.  So to say they were preferred,
8  I may have been referring to them as -- they weren't on a
9  list of preferred vendors; let's put it that way.  I just
10  happen to have experience with them with many claims
11  across the nation over the last 10 or 15 years.
12    Q   So are you saying that it was a mistake for you
13  to call Paul Davis a preferred vendor in your claims
14  notes?
15    A   I would say "preferred" was not what you would
16  think it was on a list, because there wasn't any list at
17  that time, preferred list.  I think I wanted to get their
18  opinion of the damages because they've been pretty
19  accurate before and with something that was detailed.
20    Q   Who called out Paul Davis to the Cathcart house?
21    A   I'm not sure.  I believe it was the Cathcarts.
22  I think they probably called them out.
23    Q   Are you sure about that?
24    A   No.
25    Q   If the records indicate that Paul Davis was

Electronically signed by Ellen Goldstein (001-341-678-7457)                    6e9ccab9-8597-4f64-ab5d-08013443abc5

## Page 113

1  contacted and sent out to the Cathcart home by Universal,
2  does that refresh your recollection?
3    A  Yeah.  It probably would have been -- probably
4  would have called them out for help on this one.
5    Q  Who probably would have called them out for help
6  on this one?
7    A  Either myself or Brenda Jenkins.
8    Q  Are you familiar with the categories of water
9  loss?
10   A  Yes.
11   Q  What are they?
12   A  Okay.  There's one that's clean water,
13  category 1; there's -- category 2 is clean and brown
14  water; and there's category 3, which has brown water.
15   Q  Are you familiar with the categories of water
16  damage as set forth in the IICRC S500?
17   A  No.
18   Q  Do you know what the IICRC is?
19   A  I believe it's -- categorizes procedures for
20  water handling and water-loss situations for vendors that
21  specialize in water extraction.
22   Q  It's the Institute of Inspection Cleaning and
23  Restoration Certification.
24   A  Okay.
25   Q  Have you seen this document before?  I'm showing

## Page 114

1  you what is the IICRC S500 Standard and Reference Guide
2  for Professional Water-Damage Restoration.
3    A  I've never seen that before, but --
4    Q  Have you ever read it before?
5    A  I may have looked through it, but I can't say
6  that I --
7    Q  Do you have a copy of this book?
8    A  No.
9    Q  Do you think that, for an adjustor handling 125
10 water-loss cases in Nevada alone, should be familiar with
11 the standards in the industry for water-damage
12 restoration?
13   A  No.
14   Q  Why not?
15   A  We rely on the vendors to provide a good
16 service.
17   Q  How do you know whether the vendor knows what
18 they're talking about?
19   A  They provide a documentation that the place was
20 dried out.
21   Q  And so when you send the vendor out, you don't
22 have any idea if they know what they're talking about
23 until they provide you later with a certification that
24 the home or commercial building is dried out?
25   MR. CANNON:  I'm going to object; that's

## Page 115

1  argumentative.
2    Go ahead.
3    THE WITNESS:  First of all we -- most of the time we
4  don't send anybody out because the vendor has already
5  been chosen by the insured and they're there.
6  BY MR. BALMER:
7    Q  Except in this case you did.  You did send out
8  Paul Davis.
9    A  Paul Davis didn't do the water extraction.
10   Q  Do you know whether or not Paul Davis performed
11 any water-extraction duties in the Cathcart home?
12   A  I think they did, but because this claim started
13 out -- you're talking about the original claim with the
14 water loss or the subsequent ones that were discovered
15 later, like six months later?
16   Q  I'm just asking you whether or not Paul Davis
17 Restoration did any water-damage mitigation at the
18 Cathcart home.
19   A  Not that I know of.
20   Q  At all?
21   A  I think they looked at mold.
22   Q  Okay.  Let's talk about mold.
23   So are you familiar with the IICRC S520, which
24 is the ANSI standard for professional mold remediation?
25 Are you familiar with this document?

## Page 116

1    A  No.
2    Q  It's your position that Paul Davis did in fact
3  undertake a mold remediation on the Cathcarts' home;
4  true?
5    A  I don't know.  I think they may have done some
6  testing.  They may have done some exploring for it.
7    Q  Have you not reviewed Paul Davis' estimates?
8    A  Yeah, but they made an estimate.  I don't know
9  what they actually did.
10   Q  Well, aren't there communications to you from
11 Paul Davis telling you that they were finished or almost
12 finished with the -- all of the approved work?
13   A  Yeah, but that was for the first loss back that
14 started this whole thing off in May.
15   Q  So E-mails to you in December of 2012 and in
16 January of 2013 to that effect was dealing with the
17 original water loss?
18   A  It was dealing with the original water loss and
19 was also talking about some new mold that they were
20 exploring that was brought to their attention by the
21 Cathcarts.
22   Q  So back to the IICRC S520, you've never read
23 this document, have you?
24   A  No.
25   Q  How do you know whether or not a

Page 117

1  mold-remediation contractor such as Paul Davis has any
2  idea what they're doing if you don't have an
3  understanding of the standards for professional mold
4  remediation?
5     MR. CANNON:  I'm going to object to the question.  It
6  assumes that Paul Davis was a mold-remediation expert.
7     Go ahead.
8     THE WITNESS:  Yeah.  Paul Davis does water extraction
9  and they do build-back.  I don't know that they're --
10 what their knowledge is about mold.
11 BY MR. BALMER:
12    Q   What is your understanding of Paul Davis in the
13 Cathcart case?  Did they undertake water-damage
14 restoration?
15    A   No, and it was done by Absolute.
16    Q   Did Paul Davis undertake any mold remediation?
17    A   They look for it; I know that much.  I don't
18 know what they did as far as remediation.
19    Q   Do you have any idea as you sit here what the
20 scope of work was for Paul Davis in the Cathcart house?
21    A   Yes.  They did the cabinet removal and they did
22 the build-back for the water damage that happened in May.
23    Q   Was that it?
24    A   And they looked for other mold when it was
25 brought to their attention in like November of 2012.

Page 118

1     Q   Would you characterize this claim of the
2  Cathcarts under the Universal homeowners policy as one
3  that went smoothly?
4     A   No.
5     Q   What category of water loss impacted the
6  Cathcart home in May of 2012?
7     A   It was a broken pipe that was a fresh-water
8  pipe, as far as I understood it, so it was a category 1.
9     Q   And where was that water pipe located?
10    A   It was -- that was an iffy question.  First we
11 heard it was the toilet supply line and then we heard it
12 was the line under the slab around that area.
13    Q   Would you consider the Cathcart water loss a
14 large loss?
15    A   At the time it came up, no.
16    Q   Did it turn into a large loss?
17    A   Yes.
18    Q   And you would agree that it's important to
19 determine what the cause of the water was?
20    A   Yes.
21    Q   And as you sit here today where the Cathcarts
22 have been sued in federal court by Universal and three
23 years in litigation, can you tell me what the source of
24 the water was in the Cathcart home?
25    A   It was in the slab and that's why they had to do

Page 119

1  the repipe.
2     Q   Was it in the slab or under the slab?
3     A   I don't know.
4     Q   Wouldn't that make a difference when determining
5  whether the water loss carried with it any contaminants
6  such as soil or building materials into the Cathcart
7  home?
8     A   That would.
9     Q   And in fact a fresh-water loss that starts out
10 as a category 1, when it carries with it things such as
11 soil and building materials into a home, it ceases to be
12 a category 1 and becomes a category 2 water loss at
13 least.  Isn't that true?
14    A   That's true.
15    Q   Are you aware that category 2 water losses are
16 defined by the standard in the industry, the IICRC S500,
17 as water containing a significant degree of chemical,
18 biological and/or physical contamination and having the
19 potential to cause discomfort or sickness if consumed by
20 or exposed to humans?  Are you aware of that standard
21 definition of category 2 water damage?
22    A   No.
23    Q   Is there any sort of limitation in the insurance
24 policy for water damage in the Cathcart home?
25    A   No, except for the deductible and the policy

Page 120

1  limits.
2     Q   What was the deductible?
3     A   A thousand dollars.
4     Q   And what was the policy limit for the structure
5  and personal property in the Cathcart home?
6     A   230,000 for the building.
7     Q   And so you would agree with me that from a
8  water-damage perspective, that there is no internal
9  limitation or exclusion on coverage?
10    A   Correct.
11    Q   Did you ever have any experts opine for
12 Universal as to the category of water damage in the home?
13    A   I have to look back at my notes.  I'm not sure
14 on that one.
15    Q   You don't recall that, do you?
16    A   No.
17    Q   It's important to know, isn't it, what category
18 of water loss it is?  Because that determines what sort
19 of action needs to be taken to safely mitigate the water
20 damage; isn't that right?
21    A   It's important to know for the vendor so that
22 they do a proper job, yeah.
23    Q   And it's important to know also for the
24 insurance company so that the insurance company can make
25 a determination on what is fairly owed under the

Page 121

1  insurance policy; isn't that right?
2    A   Yes.
3    Q   All right.  Do you have any training in mold
4  remediation?
5    A   No.
6    Q   Is that offered to you by any of the insurance
7  carriers?
8    A   No.
9    Q   Do you have any training in industrial hygiene?
10   A   No.
11   Q   Are you a general contractor?
12   A   No.
13   Q   Have you ever been a general contractor?
14   A   I've been a roofing contractor.
15   Q   A licensed roofing contractor?
16   A   Yes.
17   Q   And where was that?
18   A   Illinois.
19   Q   In what year?
20   A   This is back in the mid '70s.
21   Q   You yourself carried a roofing subcontractor's
22  license in the state of Illinois?
23   A   Yes.
24   Q   How long did you do that?
25   A   About two or three years.

Page 122

1    Q   What was the name of your business?
2    A   Property Management Inc.
3    Q   So you were a property manager that had a
4  roofing license so you could go do things such as roof
5  repair for apartment buildings or rental houses?
6    A   And residentials, houses, uh-huh.
7    Q   Do you have any degrees in medicine?
8    A   No.
9    Q   Have any training in occupational and
10 environmental medicine?
11   A   No.
12   Q   Any training in otolaryngology?
13   A   No.
14   Q   Internal medicine?
15   A   No.
16   Q   Nursing?
17   A   No.
18   Q   Ever gone to paramedic school?
19   A   No.
20   Q   You don't have any kind of medical knowledge?
21   MR. CANNON:  In what?  Vague.
22   THE WITNESS:  Yeah.
23   BY MR. BALMER:
24   Q   Do you have any -- do you have any medical
25  training?

Page 123

1    A   No.
2    Q   Have you ever served as an expert in any
3  capacity?
4    A   On a business-interruption claim.
5    Q   Somebody hired you as an expert on a
6  business-interruption claim?
7    A   I testified as -- in court in Louisiana about
8  business interruption.
9    Q   Were you testifying on behalf of a claim that
10 you had handled?
11   A   Yes.
12   Q   All right.  So you weren't a hired expert.  You
13 were a witness for the insurance company that you worked
14 for; is that true?
15   A   Correct.
16   Q   Have you ever spoken with Lane Ashley, Esquire
17 of Lewis Brisbois Bisgaard & Smith?
18   A   Not that I can remember.
19   Q   Would you agree with me that Universal was under
20 an obligation to investigate the insurance claim
21 submitted by the Cathcarts in May of 2012?
22   A   Yes.
23   Q   And as part of that investigation, would you
24 agree that the insurance company was under an obligation
25 to retain appropriate experts to assist in the

Page 124

1  investigation?
2    A   Well, on the May 12th there wasn't any need for
3  them, for experts.
4    Q   What experts ever did Universal hire to assist
5  it in the investigation of the Cathcarts' insurance
6  claims?
7    A   We hired Enservio, E-n-s-e-r-v-i-o, to assist
8  with the contents portion of the claim.
9    Q   Did Universal retain an industrial hygienist to
10 assist in determining the claim?
11   A   No, I don't think so.
12   Q   Did Universal retain a mold-remediation
13 contractor to assist in the investigation of the claim?
14   A   Again it's like we're talking about two
15 different claims or three different claims.  The one that
16 happened from May to November or the claims that happened
17 from November on?
18   Q   Well, let's get to the bottom of that now.
19   A   Okay.
20   Q   How many claims does Universal have for the
21 Cathcarts?
22   A   One claim.
23   Q   Okay.  So back to my question, did Universal
24 hire any industrial hygienist to assist in the
25 investigation of the claim of the Cathcarts?

Page 125

1   A   No.
2   Q   Did Universal hire any mold-remediation
3   contractor to assist Universal in the investigation of
4   the Cathcarts' claim?
5   **A   We paid for -- I don't know -- we didn't hire**
6   **them, but we authorized the payment for a mold**
7   **investigation.**
8   Q   Which one?
9   **A   So many I can't think of their name right now.**
10  **I'm sorry.**
11  Q   So was that a mold-remediation contractor that
12  you're saying that Universal hired or are you saying an
13  indoor environmental professional or certified industrial
14  hygienist?
15  **A   Industrial hygienist.**
16  Q   Okay.  So you believe -- even though you said no
17  a minute ago, you believe Universal hired an
18  industrial-hygiene-type professional to assist in the
19  investigation of the claim?
20  **A   Well, I don't know if we hired them.  That was**
21  **chosen by the Cathcarts and we authorized payment of it.**
22  Q   I'll represent to you that is -- I believe
23  you're talking about Earth Resource Group?
24  **A   Yes, I think that's right.**
25  Q   So let's talk about Earth Resource Group.

Page 126

1        Other than agreeing to pay Earth Resource Group
2   in the spring of 2013, did Universal on its own retain
3   any industrial hygiene or indoor environmental
4   professional expert to assist in its investigation of the
5   Cathcarts' claim?
6   **A   No.**
7   Q   So Earth Resource Group ultimately did a report;
8   isn't that true?
9   **A   Correct.**
10  Q   And Earth Resource Group submitted that report
11  to Universal; right?
12  **A   Correct.**
13  Q   And did you read the report?
14  **A   Yes.**
15  Q   At that time following your review of the Earth
16  Resource Group report in 2013, did Universal go out and
17  retain any other similar expert in industrial hygiene or
18  indoor environmental professional work to rebut the Earth
19  Resource Group report?
20  **A   No.**
21  Q   Did Universal go out and hire another expert to
22  critique the Earth Resource Group report?
23  **A   No.**
24  Q   So as it relates to the Earth Resource Group
25  report and the claims file, the only report from an

Page 127

1   indoor environmental professional concerning the Cathcart
2   home that is at play in this claim is the Earth Resource
3   Group report; true?
4   **A   Yes.**
5   Q   Do you know what the recommendations of the
6   Earth Resource Group report included?
7   **A   I just know they found elevated levels of mold.**
8   Q   You don't have any better understanding of it
9   than that?
10  **A   I'd have to go back and review it.**
11  Q   Did Universal accept the report of Earth
12  Resource Group as properly documenting the condition of
13  the Cathcart home?
14  **A   Yes.**
15  Q   And is it true that Universal has no evidence
16  that is contrary to the opinions set forth in that Earth
17  Resource Group report?
18  **A   Correct.**
19  Q   Ultimately you received an estimate from a
20  mold-remediation contractor by the name of Summit
21  Restoration.  Do you remember that?
22  **A   Yes.**
23  Q   Did you review that estimate?
24  **A   Briefly.**
25  Q   Well, it's an important part of the claim.  Did

Page 128

1   you review it and give it the attention that you needed
2   to give it to understand it?
3   **A   I know that it was 92,000.**
4   Q   Did you review the contents of that report?
5   **A   I just -- like I did look at it.**
6   Q   Did you just out of hand dismiss the Summit
7   Restoration report?
8        MR. CANNON:  Objection; that's not what he said.
9        THE WITNESS:  No.
10  BY MR. BALMER:
11  Q   Well, I'm asking.
12  **A   No.**
13  Q   Did Universal retain any mold-remediation expert
14  to oppose or otherwise critique the Summit Restoration
15  estimate?
16  **A   No.**
17  Q   Did Universal then accept as true the opinions
18  set forth in the Summit Restoration estimate provided to
19  Universal?
20  **A   I didn't approve it or anything like that.  I**
21  **just know that it's there for 92,000.**
22  Q   Well, don't you -- as the insurance company,
23  when an insured provides you with information concerning
24  the claim, isn't it your responsibility to deal fairly
25  and in good faith with the insured and give the insured

Electronically signed by Ellen Goldstein (001-341-678-7457)          6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 129

1 at least the same amount of deference that you would give
2 the insurance company's bottom line and at least consider
3 and act on the report in some way?
4  **A   It's pretty self-evident that the mold**
5 **remediation was $92,000 and that's all I needed to know.**
6  Q   Why did you need to know that?
7  **A   Because that's part of the damages.**
8  Q   And so you've got -- Universal has no evidence
9 to contradict the Summit Restoration estimate that was
10 provided to Universal in the late spring, early summer of
11 2013; is that right?
12  **A   Correct.**
13  MR. CANNON: You want to take a break now? It's
14 12:30.
15  MR. BALMER: Give me just a second, please --
16  MR. CANNON: Yeah, that's fine.
17  MR. BALMER: -- and we'll take a break.
18  Q   There was a doctor's note that was provided to
19 Universal concerning the Cathcarts' medical conditions.
20 Do you recall that?
21  **A   Yes. It was a handwritten note.**
22  Q   Did you review that note when it came in?
23  **A   Yes.**
24  Q   Did Universal retain any medical expert to
25 dispute or contradict the contents and opinions set forth

Page 130

1 in that handwritten doctor's note?
2  **A   No.**
3  Q   So at the time that you -- well, strike that.
4    You reviewed the doctor's note?
5  **A   Yes.**
6  Q   Did you understand it?
7  **A   Yes.**
8  Q   Did you call the doctor?
9  **A   No.**
10  Q   Did you call anybody?
11  **A   No.**
12  Q   Do you recall the contents of that short
13 handwritten note?
14  **A   I'll paraphrase it. It's just that, due to**
15 **their health conditions, they should not be living in the**
16 **house basically.**
17  Q   And so at the time that you read that report and
18 you indicate you understood it, from that point forward
19 you and Universal knew that there was medical opinion
20 that the Cathcarts should not be living in the home in
21 its current circumstance?
22  **A   Correct.**
23  Q   Do you know where the Cathcarts are living now?
24  **A   No.**
25  Q   Do you recall that the Cathcarts were forced to

Page 131

1 move back into their home when Universal withdrew living
2 expenses?
3  MR. CANNON: I'm going to object to the form of the
4 question.
5  Go ahead.
6  THE WITNESS: I don't know why they moved back in.
7 BY MR. BALMER:
8  Q   You don't know why they moved back in?
9  **A   Huh-uh, no.**
10  Q   Did you understand that if living expenses were
11 not continued on behalf of the Cathcarts, that the
12 Cathcarts would have no choice but to move back into the
13 home that the doctors told them they should not be in?
14  **A   Say that again now.**
15  MR. BALMER: Go ahead and read it back, please.
16    (The record was read as follows:
17      "QUESTION: Did you understand
18      that if living expenses were not
19      continued on behalf of the Cathcarts,
20      that the Cathcarts would have no choice
21      but to move back into the home that the
22      doctors told them they should not be
23      in?")
24
25  MR. BALMER: Let me ask it this way.

Page 132

1  THE WITNESS: Yeah.
2  MR. BALMER: I'll try it again. It's a wordy
3 question. I apologize. I'll try it again.
4  Q   Did you understand, on behalf of Universal, that
5 if Universal quit paying additional living expenses, the
6 Cathcarts were going to have to move back into their
7 house despite the doctor's orders?
8  **A   No.**
9  Q   Where did you think they were going to go?
10  **A   I don't know.**
11  Q   Did you care?
12  **A   Sure.**
13  Q   Do you take this claim seriously?
14  **A   Yes.**
15  Q   All right. We'll talk more about that after
16 lunch. That's a good place to stop.
17    (Lunch recess taken from 12:29 p.m. to
18 1:24 p.m.)
19 BY MR. BALMER:
20  Q   Mr. Ketcham, you understand that after our lunch
21 break you are still under oath?
22  **A   Yes.**
23  Q   And you are still required to tell the truth?
24  **A   Yes.**
25  Q   When we broke we were talking about the various

Page 133

1 expert reports that were provided to Universal to which
2 Universal doesn't have any answer, and that's Earth
3 Resource Group, the Summit Restoration estimate, and the
4 doctor's note, handwritten, that we spoke about. Do you
5 remember that?
6     A   Yes.
7     Q   Did Universal speak with other experts in any
8 capacity and -- well, we'll leave it there. Did
9 Universal speak with experts in some capacity?
10    A   What type of experts?
11    Q   Any kind of expert other than those that we've
12 talked about, the Earth Resource Group, Summit
13 Restoration.
14    A   We did call out ALD, American Leak Detection, to
15 help find the leak in the slab.
16    Q   And that ALD report -- that's American Leak
17 Detection -- demonstrated that it was a leak under the
18 slab; right?
19    A   Correct.
20    Q   What else?
21    A   And then I believe Paul Davis hired -- that's
22 what I'm trying to find, that certificate on that, this
23 morning and now at lunch break, trying to find that
24 certificate or -- that I talked about for the mold people
25 that Paul Davis hired.

Page 134

1     Q   Were there any consultants or experts that were
2 contacted by Universal in regard to this claim that
3 refused or declined to help out Universal in this case?
4     MR. CANNON:  I'm going to object to the term "help
5 out."
6     THE WITNESS:  Yeah. Could you try that again.
7     MR. BALMER:  Okay.
8     Q   Did Universal contact any experts who refused to
9 serve as an expert for Universal?
10    A   No.
11    Q   Is Universal in possession of any reports of any
12 expert or consultant that have not been produced to the
13 Cathcarts in this case?
14    A   There is a -- that's the report I'm trying to
15 find and that's what I'm stumbling on, I'm sorry. It's
16 the expert that was sent out by I believe Paul Davis and
17 I think their name was Sands -- that's the one I can't
18 find -- and they did a mold test and they certified it.
19 I believe that was sent to me, but I cannot find the
20 correspondence right this moment.
21    Q   Do you know what the qualifications are for the
22 mold tester whose efforts resulted in that document?
23    A   No.
24    Q   Do you know whether or not that particular
25 contractor is properly trained?

Page 135

1     A   No.
2     Q   Do you know whether that person is appropriately
3 credentialed?
4     A   No.
5     Q   Do you know what the reputation is for that
6 individual that would have been responsible for putting
7 that report together?
8     A   No.
9     Q   Do you know what the -- strike that.
10        The sampling results from that particular
11 vendor, do you understand that those results actually
12 demonstrated contamination in the home?
13    A   I believe it did, yeah.
14    Q   So the certification that you're talking about,
15 you don't believe that the report actually provided
16 evidence that the house was without contamination?
17    A   I think it was -- said that they did find mold
18 but that it was taken care of in the past. That's the
19 report I cannot find.
20    Q   Was this a post-remediation report?
21    A   I don't remember.
22    Q   Who would have remediated the mold?
23    A   Paul Davis.
24    Q   Other than that document that you are having
25 difficulty locating, is Universal in possession of any

Page 136

1 other expert report or consultant report that haven't
2 been shared in this case with the Cathcarts?
3     A   No.
4     Q   There have been some documents that have been
5 recently produced by counsel for Universal, and I'm going
6 to show them to you and I'm going to ask you about them.
7        The first document I want to ask you about is --
8 this is Bates numbered UNAIC 000514 through 518 and this
9 purports to be a -- the top page purports to be an
10 invoice from Perry Consulting Group Inc. out of El Cajon,
11 California and it references the Cathcart residence.
12 There is a print date of October 11, 2013 on page 514 in
13 the upper right-hand corner. What is this?
14    A   Say that again now.
15    Q   What is this document?
16    A   Well, it looks like an invoice from Perry
17 Consulting Group.
18    Q   Who is Perry Consulting Group?
19    A   I am not sure.
20    Q   Where is Perry Consulting Group's report?
21    A   I don't know.
22    Q   Why was Perry Consulting Group participating in
23 this case? There's an invoice date on page 514 of
24 July 31, 2013. The invoice is in the amount of $1,980.
25 Do you see that?

Electronically signed by Ellen Goldstein (001-341-678-7457)        6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 137

1    A   I do.
2    Q   Did you pay that?
3    A   I don't know.
4    Q   If the claims file indicates that you paid that,
5  does that refresh your memory?
6    A   Yes.
7    Q   $1,980 is a lot of money, isn't it?
8    A   Yes.
9    Q   And it's certainly a lot of money to pay where
10 you apparently got no report in return; is that right?
11   A   I don't know if we even paid for it.
12   MR. CANNON: Or if he didn't get it from an attorney.
13 BY MR. BALMER:
14   Q   Do you have a report from Perry Consulting
15 Group?
16   A   Not that I'm aware of.
17   Q   I will represent to you that no report from
18 Perry Consulting Group has ever been produced to either
19 my office or the Cathcarts.  Does that help you?
20   A   I don't even recall this group.
21   Q   All right.  Set that aside.  Actually I'll take
22 it back.  I'm not going to attach that.  We've got the
23 Bates numbers on the record.
24   MR. CANNON:  What's the Bates number?
25   ///

Page 138

1    MR. BALMER:  Sure (indicating).
2    Q   I am now going to show you what is Bates labeled
3  UNAIC 426 through 437, and this was also just very
4  recently produced.  Take a moment to look at that.
5    A   Oh, okay.
6    Q   Let me know when you're done.
7    A   Okay.
8    Q   Who is Jeff Hicks?
9    A   He looks like a mold -- some type of a
10 scientific expert.
11   Q   Did Jeff Hicks ever provide Universal with a
12 report?
13   A   I don't know.
14   Q   I'll represent to you that no report from Jeff
15 Hicks has ever been provided to my office or the
16 plaintiffs, Cathcart third-party plaintiffs.
17   A   Okay.
18   Q   Do you happen to know where a report might be,
19 if any?
20   A   I have to look through the file to find it.
21   Q   I'll represent to you that there's nothing in
22 that claim file from Jeff Hicks other than this.
23   A   Okay.
24   Q   You've got no report or opinions from Jeff
25 Hicks; is that right?

Page 139

1    A   I -- it was not -- they were not hired by me
2  and --
3    Q   Was he paid for by you?
4    A   That I don't know without checking the file.
5    Q   These documents were produced by Universal.
6       So you don't have any opinions from Mr. Perry;
7  is that right?
8    A   Correct.
9    Q   Even though Mr. Perry billed you for almost
10 $2,000, you don't have anything from him, do you?
11   A   No.
12   Q   And Mr. Hicks billed you for $355 and you don't
13 have anything from him either, do you?
14   A   No.
15   Q   You're sure Universal isn't holding back some
16 reports from the Cathcarts?
17   A   Not that I'm aware of.
18   Q   I am looking in binder 1 of 2 that was produced
19 as the claims file.  We testified about these binders
20 today; true?
21   A   True.
22   Q   And these documents included herein are not
23 Bates numbered, but they are tabbed; so I'm going to call
24 your attention to tab No. 9.  Tab No. 9 appears to be a
25 Curriculum Vitae from someone named M period Eric,

Page 140

1  E-r-i-c, Gershwin, G-e-r-s-h-w-i-n.  Do you know who Eric
2  Gershwin is?
3    A   He seems to be some expert on some medical
4  stuff.  I'm not sure.
5    Q   Did you ever have any discussions with anyone
6  associated with Jeff Hicks at Exponent?
7    A   Not that I'm aware of.
8    Q   Did you ever have any conversations with anyone
9  associated with Perry Consulting Group Inc.?
10   A   No.
11   Q   Did you ever have any conversations with Eric
12 Gershwin?
13   A   No.
14   Q   Did Eric Gershwin ever provide you with any sort
15 of report or opinion?
16   A   Not me, no.
17   Q   Well, you, as the insurance adjustor on the
18 Cathcart claim, would have been interested to know, in
19 your investigation of the claim, information that might
20 have been held by Mr. Hicks from Exponent, Perry
21 Consulting Group Inc., or Mr. Gershwin; right?
22   A   Yes.
23   Q   But you don't have any information from any of
24 those parties, do you?
25   A   No.

Electronically signed by Ellen Goldstein (001-341-678-7457)                                         6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 141

1   Q   Do you know if you paid Gershwin any money?
2   A   No, I don't, not without looking at the file.
3   Q   You certainly didn't utilize Perry Consulting,
4   Exponent or Gershwin in your evaluation of the Cathcarts'
5   claim; is that true?
6   A   I didn't, no.
7   Q   Don't you find it odd that there are a bunch of
8   Curriculum Vitae and some bills from various vendors and
9   there's no substantive work product produced from any of
10  them?
11  A   It is.
12  Q   You can probably understand why the Cathcarts
13  might question whether or not there's some reports that
14  haven't been produced to us?
15  A   Correct.
16  Q   You agree, though, that in your adjustment of
17  the Cathcart claim, you did not rely on Perry Consulting,
18  Exponent or Gershwin?
19  A   True.
20  Q   I'm going to show you a document that is Bates
21  labeled UNAIC 470.  Do you recognize that document?
22  A   Yes.
23  Q   What is it?
24  A   It's a note from a doctor, KE Medical Group,
25  from a Dr. Barry Hahn I believe.  I can't read the

Page 142

1   writing.  Nahn?
2   Q   Can you read the text of the document into the
3   record, please.
4   A   Dated May 10th, 2013:  "To Whom It May Concern,
5   the Cathcart family and -- are patients of mine.  I
6   understand that their home was found to have extensive
7   mold infestation.  Due to their medical condition,
8   including asthma and heart disease, living in their home
9   would be extremely detrimental to their health."
10  Q   And is it signed?
11  A   Dr. Barry Nan? Nanin? Nahn?
12  Q   Is that N-a-h-i-n, appears?
13  A   Correct, MD.
14  Q   And this is the handwritten medical record that
15  we testified about earlier?
16  A   Correct.
17  Q   And you received this?
18  A   Yes.
19  Q   On or about May of 2013?
20  A   Probably.
21  Q   And you read it when you got it?
22  A   Yes.
23  Q   And you understood it?
24  A   Yes.
25  Q   You didn't undertake any sort of investigation

Page 143

1   of your own into the contents of this document; is that
2   true?
3   A   No.
4   Q   That's not true?
5   A   No, I didn't do any investigation into that
6   document.
7   Q   What did you do with this document when you
8   received it?
9   A   I read it and put it in the file.
10  Q   Did you talk to anybody about it?
11  A   No.
12  Q   Didn't talk to your supervisor about it?
13  A   No.
14  Q   And you understood this to be -- to mean that
15  the Cathcarts should not be living in their house as it
16  stood on March 10, 2013; right?
17  A   Correct.
18  Q   And that it would be dangerous for them to live
19  there?
20  A   Yes.
21  Q   And that the Cathcarts had medical conditions,
22  including asthma and heart disease?
23  A   Correct.
24     MR. BALMER:  We'll go ahead and attach this letter
25  that is Bates numbered UNAIC 470 as the next in line,

Page 144

1   which I believe is Exhibit No. 3.
2     (Defendants' Exhibit 3 was marked for
3   identification by the Certified Court Reporter.)
4   BY MR. BALMER:
5   Q   We've kind of hit these subjects, but I just
6   want to make sure that we're clear.
7     You don t any technical training in water
8   damage?
9   A   Correct.
10  Q   You don't have any technical training in mold?
11  A   Correct.
12  Q   You don't have any technical training in
13  remediation sciences?
14  A   Correct.
15  Q   You don't have any technical training in
16  reconstruction?
17  A   Correct.
18  Q   So you couldn't testify as an expert on any of
19  those subjects?
20  A   No.
21  Q   And because you don't know -- strike that.
22     Because you don't have any technical training or
23  knowledge on any of those subjects -- water damage,
24  mold-remediation sciences, or reconstruction -- you
25  understand it's important to rely on and to retain

Electronically signed by Ellen Goldstein (001-341-678-7457)

6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 145

1 appropriate experts to assist you in those areas while
2 you're adjusting a claim; right?
3    A   Correct.
4    Q   Would you agree that, when investigating, an
5 insurance company has to conduct a thorough
6 investigation?
7    A   Sure.
8    Q   Would you agree that, in investigating a claim,
9 you have to consider the insured's interest with that of
10 the company?
11    MR. CANNON:  Objection; asked and answered twice
12 already.
13      Go ahead.
14    THE WITNESS:  Yes.
15 BY MR. BALMER:
16    Q   When you were reviewing a file regarding water
17 damage, mold and related property damage and injury, if
18 you don't understand something about that claim, where do
19 you go to figure out what you don't understand?
20    A   Rely on experts and I look at the policy
21 language.
22    Q   Would you agree that an understanding of the
23 components of a claim is necessary in order to
24 appropriately gauge policy language for coverage?
25    A   As it relates to the property damage, yes.

Page 146

1    Q   At what point do you start asking questions of
2 the legal department at Universal?  And of course we're
3 talking about when you were there.
4    A   Ask them about what?
5    Q   Is the legal department involved in all claims?
6    A   No.
7    Q   What makes a determination of when you get the
8 legal department involved in a claim at Universal?
9    A   Consulting them as the -- what direction any
10 litigation -- I guess how can I say this?  When we think
11 a file is going to litigation, who they would recommend
12 to handle the claim and -- et cetera.
13    Q   Well, I'm interested in the "et cetera."
14    A   Okay.
15    Q   What's the "et cetera" part?
16    A   We consult them to see if this is a claim we
17 want to take to suit, if -- and who should be the proper
18 person to handle it, proper attorney.
19    Q   There are claims that Universal wants to take to
20 suit?
21    A   Sometimes.
22    Q   Do you provide your insureds with legal counsel
23 when you take a claim to suit?
24    A   No.
25    Q   Are you --

Page 147

1    A   I mean if we take it on their behalf, yes.
2    Q   But that's not what we're talking about, is it?
3    A   No, but that's a pretty open-ended question
4 there.
5    Q   But you understood what I meant?
6    A   Yes.
7    Q   When Universal decides that it wants to take a
8 claim to suit, does -- against an insured -- does
9 Universal provide the insured with legal counsel to
10 protect their interests?
11    A   No.
12    Q   In the typical matter where Universal wants to
13 take a claim to suit, would you agree that the insurance
14 company has much deeper pockets to pay for lawyers and
15 legal fees and litigation costs than its insured would?
16    A   Yes.
17    Q   In fact it's not even close typically, is it,
18 between the ability to pay for lawyers between the
19 insurance company and its insured?
20    MR. CANNON:  Objection; calls for speculation, lacks
21 foundation.
22      Go ahead.
23    THE WITNESS:  It just depends on the insured.  Some
24 insureds are very well heeled and have their own legal
25 counsels and own companies and stuff like that.

Page 148

1    MR. BALMER:  Well, let's narrow that down.
2    Q   In terms of homeowner claims that deal in water
3 damage where Universal wants to take the matter to suit
4 against the insured, wouldn't you agree with me that
5 typically the insurance company is far better heeled to
6 withstand the legal expenses and costs of suit than its
7 insured?
8    A   Yes.
9    MR. CANNON:  Same objection.
10      Go ahead.
11 BY MR. BALMER:
12    Q   Do you feel like that gives the insurance
13 company an advantage in litigation?
14    A   No.
15    Q   You don't find that where an insured can't
16 afford a lawyer and the insurance company can, that
17 doesn't place the insurance company in a position of
18 strength vis-a-vis the insured?
19    MR. CANNON:  Objection; foundation, calls for
20 speculation.
21      Go ahead.
22    THE WITNESS:  I don't know how to answer that.
23      Of course the insurance company is better
24 equipped financially to hire attorneys than an
25 individual, but it's my experience that they have no

Electronically signed by Ellen Goldstein (001-341-678-7457)                6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 149

1 trouble finding an attorney to represent them.
2 BY MR. BALMER:
3    Q   In a declaratory relief action filed in federal
4 court where the insureds are defendants?
5    A   **This happens very rarely, so I don't know.**
6    Q   What happens very rarely?
7    A   **Where the insurance company files a dec action.**
8    Q   With respect to handling claims, what
9 information is available to you to help you understand
10 the terms of the policy?  For example, if you're confused
11 about one of the terms of the policy, what steps can you
12 take to clarify that?
13   A   **Oh, I can seek counsel from the -- my supervisor**
14 **or rely on my years of experience interpreting policy**
15 **language.**
16   Q   In terms of Nevada situated claims, those years
17 of interpreting policies, at least for you, are done
18 without the benefit of knowing what the Nevada
19 Administrative Code has to say on claims handling, what
20 the Nevada Revised Statutes have to say on claims
21 handling, and what the Nevada Supreme Court has said
22 concerning insurance-claim issues.  Isn't that right?
23      MR. CANNON:  Objection; mischaracterizes his former
24 testimony.
25      Go ahead.

Page 150

1      THE WITNESS:  Say that again now.
2      MR. BALMER:  Go ahead and read it back.
3      (The record was read as follows:
4         "QUESTION:  In terms of Nevada
5         situated claims, those years of
6         interpreting policies, at least for
7         you, are done without the benefit of
8         knowing what the Nevada Administrative
9         Code has to say on claims handling,
10        what the Nevada Revised Statutes have
11        to say on claims handling, and what the
12        Nevada Supreme Court has said
13        concerning insurance-claim issues.
14        Isn't that right?")
15
16      THE WITNESS:  That is true.
17      MR. BALMER:  Thank you.
18   Q   In your mind, would it be improper to focus an
19 investigation on finding grounds to deny a claim?
20   A   **No.**
21   Q   I'm going to say that question again.  I want to
22 make sure your answer is in the negative.
23      In your mind, would it be improper to focus an
24 investigation on finding grounds to deny a claim?
25   A   **Would I focus on a claim to deny it?**

Page 151

1      MR. BALMER:  Read the question, please.
2      (The record was read as follows:
3         "QUESTION:  I'm going to say that
4         question again.  I want to make sure
5         your answer is in the negative.
6            In your mind, would it be improper
7         to focus an investigation on finding
8         grounds to deny a claim?")
9
10     MR. CANNON:  Object to the form of the question.
11 Go ahead.
12     THE WITNESS:  We don't look for ways to deny claims.
13 We look for ways to interpret the policy and apply the
14 right policy conditions and language to the claim.  We
15 don't look to deny claims.
16 BY MR. BALMER:
17   Q   All right.  Thank you.  That's not my question.
18     My question is, in your mind would it be
19 improper to focus an investigation on finding grounds to
20 deny a claim?
21   A   **Yes, it would.**
22   Q   Would you agree that, in evaluating a claim, you
23 have to be fair and objective?
24   A   **Yes.**
25     MR. CANNON:  Asked and answered.

Page 152

1 BY MR. BALMER:
2    Q   Would you agree that it would be improper to
3 deny a claim based on speculation?
4    A   **Yes.**
5    Q   I think we've hit this.  Would you agree that it
6 is the insurance company's obligation to investigate the
7 claim?
8    A   **Yes.**
9    Q   And if there are claims about a claim, do you
10 think you should seek all information related to that
11 claim?
12   A   **The necessary amount.**
13   Q   Would you agree that it is improper to
14 misrepresent or miscommunicate facts to an insured in the
15 course of an investigation?
16   A   **Yes.**
17   Q   Are you aware of what representations were made
18 in the sale of the homeowners policy to the Cathcarts?
19   A   **No.**
20   Q   Did you ever talk to the agent?
21   A   **No.**
22   Q   Who maintains physical possession of the claims
23 file?
24   A   **Universal and -- North America.**
25   Q   The materials of the claims file that were

Electronically signed by Ellen Goldstein (001-341-678-7457)
6e9ccab9-8597-4f64-ab5d-08013443abc5

Page 153

1 produced today in the two large binders, are those
2 materials that were stored at Universal in paper form or
3 in electronic format?
4    A    Electronic.
5    Q    Are there paper claims files kept at Universal?
6    A    No.
7    Q    And so in order to print out the claims file
8 from the electronic database, that requires somebody to
9 go in and click on all of the portions of the file they
10 want to produce; is that right?
11    A    Correct.
12    Q    Is it possible to print out part of the claims
13 file, something less than all of it?
14    A    I suppose if the person clicking on all of them
15 missed a click, yeah.
16    Q    Either accidentally or intentionally?
17    A    Yes.
18    Q    Somebody could miss a click?
19    A    It's possible.
20    Q    Somebody could miss more than one click; is that
21 right?
22    A    Could be.
23    Q    Are the servers that maintain the claims file in
24 the Cathcart case located in Sarasota?
25    A    Yes.

Page 154

1    Q    Did you have login information for the server
2 where you could access claims-file documents?
3    A    Only through the claims system.
4    Q    So you would log on to the claims system?
5    A    Yes.
6    Q    Does it notate every time somebody logs on to
7 the claims system?  Is a record kept of that?
8    A    No, I don't believe so.
9    Q    In relation to the claims notes, is it possible
10 to insert additional claims notes into that file?
11    A    No.
12    Q    Once it's in it's in?
13    A    Once it's in it's in with all the bad spellings.
14    Q    Can you delete from the claims file?
15    A    No.
16    Q    Or -- I'm sorry -- can you delete from the
17 claims notes?
18    A    No.
19    Q    What would cause, in two different versions of
20 the claim notes, to have claims notes in different orders
21 from one set to the next?  Is that possible?
22    A    No, I don't think so; like, you know, what I'm
23 looking at here?  Once it's in there, it can only be --
24 it can't be manipulated at all.
25    Q    You sure?

Page 155

1    A    Yeah.
2    Q    You've got the claims-file binder, one of the
3 two, in front of you and it's organized into tab dividers
4 and then there are blue-sheet dividers within the tabs.
5 Do you see that?
6    A    Yes.
7    Q    Is this the way that a claims file is normally
8 kept in the ordinary course?
9    A    No.
10    Q    Who put this book together?
11    A    I don't know.  Someone at Universal.
12    Q    I'm going to show you a couple of documents.
13 Let me show you what is Bates No., down in the bottom,
14 ALS 16.  What is that document?
15    A    It's a Notice of Intent to Lien on the Cathcarts
16 from ALS Development and Management Corp. doing business
17 as Paul Davis Restoration.
18    Q    So what is this document?  What's your
19 understanding of what this document is?
20    A    That means if the Cathcarts don't pay them,
21 they're going to put a lien on their house.
22    Q    Did you know that Paul Davis was going to
23 institute lien proceedings against the Cathcarts?
24    A    No.
25    MR. BALMER:  We'll go ahead and mark this Notice of

Page 156

1 Intent to Lien as the next in line, which I believe is
2 Exhibit No. 3.
3    THE REPORTER:  Huh-uh.
4    MR. BALMER:  Four, sorry.  I'm looking at Exhibit 3.
5    (Defendants' Exhibit 4 was marked for
6 identification by the Certified Court Reporter.)
7 BY MR. BALMER:
8    Q    I'm going to show you another document that is
9 Bates numbered in the bottom right ALS 94 and 95.  It's a
10 two-page document.  Ask you to review that and I've got
11 some questions for you.
12        What is that document?
13    A    It's from collections at Paul Davis Restoration
14 addressed to James Ketcham.  "James, please be advised we
15 must receive payment on this claim in the 15 days to
16 avoid lien process.  Please contact our office with any
17 further questions you may have."
18    Q    Did you receive this E-mail?
19    A    Yes.
20    Q    Have you look at the second page.  Is that a
21 read confirmation from you?
22    A    Yes.
23    Q    So you actually read this E-mail from Paul Davis
24 Restoration that said unless they receive payment on the
25 claim within 15 days, they're going to move forward with