# Exhibit 6C

Page 157

1  the lien process on the Cathcart house?
2  A  Yes.
3  Q  Just a minute ago you said you didn't know that
4  they were going to move forward with the lien process.
5  A  I didn't know they were going to move forward
6  with the lien. Just because they say they are, it could
7  be -- we get these quite often -- not quite often, but
8  I've seen them before.
9  Q  Are you just playing roulette with your
10  insured's house?
11  MR. CANNON: Object; it's argumentative.
12  BY MR. BALMER:
13  Q  I mean you're playing chicken with the
14  contractor on whether they file a Notice of Lien on the
15  client's house?
16  MR. CANNON: Same objection.
17  BY MR. BALMER:
18  Q  Please answer that.
19  A  **We are not playing with the insureds. I have no**
20  **control over what Paul Davis does.**
21  Q  You were told, were you not, from Paul Davis
22  that in the event that they don't receive payment on the
23  claim in 15 days, that "We're going to move forward with
24  the lien process." They told you that, didn't they?
25  A  Yes.

Page 158

1  Q  All right. And you just didn't take it
2  seriously?
3  A  **No, I took it seriously.**
4  Q  What did you do?
5  A  **The claim was in dispute.**
6  Q  With Paul Davis?
7  A  **With the charges, yes.**
8  Q  Did you send him something saying it was in
9  dispute?
10  A  **We had talked earlier about it.**
11  Q  Who had talked earlier about it?
12  A  **Myself and Paul Davis.**
13  Q  Did you send Paul Davis a letter saying, "Hey,
14  wait. Hold on. We have a dispute concerning your claim
15  for payment. Please don't put a lien on the Cathcart
16  home"? Did you do anything like that?
17  A  **No.**
18  Q  Why not?
19  A  **Because the claim was in dispute.**
20  Q  And so because Universal believed that the claim
21  was in dispute, you allowed Paul Davis to go forward and
22  affix a lien on the Cathcart home?
23  A  **I had no control over Paul Davis.**
24  Q  But you have control over whether Universal
25  takes action to protect its insured, don't you?

Page 159

1  MR. CANNON: Object; argumentative, lacks foundation,
2  calls for speculation.
3  Go ahead.
4  THE WITNESS: We look at all aspects of the claim and
5  how we handle claims.
6  BY MR. BALMER:
7  Q  And which part of the way you looked at the
8  claim was in the nature of your fiduciary-like duty to
9  the Cathcarts in terms of the threat of Paul Davis to
10  file a Notice of Lien on the Cathcart family home?
11  A  **Try that again.**
12  MR. BALMER: You can read it back. Please try to use
13  the appropriate inflection.
14  (The record was read as follows:
15       "QUESTION: And which part of the
16       way you looked at the claim was in the
17       nature of your fiduciary-like duty to
18       the Cathcarts in terms of the threat of
19       Paul Davis to file a Notice of Lien on
20       the Cathcart family home?")
21
22  THE WITNESS: Again I have no control over what Paul
23  Davis does. They may or may not have filed lien on their
24  property.
25  ///

Page 160

1  BY MR. BALMER:
2  Q  You just didn't care whether they did or not?
3  MR. CANNON: I'm going to object; that
4  mischaracterizes.
5  MR. BALMER: Well, I'll ask it a different way.
6  Q  Did you care?
7  A  **Yes.**
8  Q  And how did you act in a way that demonstrates
9  that Universal cared whether or not Paul Davis affixed a
10  Notice of Lien on the Cathcart family home?
11  A  **The claim was still in dispute, so it was going**
12  **to play out.**
13  Q  In what way was it going to play out?
14  A  **Well, that's what I didn't know at the time.**
15  Q  When you received this E-mail on April 3, 2013
16  at 1:00 p.m. that we know that you received, did you pick
17  up the phone and call Paul Davis?
18  A  **No.**
19  Q  Did you send an E-mail back to Paul Davis
20  saying, "Hey, hold on. Let's figure this out. We don't
21  want a lien put on the Cathcarts' home"? Did you do
22  that?
23  A  **Not at that time.**
24  Q  Did you do that at any time?
25  A  **I think I've talked to Paul Davis many times.**

Page 161

1  Q  In response to Paul Davis' written threat to you
2  that they were going to institute lien proceedings on the
3  Cathcart home on April 3, 2013, did you contact Paul
4  Davis by telephone to say, "Hey, let's work something
5  out"?
6  A  Not that I remember.
7  Q  Did you hit the reply button to this E-mail and
8  write Paul Davis back and say, "Hey, let's figure
9  something out. We don't want a lien put on the
10 Cathcarts' house"?
11 A  I don't believe I did.
12 Q  In fact you didn't respond at all to this
13 E-mail, did you?
14 A  I don't believe so.
15 Q  And just decided to wait and see what happened;
16 is that right?
17 A  No.
18 MR. CANNON: I'm going to object, mischaracterizes.
19 BY MR. BALMER:
20 Q  What affirmative action did you take to protect
21 the Cathcarts from the threat of lien?
22 A  I had several conversations with Paul Davis.
23 Q  Following your receipt of the April 3, 2013
24 E-mail, what action did you take on behalf of Universal
25 North America to protect the Cathcarts from having their

Page 162

1  family home liened up by Paul Davis?
2  A  Nothing I can remember right now.
3  Q  All right.
4     We'll go ahead and attach these two pages
5  collectively -- it's ALS 94 and 95 -- as the next exhibit
6  in order.
7  A  What was the date on that?
8  Q  April 3, 2013.
9     (Defendants' Exhibit 5 was marked for
10 identification by the Certified Court Reporter.)
11 BY MR. BALMER:
12 Q  Now, looking at Exhibit No. 5, what we were just
13 talking about, what is the date of that E-mail?
14 A  April 3rd, 2013.
15 Q  And how long did Paul Davis indicate to
16 Universal, to you specifically, that you had before they
17 would move forward with lien proceedings?
18 A  Fifteen days.
19 Q  And you took no action?
20 A  Correct.
21 Q  I'm going to show you what we'll mark as next in
22 line. It's ALS 26 and 27. Take a look at that document
23 and I'd like to know from you what that is.
24 A  That is a Notice of Lien by ALS. It's a filing
25 in the amount of 40,631.90.

Page 163

1  Q  What is the date of that Notice of Lien?
2  A  4-18-2013.
3  Q  How many days after the E-mail that Paul Davis
4  sent to you and you received was that Notice of Lien
5  filed?
6  A  Fifteen days.
7  Q  Just like Paul Davis told you they were going to
8  do; right?
9  A  Correct.
10 Q  Thank you.
11    Go ahead and mark this as next in line, which is
12 Exhibit No. 6.
13    (Defendants' Exhibit 6 was marked for
14 identification by the Certified Court Reporter.)
15 BY MR. BALMER:
16 Q  Following April 3, 2013, did you just ignore
17 Paul Davis from there on out?
18 A  No. I had several conversations with them.
19 Q  After April 3?
20 A  I don't remember.
21 Q  I'm going to show you what has been Bates
22 labeled UNAIC 310 to 312. What is that document?
23 A  That's a document dated February 11th, 2013.
24 It's a letter of representation. It says, "Please be
25 advised the law firm has been retained to represent

Page 164

1  Matthew Cartright and his family in relation to the
2  claims" --
3  MR. CANNON: Cathcart.
4  THE WITNESS: Cathcart, I'm sorry.
5    -- "and his family in relationship to claims and
6  damages associated with the above named."
7  BY MR. BALMER:
8  Q  Did you receive this letter? It's addressed to
9  you.
10 A  Yes.
11 Q  Did you receive this letter?
12 A  Yes.
13 Q  Did you review it?
14 A  Yes.
15 Q  Okay. Starting on the bottom of page 310, which
16 is the first page of the document, there are some bullet
17 points that are set forth there and throughout much of
18 page 2. Why don't you review to yourself those bullet
19 points and I've got a couple of questions for you.
20 A  Okay.
21 Q  Let me know when you're done.
22 A  You want me to go to the second page and start
23 reading the bullet points?
24 Q  Yes, please. I'd like you to be familiar with
25 the bullet points and then I've got a couple questions

Page 165

1  for you.
2  A  Okay.
3  Q  Concerning the first bullet point, what action
4  did you, on behalf of Universal, take to provide the
5  Cathcarts with a consultation with an experienced
6  occupational environmental health physician?
7  A  We didn't.
8  Q  And you understood that the Cathcarts, given the
9  situation in their home, were requesting that Universal
10 provide the Cathcarts with an experienced occupational
11 and environmental health physician to investigate their
12 reported building-related symptoms and habitability of
13 the home and to oversee the remediation processes of the
14 home and personal property and to design and oversee the
15 clearance protocol and sampling results to ensure the
16 home is properly returned to a habitable condition?  You
17 understood that that's why the Cathcarts were making that
18 request?
19 A  Yes.
20 Q  And did Universal ignore that request?
21 A  Well, I think we later on provided -- agreed to
22 pay for the mold testing.
23 Q  All right.  But this isn't asking for mold
24 testing, is it?  This is asking for an occupational and
25 environmental health physician, given the Cathcarts'

Page 166

1  reported symptomatology, to assist in determining what
2  needs to be done in the house.  Isn't that right?
3  A  Yes.
4  Q  And so from the perspective of this first bullet
5  point and request by the Cathcart family, Universal
6  ignored that request; is that true?
7  A  That's true.
8  Q  The second bullet point that the Cathcarts had
9  requests the implementation of additional environmental
10 sampling --
11 A  Hold on just one second.
12 Q  Yes, sir.
13 A  I do remember that at this time this claim was
14 turned over to counsel, as I recall.
15 Q  Are you sure?
16 A  No, I'm not sure.
17 Q  All right.  Well, let's make sure that you're
18 clear on your testimony before you fog up the record.
19 A  Okay.  Hang on just one second.  This came in --
20 Q  I'll represent to you that you didn't, at least
21 according to the claims notes, go the counsel route until
22 March or April of 2013.
23 A  Okay.
24 Q  But you can look back through your notes and be
25 sure.

Page 167

1  A  That's probably true, okay.
2  Q  So back to my question, was, you and Universal
3  ignored the Cathcarts' first bullet-point request for the
4  involvement of a qualified occupational and environmental
5  health physician?
6  A  That's true.
7  Q  All right.  Second bullet point, the Cathcarts
8  were seeking the implementation of additional
9  environmental sampling undertaken by an indoor
10 environmental professional of the Cathcarts' choosing
11 pursuant to a health-based sampling protocol for the
12 home, to be designed and overseen by an experienced
13 occupational and environmental health physician.  What
14 action did Universal take in that regard?
15 A  Nothing at the time this letter was -- at the
16 time this was requested.
17 Q  Universal just ignored that request?
18 MR. CANNON:  I'm going to object to the phraseology
19 "ignored."  It's argumentative, also lacks foundation.
20     Go ahead.
21 THE WITNESS:  Well, soon after that we did authorize
22 mold testing.
23 BY MR. BALMER:
24 Q  Soon after that?
25 A  Uh-huh.

Page 168

1  Q  Do you remember when it was that you finally
2  authorized sampling?
3  A  No.  It was probably about a month or two.
4  Q  Right.  Meanwhile, while Universal is sitting on
5  the Cathcarts' request for additional sampling for those
6  one to two months, the Cathcarts were in replacement
7  housing; isn't that right?
8  A  Yes.
9  Q  And while the Cathcarts were in replacement
10 housing for that one- to two-month delay and approval of
11 the testing, the Cathcarts were burning through, what,
12 almost $5,000 a month in replacement housing?
13 A  Probably.
14 Q  Probably or that's about right?
15 A  Yeah.  I think it was like 4105, something like
16 that.
17 Q  What action -- strike that.
18    How did Universal's month or two delay in
19 agreeing to pay for sampling in the Cathcart home -- how
20 did that protect the additional-living-expense policy
21 limit?
22 A  Well, we did allow them, until we got this
23 resolved, to stay in housing.  We did provide ALE.
24 Q  Ultimately isn't it Universal's position that
25 additional living expenses were pulled because it was

Page 169

1  exhausted?
2  **A  Yes.**
3  Q  All right.  So in this one to two months where
4  the Cathcarts are in replacement housing spending 4- to
5  $5,000 a month from their ALE limit, tell me again how
6  that Universal delay protected the Cathcarts' additional
7  living-expense limit.
8  MR. CANNON:  I'm going to object to foundation on the
9  question, also to the form.
10    Go ahead.
11  THE WITNESS:  Well, all I can say is that we provided
12  them housing outside of their home because of these
13  issues until we could get somebody in there to resolve
14  these things.
15  MR. BALMER:  All right.  Let me ask --
16  THE WITNESS:  It takes some time.
17  BY MR. BALMER:
18  Q  Let me ask it this way:  The 5- to $10,000 in
19  additional living expenses that was burned through in
20  that month to two-month delay in Universal agreeing to
21  pay for some sampling in the Cathcart home, did that 5-
22  to $10,000 come off of the additional-living-expense
23  limit?
24  **A  Yes.**
25  Q  So back to my question, how was it that the

Page 170

1  delay of Universal in agreeing to have the Cathcarts'
2  home tested -- how did that do anything to protect the
3  Cathcarts' additional-living-expense limit that's alleged
4  by Universal?
5  MR. CANNON:  Again I'm going to object to the form of
6  the question.
7  THE WITNESS:  Well, there was other mitigating things
8  going on at the time.  You know, we -- they were asking
9  for, you know, two different vendors and they couldn't
10  decide on a vendor, and we authorized it as soon as it
11  was -- they chose somebody, 'cause we didn't want to
12  choose somebody that -- we wanted them to choose somebody
13  because they would feel more comfortable with choosing
14  whoever they wanted.  So that took some time to get an
15  expert in there and then get these things -- get the
16  tests going.
17  BY MR. BALMER:
18  Q  So meanwhile approximately 20 percent of their
19  alleged additional-living-expense limit was burned
20  through; isn't that right?
21  **A  That's true.**
22  Q  What did you do on the back end to help out the
23  Cathcarts in relation to that burning of 20 percent of
24  their additional-living-expense limit due to Universal's
25  delay?

Page 171

1  MR. CANNON:  I'm going to object to the question; it
2  assumes that there was some obligation on them to do
3  that.
4    Go ahead.
5  THE WITNESS:  At the time they were represented by
6  you, so you had an opportunity to get a hygienist in
7  there of your choice if it was that important.
8  BY MR. BALMER:
9  Q  Well, the Cathcarts, you'll agree, very
10  specifically asked for Universal, as part of the claim,
11  to provide that service.  Ultimately Universal agreed to
12  provide that service.  My question is, how did that one-
13  to two-month delay in Universal agreeing to provide that
14  service -- how did that -- how did that protect the
15  additional-living-expense limits alleged by Universal in
16  this case?
17  MR. CANNON:  Again I'll object; it assumes that --
18  BY MR. BALMER:
19  Q  I can't see in any way that it did.  In fact I
20  see that it wasted a significant amount of the additional
21  living expense that's alleged to be capped by Universal.
22  I'm asking you --
23  MR. CANNON:  That's not a question.
24  MR. BALMER:  Hold on.
25  Q  I'm asking you, from your perspective, how that

Page 172

1  delay protected the limits.
2  **A  Well, in any case, if we have a fire and the**
3  **building permits take longer to get than normal, that**
4  **delay is normal, you know.  The additional living**
5  **expenses can take -- you can be in temporary housing**
6  **longer than you expect because of all kinds of delays:**
7  **Permitting, getting bids, getting people scheduled to get**
8  **out there.  There's a lot of different factors that could**
9  **make this delay in getting the expert out there.**
10  Q  But here we're not talking about any delay
11  caused by anybody other than Universal just not agreeing
12  to the request for a month or two.
13  MR. CANNON:  I'm going to object.
14  BY MR. BALMER:
15  Q  Aren't we?
16  MR. CANNON:  That mischaracterizes.
17    Go ahead.
18  THE WITNESS:  I think that as soon as we got the
19  vendor in there of choice and got the credentials and got
20  the papers signed back and forth, we authorized it.  I
21  don't think there was that big of a delay from the time
22  we got that person lined up.
23  BY MR. BALMER:
24  Q  So to the extent that there was a delay, would
25  you agree with me that that did not protect the

Page 173

1 additional-living-expense limits?
2     MR. CANNON: Again I'm going to object; it assumes
3 that there was some requirement that we protect the
4 limit.
5     Go ahead.
6     THE WITNESS: Certainly, just like I mentioned with
7 the fire, getting permits and getting contractors lined
8 up, that's going to eat into your ALE.
9 BY MR. BALMER:
10    Q   Was this a fire?
11    A   No.
12    Q   Were we waiting for permits from the city?
13    A   Waiting for the -- getting an expert lined up
14 and getting the official request in and his contract
15 signed and first check made and delivered.
16    Q   You will agree that it was solely within
17 Universal's control whether and when to agree to an
18 environmental tester; right?
19    MR. CANNON: Object; mischaracterizes what he said.
20    Go ahead.
21    THE WITNESS: Say the question again.
22    MR. BALMER: Sure.
23    Q   Once the request was made of Universal, you will
24 agree that it was within Universal's sole control to
25 agree to an environmental tester?

Page 174

1    A   We agreed to pay for it.
2    Q   Ultimately. My question is a little bit
3 different though. My question is concerning the timing
4 of Universal's agreement. That's within Universal's sole
5 custody and control, is it not?
6    MR. CANNON: Mischaracterizes.
7    Go ahead.
8    THE WITNESS: I'd have to go back and look at the
9 file, but I think as soon as we got the request in, there
10 wasn't much of a delay in getting the arrangements made
11 and the paperwork signed and the checks issued.
12 BY MR. BALMER:
13    Q   You sure about that?
14    A   Let me read my notes here.
15    Q   What are you referring to?
16    A   Okay. So we got this request sometime in the
17 middle of February.
18    Q   There's a date on the letter, is there not?
19    A   Yes.
20    Q   What's the date?
21    A   It's February 11th, but I'm not sure of when it
22 was actually delivered. Yeah, the -- looks like we got
23 an authorization right around the 1st of April from Earth
24 Resources and they started the ball rolling on getting
25 the testing done and I agreed to pay half now and half

Page 175

1 later.
2    Q   So from a request of February 11th, it wasn't
3 until the beginning of April that the testing got
4 underway; isn't that true?
5    MR. CANNON: Just for clarity, the fax date on the
6 letter is the 13th, upper left-hand corner.
7    MR. BALMER: Can I see it?
8    THE WITNESS: (Indicating.)
9    MR. BALMER: It says February 12th in the upper
10 left-hand corner.
11    MR. CANNON: I need my glasses, huh? It sure does.
12 BY MR. BALMER:
13    Q   So my question to you is, is that a true
14 statement?
15    A   Say it again, please.
16    MR. BALMER: Please.
17    (The record was read as follows:
18        "QUESTION: So from a request of
19    February 11th, it wasn't until the
20    beginning of April that the testing got
21    underway; isn't that true?")
22
23    THE WITNESS: Yes.
24 BY MR. BALMER:
25    Q   Let's go on to the next bullet point. The

Page 176

1 Cathcarts requested from Universal a remediation of their
2 structure by a licensed bonded insured and properly
3 experienced remediation contractor of the Cathcarts'
4 choosing and based upon an appropriately thorough
5 mold-remediation protocol designed by a competent indoor
6 environmental professional of the Cathcarts' choosing, in
7 coordination with the occupational environmental health
8 physician.
9       What action did you take on that request?
10    A   We didn't take any action on that one.
11    Q   The next bullet point is that the Cathcarts
12 requested remediation and/or replacement of the
13 Cathcarts' personal property based upon an appropriately
14 thorough mold-remediation protocol designed by a
15 competent indoor environmental professional of the
16 Cathcarts' choosing, in coordination with the
17 occupational and environmental health physician.
18       What action did you take on that request?
19    A   We didn't because I think I wrote you in a
20 letter concerning that mold coverage would not cover
21 contents.
22    Q   And what is that based on?
23    A   Based on the policy language.
24    Q   Which policy language is that?
25    A   I have to go back and look at the policy and

Page 177

1  that letter. It may take me a minute to find it.
2  Q  We can come back to it. I think we're going to
3  meander that way anyway.
4  A  Okay.
5  Q  So remember that we're going to talk about that.
6     The next bullet point, the Cathcarts requested
7  the implementation of a health-based clearance sampling
8  protocol designed by a competent indoor environmental
9  professional of the Cathcarts' choosing, in coordination
10 with the occupational and environmental health physician.
11    What action did Universal take on that request?
12 A  We didn't.
13 Q  The next bullet point was, "Reconstruction of
14 the Cathcart home following remediation by a licensed
15 bonded insured and properly experienced reconstruction
16 contractor of the Cathcarts' choosing."
17    What action did Universal take on that request?
18 A  That was already being worked on by Paul Davis,
19 who was a licensed and bonded and insured contractor.
20 Q  Okay. First, who chose Paul Davis?
21 A  They did. They signed the contract.
22 Q  That's a fallacy, isn't it, the contract? Who
23 sent out Paul Davis to the house?
24 A  Universal.
25 Q  This reconstruction clearly was meant to be done

Page 178

1  following the necessary remediation of the home.
2  Considering that, what action did Universal take on that
3  bullet point?
4  A  We didn't. Universal didn't.
5  Q  Next bullet point, "Reimbursement of all
6  out-of-pocket expenses incurred by the Cathcart family,"
7  what action did Universal take on that bullet-point
8  request?
9  A  That was part of the -- they're referring to the
10 additional living expense?
11 Q  No. "Reimbursement of all out-of-pocket
12 expenses incurred by the Cathcart family." What action
13 did Universal take on that request?
14 A  Well, we had already paid them for part of the
15 build-back on the original water loss.
16 Q  You had? How much was that?
17 A  It was right around 6300 plus 4,000 for the
18 replumb.
19 Q  Anything else?
20 A  The cabinets, and I can't even think right now.
21 Let's see -- oh, and the Absolute flood bill.
22 Q  Anything else?
23 A  That's it.
24 Q  The next bullet point was, "Extend all
25 replacement housing expenses through the time the

Page 179

1  Cathcart family home is verifiably remediated, tested,
2  cleared and reconstructed."
3     What action did you take on that request?
4  A  We paid them till the policy limits were
5  exhausted.
6  Q  To your knowledge, was the Cathcart family home
7  ever verifiably remediated, tested, cleared and
8  reconstructed?
9  A  No.
10 Q  Down at the bottom of page 2, the Cathcarts
11 requested, "Please also provide to my office immediately
12 a copy of any and all environmental sampling results and
13 analysis for the Cathcart home. I'm aware that the mold
14 sampling was conducted by some or all of the following or
15 others:" Bullet point 1, "MSE Environmental," and
16 bullet 2, "Nevada Mold Testing, Dennis Whitaker."
17    What action did you take on that request?
18 A  I'm not sure. We may have sent it out later,
19 but I just don't remember on those two items.
20 Q  The Cathcarts also asked -- in the paragraph on
21 page 3 the Cathcarts say, "The Cathcart family has not
22 been provided with any of the testing results despite
23 their request for them."
24    Did you know that the Cathcarts were requesting
25 copies of the test results before this time?

Page 180

1  A  I believe so.
2  Q  Why were you not providing any of those test
3  results to the Cathcarts? Why did they have to get a
4  lawyer to ask you for those?
5  A  I'm not sure I even had them at the time. I'm
6  not sure.
7  Q  You knew where to get them though, didn't you?
8  A  Uh-huh.
9  Q  "Yes"?
10 A  Yes.
11 Q  So the Cathcarts are asking for mold-sample
12 results that directly relate to their home, and Universal
13 is just not providing them; is that right?
14 A  At that time, yes.
15 Q  The next part of that paragraph says, "Please
16 also immediately provide my office with a copy of the
17 entire claims file, including all electronically stored
18 information and materials and photographs and video for
19 this matter (claim No. 1201NV2400022) so that we may
20 fully examine the nature of the water loss and ensuing
21 mitigation efforts and also so that we may provide the
22 same to Cathcarts' physicians to consider in conjunction
23 with their medical examinations, investigations, opinions
24 and treatment course for the members of the Cathcart
25 family."

Page 181

1  What action did you take regarding that request?
2  A  I believe that we sent some -- responded to this
3  in the letter, you know, in April, but I have to go back
4  and read it.
5  Q  In April? This letter is dated February 11,
6  2013. You didn't respond to this request until April?
7  A  I have to go back and look at the letters.
8  Q  Why don't we make it easier for you.
9     Did you provide that information that the
10 Cathcarts were looking for?
11 A  Not at that time.
12 Q  When did you first provide an entire copy of the
13 claims file, this morning?
14 A  Yes.
15 Q  And so from February 11th, 2013 to -- it took
16 until February 26, 2016 for the Cathcarts to be provided
17 with a full copy of the claims file. Is that reasonable
18 to you? Three years and two weeks later we finally
19 receive the claims file. Is that reasonable?
20    MR. CANNON: I'm going to object to that. It
21 mischaracterizes what actually happened.
22    Go ahead.
23    THE WITNESS: That does seem unreasonable.
24 BY MR. BALMER:
25 Q  All right. But even back then you understood,

Page 182

1  did you not, why the Cathcarts wanted the information in
2  February of 2013, so that they could examine the nature
3  of the water loss and what had occurred in the home so
4  that they could make some decisions? You understood
5  that, didn't you?
6  A  Yes.
7  Q  Seems reasonable that the Cathcarts are trying
8  to figure out what's going on so they can move the claim
9  forward to conclusion, doesn't it?
10 A  Yes.
11    MR. BALMER: Go ahead and attach that letter as the
12 next in line, which is Exhibit No. 7.
13    (Defendants' Exhibit 7 was marked for
14 identification by the Certified Court Reporter.)
15 BY MR. BALMER:
16 Q  So in going through the files, I've located a
17 couple of documents I want to talk to you about, and this
18 is in line with some of what we were talking about in
19 Exhibit No. 7, specifically mold sampling conducted by
20 MSE and Nevada Mold Testing. I'm going to show you these
21 documents. One is -- and we'll start with this one -- is
22 labeled ALS 98. It appears to be an invoice from MSE
23 dated November 16, 2012.
24 A  Yeah, okay. I see it.
25 Q  You never provided any results of any

Page 183

1  post-remediation testing, five samples total, to the
2  Cathcarts, did you?
3  A  No.
4  Q  In fact to this date that's never been produced
5  to the Cathcarts; isn't that right?
6  A  Yes.
7  Q  Now, are you familiar -- are you familiar with
8  the use of the term "post-remediation testing"?
9  A  Yes.
10 Q  What does that mean?
11 A  After the remodeling or the reconstruction is
12 completed, they come back and do a final test.
13 Q  After the what is completed?
14 A  After the remodeling is done, the reconstruction
15 is done, they come out and they do a final test to test
16 for -- to give a clearance.
17 Q  Aren't post-remediation testing done following a
18 mold remediation and prior to reconstruction?
19 A  Yes.
20 Q  All right. So back to this document,
21 post-remediation testing, five samples total, your
22 understanding of the use of the three words
23 "post-remediation testing," does that indicate to you
24 that there was some mold remediation that had been done
25 in the Cathcart home prior to that November date at the

Page 184

1  top of the invoice that they were doing post-remediation
2  testing from?
3  A  Yes.
4  Q  And who was that billed to?
5  A  Paul Davis Restoration.
6  Q  Does that refresh your memory on whether Paul
7  Davis Restoration was doing mold remediation in the
8  Cathcart home?
9  A  Yes.
10 Q  All right.
11    We'll go ahead and mark this as the next in
12 line, which is Exhibit No. 8.
13    (Defendants' Exhibit 8 was marked for
14 identification by the Certified Court Reporter.)
15 BY MR. BALMER:
16 Q  I'm going to call your attention to this next
17 document. It's got a number in the bottom right-hand
18 corner ALS 143. It's another invoice from MSE
19 Environmental, also doing post-remediation testing, this
20 time dated 12-26-2012. Take a look at that.
21    Does that appear to be yet another round of
22 post-remediation testing in December --
23 A  Yes.
24 Q  -- at the Cathcart home?
25 A  Uh-huh.

Page 185

1  Q  Is that a "yes"?
2  A  Yes.
3  Q  And again they're using the terms
4  "post-remediation testing." Does that indicate to you
5  that it's very likely that there must have been some
6  failure in the original post-remediation sampling that
7  caused further remediation to have to occur in the
8  Cathcart home?
9  A  It's possible, yes.
10 Q  And for that reason it certainly would be
11 important for everybody to know, would it not, the
12 Cathcarts and Universal, as to what exactly has been
13 going on in the Cathcart home concerning mold
14 remediation?
15 A  Yes.
16 Q  Because it appears that whatever
17 mold-remediation work that was being done by Paul Davis
18 Restoration in the Cathcart home failed its first effort;
19 isn't that right?
20    MR. CANNON: I'm going to object; that calls for
21 speculation.
22    THE WITNESS: I don't -- yeah, I don't know.
23 BY MR. BALMER:
24 Q  Isn't that likely given the two documents?
25    MR. CANNON: Same objection; calls for speculation.

Page 186

1  BY MR. BALMER:
2  Q  Go ahead.
3  A  It's possible.
4  Q  Did you ever provide the sample results from
5  this December 26, 2012 sampling from MSE to the
6  Cathcarts?
7  A  No.
8     MR. BALMER: Go ahead and mark ALS 143 as the next
9  exhibit in line, which is No. 9.
10    (Defendants' Exhibit 9 was marked for
11    identification by the Certified Court Reporter.)
12 BY MR. BALMER:
13 Q  I'm going to show you what is, down in the
14 bottom corner -- what document are you looking at? What
15 is that?
16 A  I'm looking at a letter sent to you on 2-15-13.
17    MR. CANNON: That was the one he was looking for.
18 BY MR. BALMER:
19 Q  Did that help you?
20 A  Yes.
21 Q  Did you provide the claims file?
22 A  No.
23 Q  Did you provide the MSE results?
24 A  No.
25 Q  Did you agree to do any of those bullet points

Page 187

1  we talked about in Exhibit No. 7?
2  A  The one I think that we did was, "Per your
3  request, enclosed is a certified copy of the policy for
4  the Cathcarts, SanAir Technology Laboratory report,
5  Absolute Flood Response and Construction invoice, and ALS
6  Development and Management Corporation DBA Paul Davis
7  Restoration of South Nevada."
8  Q  And that's all you provided in response to all
9  those bullet-pointed requests; isn't that true?
10 A  Yes.
11 Q  Thank you.
12 A  Well, I shouldn't say that. We did clarify,
13 "Concerning additional living expense, the Cathcarts have
14 been paid 2,193.08 and to date the additional expense and
15 housing expense is 10,540.27. Universal has addressed
16 all additional-living-expense received documents
17 submitted to date. If the Cathcarts have additional
18 living-expense receipts to submit, please present those
19 receipts for consideration."
20 Q  Concerning -- thank you. Concerning the
21 additional living expenses, did Universal set the
22 Cathcarts up on CRS?
23 A  Yes.
24 Q  Who brought CRS into the mix?
25 A  Universal.

Page 188

1  Q  Does Universal typically work with CRS?
2  A  It works with several different
3  temporary-housing companies.
4  Q  In Nevada is CRS the go-to company for
5  Universal?
6  A  Most of the time, yes.
7  Q  So are they a preferred vendor?
8  A  No.
9  Q  Universal has a relationship with CRS back then
10 in 2012, 2013?
11 A  Back then in 2012 they were not a preferred
12 vendor.
13 Q  Estimate for me the percentage of additional
14 living expenses in the 2012, 2013 time period in Nevada
15 that went through CRS for Universal.
16 A  I have no idea.
17 Q  Would it be almost all of it?
18 A  I don't know.
19 Q  How do we find out that information?
20 A  I don't think you could find that out.
21 Q  So it's a secret?
22 A  It's not a secret. I just don't know how I
23 could get that information.
24 Q  List for me, please, all of the housing vendors
25 in Nevada that you dealt with in 2012, 2013 other than

Page 189

1  CRS.
2  A  I can't remember the names because they're all
3  kind of similar.
4  Q  That's what I'm looking for. I'm looking for
5  names.
6  A  I don't remember. Temporary Housing is one that
7  we use a lot and I can't think of the other names.
8  There's probably four or five vendors that we use and we
9  use them in all different states. We kind of just rotate
10 who we use.
11 Q  Why did you pick CRS for this case?
12 A  I think it just was in the rotation and I just
13 gave them this one.
14 Q  So you chose CRS for this file?
15 A  Yes.
16 Q  Okay. I'm going to show you what is numbered
17 ALS 106 bottom left-hand corner. Would you review that
18 and tell me what it is.
19 A  Nevada Mold Testing Inc. invoice for $450,
20 clearance test, three air samples, dated July 17th, 2012.
21 Q  Concerning the terminology used, "clearance
22 test," is it your understanding that clearance test
23 followed mold remediation?
24 A  Yes.
25 Q  So does that refresh -- I mean who was the

Page 190

1  invoice party on that?
2  A  It was billed to Paul Davis Restoration.
3  Q  Does that refresh your recollection further
4  about Paul Davis Restoration doing mold remediation
5  before this clearance test in July of 2012?
6  A  Yeah, I don't know if Paul Davis did the mold
7  remediation or Absolute did it. I don't know.
8     MR. CANNON: Can we take a break? We've been going
9  another hour and a half.
10    MR. BALMER: Yeah. Let me finish this document.
11    MR. CANNON: Okay, I'm sorry. Go ahead.
12 BY MR. BALMER:
13 Q  Does that refresh your memory as to the fact
14 that mold remediation was accomplished in the Cathcart
15 home prior to July of 2012?
16 A  Yes.
17 Q  And this document seems to indicate that there
18 was a -- some test results that were floating around as
19 of July of 2012; but as of February 11th, 2013 when you
20 received the letter from my office on behalf of the
21 Cathcarts, you still had not provided those results to
22 the Cathcarts. Isn't that right?
23 A  Yes. I don't believe I had them.
24 Q  You knew where to get them though, didn't you?
25 A  Yes.

Page 191

1  Q  You didn't go get them, did you?
2     MR. CANNON: I'm going to object; that assumes he
3  knew they existed.
4     Go ahead.
5     THE WITNESS: No, I didn't get them.
6  BY MR. BALMER:
7  Q  And so let's see. From July, that's seven
8  months that went by that these testing results were in
9  existence that the Cathcarts were requesting them that
10 Universal didn't provide them. Isn't that right?
11 A  Yes.
12 Q  All right.
13    We can take a break, about five minutes. Go
14 ahead and mark this as Exhibit No. 10 and then we'll go
15 off the record. Thank you.
16    (Defendants' Exhibit 10 was marked for
17 identification by the Certified Court Reporter.)
18    (Brief recess taken.)
19 BY MR. BALMER:
20 Q  Sir, you understand that we're back from our
21 break and you're still under oath?
22 A  Yes.
23 Q  And you're still required to tell the truth?
24 A  Yes.
25 Q  Are you still willing to tell the truth?

Page 192

1  A  Yes.
2  Q  Is there anything about your testimony where
3  you've been untruthful today?
4  A  No.
5  Q  Let's go through these documents. This is Bates
6  numbered in the bottom corner UNI -- I'm sorry --
7  UNAIC 356 through 385 and I think these are probably what
8  you've had open in front of you for a large part of
9  today's proceedings. Do you recognize that document?
10 A  Yes.
11 Q  What is it?
12 A  These are the claims notes associated with the
13 claim we're discussing today.
14 Q  Have you seen these before?
15 A  Yes.
16 Q  Did you participate in their generation?
17 A  Yes, some of my notes are in here.
18 Q  All right. Let's go over this document and I've
19 got questions for you, but before we do let's go ahead
20 and mark this as the next in line. The claims notes will
21 be Exhibit No. 11.
22    (Defendants' Exhibit 11 was marked for
23 identification by the Certified Court Reporter.)
24 BY MR. BALMER:
25 Q  Okay. Just so I can get my bearings on the

Page 193

1 claims notes, what's the purpose of a claims note?
2 A  It's to document the file and the progress.
3 Q  Is it important to be accurate in documenting
4 information in the claims file?
5 A  Yes.
6 Q  Is it important to be honest in documenting
7 things in the claims file?
8 A  Yes.
9 Q  Is it important to be thorough in the things
10 that you document in the claims file?
11 A  Yes.
12 Q  And is the reason that you're to be accurate,
13 honest, and truthful in the claims notes is because
14 ultimately somebody might have to go back later and rely
15 on those notes to refresh some memory?  Correct?
16 A  Yes.
17 Q  So it says, "Notes Listing for Claim Number,"
18 and it says 1201NV2400020?
19 A  Two.
20 Q  Two.
21    Is that the claim number for the Cathcart claim?
22 A  Yes, it is.
23 Q  Have you ever met the Cathcarts?
24 A  No.
25 Q  All right.  So we have several categories across

Page 194

1 the top: Date, User, Type, Claim Number, and Note.  What
2 is in the Date category?  What does that mean?
3 A  The date it was entered.
4 Q  The date that what was entered?
5 A  The note.
6 Q  And the User column, what is in there?
7 A  The person that entered the note.
8 Q  And Type, what does that mean?
9 A  Actually I don't know.
10 Q  You worked for Universal for years and you don't
11 know what Type is on the claims notes?
12 A  Actually this does not show up on our notes in
13 our system, only when you print it out.  I have no idea
14 what that is.
15 Q  Any guesses?
16 A  It's -- I am at a loss.
17 Q  Did you in fact work for Universal?
18 A  Yes.
19 Q  All right.  Just making sure.
20    All right.  Claim Number, what goes in that
21 column?
22 A  The claim number.
23 Q  And so looking through all the pages, the type
24 of "IC" and the claim number all appear to be the same
25 throughout the pages.  Would you expect that?

Page 195

1 A  Yes.
2 Q  And then the last column on the far right is
3 entitled "Note."  What goes in the Note column?
4 A  The notes that are entered in the notes.
5 Q  Take me through your computer screen so I
6 understand how you enter these notes.  What do you see
7 when you log in?
8 A  When you're in the claim, all you see is a
9 heading for the note and the note itself.
10 Q  Is there a way to scroll then through the
11 previous notes?
12 A  Yes.
13 Q  Is that a different screen?
14 A  No.  Same screen.
15 Q  Can you cut and paste from one note to the next?
16 A  Yes.
17 Q  Are there any documents that are automatically
18 uploaded into the claim notes?  For instance, I see
19 throughout there are E-mails and copies of letters and
20 things that appear in the Note column.
21 A  Yeah.  Those would have to be copied and pasted
22 in there.
23 Q  Is that something you typically did?
24 A  Yes.
25 Q  Why?

Page 196

1 A  Convenience to save time.
2 Q  All right.  So let's talk, on the first page,
3 which is 356, over on the far left-hand column there is a
4 date.  The very first date is what?
5 A  March 11th, 2012.
6 Q  Okay.  What happened on that date?
7 A  It says, "First notice of loss.  Insured woke up
8 and was alerted by a yard worker, who saw a water leaking
9 from house.  Insured discovered water throughout the
10 entire house.  Referred to Rytech."
11 Q  So what's the claim date?
12 A  5-21-2012.
13 Q  How do we get to a March 11, 2012 date?
14 A  I have no idea.
15 Q  Are those dates automatically generated?
16 A  Yes.
17 Q  Explain that.
18 A  I have no explanation.  I am surprised.
19 Q  Claim note is wrong, isn't it?
20 A  Yes.
21 Q  Who is Rytech?
22 A  That's a water-mitigation vendor.
23    MR. BALMER:  That's R-y-t-e-c-h.
24 Q  It's a water-mitigation vendor?
25 A  Yes.

Page 197

1  Q  When it says, "Referred to Rytech," is that
2  Universal referring the Cathcarts to Rytech?
3  A  Yes.
4  Q  Is Rytech a preferred vendor?
5  A  Well, there were no preferred vendors at that
6  time.
7  Q  Why would the Cathcarts be referred to Rytech?
8  It doesn't say, "Referred to Rytech and others."  It just
9  specifically says Rytech.
10  A  I have no idea.  I just never noticed that until
11  right now.
12  Q  Never noticed what?
13  A  I never noticed why there would be a March 11th,
14  2012 note in there.  That seems almost impossible for the
15  system to do that; and then why it would say, "referred
16  to Rytech," I don't know.
17  Q  Well, the description of the loss is a
18  description of the loss for the Cathcart home that's the
19  subject of the claim, is it not?
20  A  Yes.
21  Q  So it appears that the date is wrong, but it
22  says, "referred to Rytech."  That is a specific referral
23  to a water-mitigation contractor from Universal, is it
24  not?
25  A  Yes.

Page 198

1  Q  Who is the user?
2  A  I don't know.
3  Q  You don't know who that is?
4  A  No.
5  Q  A lot of mystery surrounding these claim notes
6  already and we're only on the first entry.
7  A  Jeez.
8  Q  The next entry is what date?
9  A  This entry was made by the customer-service
10  intake people, so I would not be familiar with their
11  names.  It's -- the call was made and it went to the
12  customer-service end of the claim.
13  Q  Is customer service located at that Sarasota
14  building?
15  A  Yes.
16  Q  So it's basically a half a floor, the second
17  floor; right?
18  A  Yeah, yes.
19  Q  And is it a bunch of cubicles where the intake
20  people sit?
21  A  Yes.
22  Q  And you worked there for several years?
23  A  Yes.
24  Q  How many employees altogether at one time in
25  that building --

Page 199

1  A  Anywhere --
2  Q  -- for Universal?
3  A  In that building, probably anywhere from 100 to
4  125 over the four years.
5  Q  Altogether when you add up everybody that's in
6  there, or it's 100 to 125 at one time?
7  A  It's 125 at one time.
8  Q  The second entry is dated May 21, 2012, is it
9  not?
10  A  Yes.
11  Q  There's another 12 after the 2012.  What's that
12  mean?
13  A  There's another what?
14  Q  It says, "05/21/2012," space, "12."
15  A  Oh.
16  Q  What does that mean?  Again you're stumped?
17  A  I'm stumped.  See, we don't see that in our
18  screens.
19  Q  This isn't the first time you've seen the claims
20  notes printed out, is it?
21  A  No.
22  Q  Is it the first time you've really looked at
23  claims notes printed out?
24  A  In the very beginning.
25      I'm still stumped on how that March 11th date

Page 200

1  got in there.
2  Q  Now, the user name is a little bit different in
3  the second entry as the first, isn't it?
4  A  Yes.
5  Q  There's an N on the first one and there's no N
6  on the end of the second entry.
7  A  That's correct.
8  Q  Wouldn't that also be something that's computer
9  generated?
10  A  Yes.
11  Q  Down in the third, fourth and fifth entries the
12  user is what?
13  A  "XACT."  That stands for Xactimate.
14  Q  Was there already an Xactimate estimate entered
15  in on 5-22-2012?
16  A  No.  That just says it goes to Xactimate to give
17  a field assignment.
18  Q  Xactimate chooses who to give field assignments
19  to?
20  A  No.  That's entered by the First Notice of Loss
21  folks, FNOL, and they assign it to the appropriate
22  adjusting firm.
23  Q  The next entry is by JenkinsB.  Who is that?
24  A  Brenda Jenkins.
25  Q  That's on 5-22?

Page 201

1   A   Yes.
2   Q   And then the next entry, it looks like it has
3   your name?
4   A   Yes.
5   Q   Did you participate in the claims file for this
6   claim as of 5-22-2012?
7   A   Yes.
8   Q   Why were you involved initially?
9   A   Let's see. The insured probably wanted a call
10  back from a supervisor. That's how I got involved that
11  quick.
12  Q   And which of these notes are yours in that?
13  A   It starts on that same line with my name, starts
14  "Called named" -- that's NI -- "called name insured."
15  Q   During that initial phone call that you had with
16  her, did she express concern about her medical condition?
17  A   Yes.
18  Q   And she explained to you she has no water?
19  A   Yes.
20  Q   And you say here that you explained that the
21  policy would cover the water damage but not the pipe
22  repair or replumb. So as of 5-22-2012 you already knew
23  that you had a covered loss; isn't that right?
24  A   Yes.
25  Q   And that you would cover the water damage; is

Page 202

1   that true?
2   A   Yes.
3   Q   And there's no limitations, as we discussed
4   earlier, on the water-damage coverage -- is that right --
5   up to policy limit?
6   A   I'm sorry?
7   Q   There is no limitation or exclusion or exception
8   that would apply to the water-damage repairs, up to the
9   policy limit, for the structure; isn't that right?
10  A   Yes, subject to their thousand dollar
11  deductible.
12  Q   Now, you told me it would be out of pocket for
13  repipe, but ultimately you paid for the repipe, didn't
14  you?
15  A   Yes.
16  Q   So why did you tell her you weren't going to pay
17  for the repipe and then later did? 'Cause that was
18  something that upset her, wasn't it, Universal saying
19  that they weren't going to pay for the repipe?
20  A   No. I meant that we weren't going to pay for
21  the repair of the pipe. She wanted, at that time,
22  Universal to send out a plumber to fix the plumbing, and
23  I explained that that wasn't -- the repair of the pipe
24  itself was not covered; but at that time we did not know
25  that it was under the slab.

Page 203

1   Q   But ultimately -- what's the difference whether
2   it's under the slab or not in terms of Universal paying
3   for the repair of the pipe itself?
4   A   It wouldn't pay for the repair of the pipe. The
5   policy would not repair the pipe.
6   Q   But the policy would repipe her house?
7   A   If it's more cost effective, yes.
8   Q   More cost effective than what?
9   A   Then digging through the foundation and breaking
10  a tension bar and causing more problems.
11  Q   My question is, why did you tell her that
12  Universal was not going to pay for the repair of the pipe
13  and then ultimately you paid for the repair of the pipe?
14  A   Well, as we found out more information, it was
15  in the slab, and that had us change our mind once we
16  found out more information.
17  Q   I see. So more thorough investigation had you
18  change your mind from the initial policy position that
19  you took with the insured; is that right?
20      MR. CANNON: I'm going to object to the "more
21  thorough." It's argumentative and misstates.
22      Go ahead.
23      THE WITNESS: As it was reported, it was a pipe
24  break. We were not sure where and she wasn't either, and
25  we explained that -- both Brenda and I explained -- that

Page 204

1   the repair of the pipe was not covered. The resultant
2   water damage would be.
3   BY MR. BALMER:
4   Q   But then ultimately you paid for the repair of
5   the piping, did you not?
6   A   Once we found out more information, yes.
7   Q   Okay. So a more thorough investigation of the
8   facts, following your initial leap to say no coverage,
9   resulted in you changing your mind on a coverage
10  position, did it not?
11      MR. CANNON: Object to the characterization, form of
12  the question.
13  BY MR. BALMER:
14  Q   Go ahead. You can answer.
15      MR. CANNON: Go ahead.
16      THE WITNESS: Once we found out more information, it
17  was determined that the pipe to replumb the house would
18  be covered.
19  BY MR. BALMER:
20  Q   So your initial position on repairing of the
21  plumbing was inaccurate and, based on a more thorough
22  understanding of the facts, you changed your mind on that
23  initial coverage position. Is that true?
24      MR. CANNON: Object to the form of the question,
25  mischaracterizes, argumentative.

Page 205

1  Go ahead.
2  MR. BALMER: Read the question back.
3  (The record was read as follows:
4  "QUESTION: So your initial
5  position on repairing of the plumbing
6  was inaccurate and, based on a more
7  thorough understanding of the facts,
8  you changed your mind on that initial
9  coverage position. Is that true?")
10
11  THE WITNESS: Yes.
12  BY MR. BALMER:
13  Q  The last entry on this page 356 is made by user
14  SunderlK. Who is that?
15  A  That's Kristy Sunderlin.
16  Q  And what position does she have on this claim?
17  A  At that time she was a First Notice of Loss
18  customer rep.
19  Q  Why did we have two First Notice of Loss
20  customer reps on this case?
21  A  I don't know.
22  Q  'Cause the first one was MosisA, M-o-s-i-s-A;
23  correct?
24  A  Yes.
25  Q  Seems like there's some irregularities with the

Page 206

1  way this claim came in initially within the first page of
2  claims notes. Isn't that right?
3  MR. CANNON: Object to the form of the question.
4  Go ahead.
5  THE WITNESS: Yeah, yes. It's surprising.
6  BY MR. BALMER:
7  Q  Are you saying that in other claims the claims
8  notes aren't this much of a mess?
9  A  I'm not saying that the claims notes are a mess
10  in this or any other claim. I'm just saying that
11  March 11th, 2012 is an anomaly.
12  Q  And the name on the first two entries and the
13  fact that there are two First Notice of Loss adjustors;
14  isn't that right? I mean all those things are weird;
15  true?
16  MR. CANNON: Objection; form of the question.
17  MR. BALMER: You don't like the word "weird"? You
18  don't like that?
19  THE WITNESS: I would say it's unusual.
20  BY MR. BALMER:
21  Q  All right. Let's go to the next page, 357. The
22  very first line on 357 is a question mark, "Water stat
23  reserve $7,500." What note is that?
24  A  All claims that come in, if they're wind or fire
25  or water, all have a stat reserve.

Page 207

1  Q  What's stat mean?
2  A  A prearranged reserve for those types of losses.
3  Q  Why would the company just assume that the loss
4  reserve preset amount of 7500 would be sufficient?
5  A  They do not believe that the reserve would be
6  sufficient. It's not -- that's not why the $7500 is
7  there. They take the average of all water claims that we
8  have over the years and average them out and that's the
9  average amount paid out for a water claim. This is just
10  an initial reserve to set up the file before any real
11  investigation is conducted.
12  Q  Down towards the bottom of that entry, the
13  fourth line up from the bottom of that entry, it says,
14  "Contact vendors." Does that mean that Universal was
15  going to make contact with the vendors?
16  A  Is that the second note down or the one, two,
17  three, fourth note?
18  Q  It's the --
19  MR. CANNON: It's the same one at the top, only down.
20  MR. BALMER: Right here (indicating).
21  THE WITNESS: That is a -- I would call it a canned
22  instructions to the field adjustor from the inside
23  adjustor.
24  BY MR. BALMER:
25  Q  Do you use terminology "in-house adjustor" and

Page 208

1  "outhouse adjustor"?
2  A  Yes, field adjustor versus in-house.
3  Q  Do the field adjustors take exception to being
4  called outhouse adjustors?
5  A  No, they aren't called outhouse adjustors.
6  They're called field adjustors.
7  Q  Down in the next note there is -- it looks like
8  somebody new on the claim. Who is that? AndersoL, who
9  is that?
10  A  That's probably Linda Anderson.
11  Q  Who is she?
12  A  She's a liability desk adjustor.
13  Q  What's a liability desk adjustor?
14  A  Adjustor that handles nothing but liability
15  claims.
16  Q  Why would a liability adjustor be involved with
17  this file? This is a first-party claim, isn't it?
18  A  Yes. She may have gotten the call transferred
19  to her.
20  Q  It says over across from her name, "mitigation
21  claim information"?
22  A  Yes.
23  Q  What does that mean?
24  A  That -- I have no idea.
25  Q  Is the liability desk adjustor responsible for

Page 209

1  subrogation?
2  A  No.
3  Q  Okay. So we also have Anderson L. in the
4  next -- the second next one. It looks like she's taking
5  information from the insured. Why is she doing that as a
6  liability desk adjustor?
7  A  It could be -- well, I hate to speculate.
8  Q  Well, you ran that office for years. What's
9  going on?
10  A  Here's what I speculate. She, Linda, was on
11  after-hours duty and she took the call and later put in
12  that -- she probably later put in the note.
13  Q  You don't know any of that is true, do you?
14  A  No.
15  Q  All right. So let's stop you there.
16     It indicates over in the note, "Piping under
17  slab foundation burst," doesn't it? It's in the note
18  across from her name.
19  A  Yes.
20  Q  All right. So from the very same day that you
21  got involved with the claim, seems pretty clear in the
22  claims notes that Universal knew exactly what the cause
23  of the loss was: "Piping under slab foundation burst."
24  Is that right?
25  A  Not necessarily. That's what's in the note

Page 210

1  but --
2  Q  Can't we rely on the notes?
3  A  Yes.
4  Q  Okay.
5  A  That's one opinion of what the cause was at this
6  stage of the game.
7  Q  Down towards the end of that note,
8  second-to-last sentence it says, "I also contacted DKI
9  for Miss Cathcart as the FNOL person referred her to
10  Rytech, which does not service Nevada." Do you see that?
11  A  Yes.
12  Q  So would this be a double referral? So the
13  first referral by Universal to Rytech didn't work, so now
14  Universal is referring to DKI for its insureds?
15  A  Yeah, that does look like a mistake that it was
16  referred to Rytech in the first place.
17  Q  But then that defect is cured by a referral to
18  DKI; isn't that right?
19  A  Yes.
20  Q  What's DKI?
21  A  It's a water-mitigation company.
22  Q  Okay. So so far, within hours of the loss being
23  reported, Universal has referred two specific contractors
24  to the Cathcarts; isn't that right?
25  A  Yes.

Page 211

1  Q  Was DKI a preferred vendor?
2  A  No preferred vendors at that time.
3  Q  Just vendors you worked a lot with?
4  A  Yes.
5  Q  Down at the bottom of that page it says that,
6  "Field adjustor assigned is Hyrum Pereira." It's
7  H-y-r-u-m P-e-r-e-i-r-a. It looks like "@DavidMorse."
8  Do you know Hyrum?
9  A  Do I know him personally? No.
10  Q  Have you ever met him?
11  A  No.
12  Q  Is that because you're way out in Sarasota,
13  Florida and Hyrum is somewhere else?
14  A  He's in Nevada, yes.
15  Q  Where is he now?
16  A  I don't know.
17  Q  When was the last time you talked to him?
18  A  I don't know. Years ago.
19  Q  All right. Next page, 358, looks like there's
20  an entry by user XACT on 5-23. Do you see that?
21  A  Yes.
22  Q  Who entered that?
23  A  That would be Hyrum.
24  Q  How do you know?
25  A  Because that's the way it shows up with the

Page 212

1  field adjustors.
2  Q  Oh, so the XACT becomes a field adjustor?
3  A  Yeah. Whoever it was assigned to, it will show
4  up as XACT.
5  Q  It says, "On 5-22-12 I was called by Oscar
6  Mendoza that I needed to be a water loss that had just
7  happened the night before on 5-21-2012."
8     Who is Oscar Mendoza?
9  A  He's a supervisor in California for this field
10  adjustor.
11  Q  At David Morse?
12  A  Yes.
13  Q  Universal hired David Morse?
14  A  Yes.
15  Q  Universal through David Morse hired Hyrum?
16  A  Yes.
17  Q  You would agree that Universal is responsible
18  for the work and representations of Hyrum Pereira at
19  David Morse?
20     MR. CANNON: I'm going to object to that; that's a
21  legal conclusion you're asking him for.
22     Go ahead.
23  BY MR. BALMER:
24  Q  Go ahead.
25  A  The company that hires him is responsible for

Page 213

1  Hyrum.
2  Q  And the company that employs Hyrum is an agent
3  of the insurance company; is that not right?
4  MR. CANNON: Same objection.
5  THE WITNESS: He's an independent contractor.
6  BY MR. BALMER:
7  Q  Is it your position that the adjustor firm,
8  David Morse, is not an agent of Universal?
9  MR. CANNON: Same objection.
10  Go ahead.
11  THE WITNESS: There's an agreement, a contract,
12  between David Morse & Associates and Universal and I'm
13  not familiar with it.
14  BY MR. BALMER:
15  Q  Hyrum from David Morse has the ability to bind
16  Universal, does he not?
17  MR. CANNON: Objection; legal conclusion.
18  Go ahead.
19  THE WITNESS: No.
20  BY MR. BALMER:
21  Q  So is David Morse and Hyrum not working on
22  behalf of Universal in this claim?
23  A  As a 1099, yes.
24  Q  Universal, at the time of the Cathcart loss, had
25  no adjustor within 3,000 miles of Nevada; isn't that

Page 214

1  right?
2  A  No staff adjustor.
3  Q  Okay. Well, you can't have it both ways. You
4  can't seek refuge in calling staff adjustor but still
5  having independent adjustors and then in the same breath
6  say that the independent adjustor doesn't work for
7  Universal. You can't have it both ways.
8  MR. CANNON: All right. That's not a question. You
9  don't have to answer it.
10  BY MR. BALMER:
11  Q  So my question is, my question is, isn't it true
12  that Universal did not have an adjustor within 3,000
13  miles of Las Vegas at the time the Cathcart loss
14  occurred?
15  MR. CANNON: Objection; that's been asked and
16  answered.
17  Go ahead.
18  THE WITNESS: There was no staff adjustor from
19  Universal in Nevada.
20  BY MR. BALMER:
21  Q  And so because of that, Universal had to hire an
22  adjustor to come in and handle parts of the claim; isn't
23  that right?
24  A  Yes.
25  Q  And Universal did that at its convenience so

Page 215

1  that its adjustors from Sarasota didn't have to go to
2  Nevada; isn't that right?
3  MR. CANNON: Foundation.
4  BY MR. BALMER:
5  Q  Is that right?
6  A  That's right.
7  Q  From the insured's standpoint, the insured has
8  an insurance contract with whom?
9  A  Universal.
10  Q  And the insureds have a loss that they present
11  to whom?
12  A  Universal.
13  Q  And the insureds communicate about the claim
14  with?
15  A  Universal.
16  Q  And the insureds expect to receive compensation
17  on their claim from?
18  A  Universal.
19  Q  From the insured's perspective, it's all
20  Universal. You would agree with me on that, wouldn't
21  you?
22  MR. CANNON: Objection; calls for speculation.
23  Go ahead.
24  THE WITNESS: From an insured's perspective, I would
25  say that's correct.

Page 216

1  BY MR. BALMER:
2  Q  The insureds didn't have any say in whether
3  Universal provided its own adjustor in Las Vegas or hired
4  somebody else; isn't that right?
5  A  That's correct.
6  Q  And certainly the insured did not have any input
7  into who that other adjustor, if it's not Universal,
8  might be; isn't that true?
9  A  Yes.
10  Q  Universal chose David Morse to represent it on
11  the Cathcart claim, did it not?
12  MR. CANNON: Objection; calls for legal conclusion.
13  BY MR. BALMER:
14  Q  Yes? Go ahead.
15  MR. CANNON: Go ahead.
16  THE WITNESS: Yes.
17  BY MR. BALMER:
18  Q  Universal vetted David Morse to work on behalf
19  of Universal on claims in Nevada such as Cathcart; true?
20  MR. CANNON: Objection; calls for speculation,
21  foundation.
22  Go ahead.
23  THE WITNESS: Yes.
24  BY MR. BALMER:
25  Q  And Universal had an agreement with David Morse

Page 217

1  to perform those services on behalf of Universal in
2  Nevada on claims such as and including the Cathcarts';
3  isn't that right?
4     A   Yes.
5     Q   Down in the middle of the claims notes on
6  May 23rd, 2012 it says, "I called American Leak
7  Detection, who is going out Thursday between 12:00 and
8  2:00 5-24-2012 to find the leak and provide a detection
9  report along with their invoice as usual." Do you see
10 that?
11    A   Yes.
12    Q   All right. So we gain from that information
13 that Universal is hiring yet another contractor to come
14 out to the Cathcart home, American Leak Detection; right?
15    A   Yes.
16    Q   And it appears from this note that American Leak
17 Detection is somebody that Universal frequently uses on
18 water-damage claims given the use of the term "as usual";
19 correct?
20    A   Yes.
21    Q   Okay. So let's go down to the last sentence --
22 the second-to-last sentence of that claims note. I want
23 you to read that sentence into the record. It starts
24 with "Paul Davis." Go.
25    A   Okay. "Paul Davis has also been called out as a

Page 218

1  preferred vendor to provide the insurance -- insured --
2  reconstruction services. This has been communicated with
3  Brenda.user Hpereira."
4     Q   All right. So there we have it in the claims
5  notes: "Paul Davis has also been called out as a
6  preferred vendor." Do you see that?
7     A   Yes.
8     Q   Okay. So I've been asking you all day whether
9  Paul Davis was a preferred vendor. You keep saying no,
10 but the claims notes say yes; isn't that true?
11    A   Yes.
12    Q   And as we know, it's important to be accurate,
13 truthful and thorough in the claims notes; true?
14    A   Yes.
15    Q   So it appears that Paul Davis was a preferred
16 vendor; right?
17    A   We didn't have any preferred-vendor list at that
18 time.
19    Q   Did they just make that up?
20    A   They probably customarily used that vendor for
21 our company and other companies.
22    Q   Well, you would agree that they used the term
23 very specifically "preferred vendor"?
24    A   Yes.
25    Q   Typically the preferred vendors for insurance

Page 219

1  companies have a relationship with the insurance company;
2  true?
3     A   Yes.
4     Q   And whether that be by express written agreement
5  or frequent usage; true?
6     A   Yes.
7     Q   And preferred vendors develop relationships with
8  the insurance companies and adjustors on files; right?
9     A   Yes.
10    Q   And the insurance companies like their preferred
11 vendors because they feel like they can communicate with
12 those preferred vendors concerning claims; is that right?
13    A   That and other things.
14    Q   And the other things could possibly be and
15 include the fact that the preferred vendor's pricing is
16 known?
17    A   Yes.
18    Q   And the preferred vendor's willingness to work
19 within the parameters established by the insurance
20 company is another reason; true?
21    A   Yes.
22    Q   And ultimately it's beneficial to the insurance
23 company to have one of its preferred vendors out at a
24 loss for all of those reasons, among others; isn't that
25 right?

Page 220

1     A   Yes.
2     Q   Down on the -- it doesn't look like anything
3  happened then for six days on this file. Is that right?
4  So we've got 5-23-2012 to 5-29-2012.
5     A   Yes.
6     Q   Any explanation for why six days was allowed to
7  elapse when there is significant water damage in the
8  Cathcart home?
9     A   Well, there is six days' gap in making a note.
10 That doesn't mean there was six days -- a gap in actually
11 doing anything.
12    Q   But you testified earlier that it's important to
13 be complete, accurate and thorough in the reporting you
14 do on the claims notes because somebody might need to
15 look at them later and determine what happened. Isn't
16 that true?
17    A   Yes.
18    Q   And there's no note between 5-23-2012 and
19 5-29-2012; isn't that true?
20    A   Yes.
21    Q   So it appears as though there's inactivity on
22 the part of the insurance company during the time, given
23 the absence of notes.
24        MR. CANNON: I'm going to object; that
25 mischaracterizes the testimony.

Page 221

1  Go ahead.
2  THE WITNESS: Yeah. No, I don't know that there's
3  any -- there could have been other things going on. Just
4  because we didn't put a note in for six days doesn't mean
5  there wasn't anything going on.
6  BY MR. BALMER:
7  Q  The point of the claims notes is that -- to
8  document what was going on so three years and two weeks
9  later, when you're sitting in a deposition, you can look
10 back and understand exactly what did or did not occur on
11 a particular day. Isn't that right?
12 MR. CANNON: I'm going to object. I don't think they
13 envisioned a lawsuit three years later.
14    Go ahead.
15 THE WITNESS: Whenever there's communications with
16 the insured or some other vendor or some other activity,
17 we put a note in the file.
18 BY MR. BALMER:
19 Q  And here there's no activity note in the file;
20 isn't that right?
21 A  That's correct.
22 Q  So you can't tell me that there was in fact any
23 activity during that six-day period of time; is that
24 true?
25 A  That's true.

Page 222

1  Q  Thank you.
2     Down in the next note it talks about,
3  "XactAnalysis note uploaded to CTS/XA." What is that?
4  A  Yeah. That was again put in by XACT, so that
5  would have been put in by Hyrum, the field adjustor.
6  Q  But what is a CTS/XA?
7  A  I have no idea.
8  Q  How do you not know what that means? Don't
9  you -- you're tasked with looking at the file and
10 auditing what's been going on. How do you not know what
11 CTS/XA stands for?
12 A  It's an XactAnalysis-generated note and that's
13 their code for something. I don't know what their notes
14 are, what their codes are in XactAnalysis.
15 Q  Over the time that you worked at Universal, you
16 just kind of went about your business without asking
17 anybody what that meant?
18 A  Yes.
19 Q  On the next page, 359, in the third note down
20 dated 6-1-2012 it says, quote, "Change reserves per field
21 rep reg. to $7,693 period/coverage A." What does that
22 mean?
23 A  That means that Marina Rivera put a reserve note
24 in there per the field-rep estimate -- or request.
25 Q  What's coverage A?

Page 223

1  A  The building.
2  Q  On the next page, page 360, down at the bottom
3  we see your name again, do we not?
4  A  Yes.
5  Q  And your last entry was May 22, 2012, more than
6  a month before. Why were you absent from the file for a
7  month and a couple days?
8  A  That would be fairly normal.
9  Q  What communication did Universal have with
10 Absolute Flood Response?
11 A  It looks like there's a call from Brenda Jenkins
12 from Absolute on June 26.
13 Q  Do you know what communication Hyrum Pereira had
14 with Absolute?
15 A  No, I don't.
16 Q  Do you know what direction Hyrum Pereira gave to
17 Absolute?
18 A  He probably didn't give them any directions.
19 Q  As you sit here today, though, you can't
20 testify, can you, about what Hyrum Pereira said to
21 Absolute?
22 A  No.
23 Q  'Cause ultimately Hyrum was responsible for
24 dealing with Absolute in terms of getting their
25 invoicing; true?

Page 224

1  A  That would have been the responsibility of
2  Brenda Jenkins.
3  Q  Do you know what conversations and
4  communications Brenda Jenkins had with Absolute?
5  A  This is this one I was talking about. On
6  June 26, 2012 she's calling that the payment is being
7  issued to the insured and Absolute on June 26.
8  Q  Do you know what communications Miss Jenkins had
9  with Absolute prior to that date?
10 A  Doesn't look like there's any that I can see.
11 Q  They talk in terms of Absolute Flood having
12 performed EMS. What does EMS stand for?
13 A  Emergency services.
14 Q  There's two of the letters of the acronym.
15 What's the M?
16 A  Emergency mitigation service. That's the only
17 thing I can think of.
18 Q  Okay. Do you know that's for sure what that
19 means?
20 A  Pretty sure.
21 Q  You think it's emergency mitigation services?
22 A  Yes.
23 Q  On 6-21-2012 in the note it indicates that,
24 quote, "Increased the dwelling reserve and opened
25 contents reserve," but there are no numbers associated

Page 225

1 with that. Why not?
2 A Looks like the adjustor just left them out.
3 Q Well, that's pretty important information, isn't
4 it, for other adjustors looking at the file?
5 A They could easily find that out.
6 Q How?
7 A Go in and see the history of the reserve change.
8 Q Why hasn't that been produced?
9 A I don't know.
10 Q You've been through the whole claims file. Is
11 it in there?
12 A Not that I'm aware of.
13 Q So that isn't the whole claims file, is it?
14 MR. CANNON: I'll object; that assumes that those
15 papers are in the claims file.
16    Go ahead.
17 THE WITNESS: I don't remember seeing them in the
18 file.
19 BY MR. BALMER:
20 Q So Mr. Cannon raises an interesting point. What
21 other documents does Universal have that they don't
22 categorize as going in the, quote, "claims file"? It's
23 my understanding the claims file had all the information
24 concerning the claim. I'm real interested to know what
25 other information there might be that's not included in

Page 226

1 the claims file. What is it?
2 A I don't know.
3 Q Well, we know that those reserve summaries
4 aren't in the claims file, don't we?
5 A Yes.
6 Q How do we get those?
7 A It's a screen shot on the computer.
8 Q So it's pretty easy to do?
9 A Yes.
10 Q I don't suppose you still have access to --
11 A No.
12 Q -- those computers?
13 A No.
14 Q What do you call that screen? Is that called
15 like reserve history?
16 A Yes. I'm not sure of the exact. You can see
17 the reserve-change screen.
18 Q Reserve-change screen?
19 A It's either reserve history or reserve change.
20 Q I call your attention to page 361. The very top
21 entry, entry made by KetchamJ, that's you; right?
22 A Yes.
23 Q Date of June 26, 2012. You write, "Received
24 call from both named insureds. They had several issues.
25 See payments made for water extraction and repipe. They

Page 227

1 would not sign Paul Davis contract because it had a
2 clause about a $150 penalty if payment not done timely."
3 Do you see that?
4 A Yes.
5 Q They told you that?
6 A Yes.
7 Q So you knew right off the bat in June of 2012
8 that the Cathcarts were concerned about signing any sort
9 of contract with the preferred vendor of Universal and
10 this was the reason. Isn't that right?
11 A They didn't want to sign that because of that
12 $150 penalty clause.
13 Q And how prophetic that ultimately the Paul Davis
14 bill is not paid and they end up with a mechanic's lien
15 on their house that's in a foreclosure action. Do you
16 see the irony there?
17 MR. CANNON: Move to strike the question.
18 BY MR. BALMER:
19 Q You can answer it.
20 A Yes.
21 Q It says -- goes on to say in your claim note,
22 "They also had issue with mold found in wall when they
23 opened up the wall for repipe. This was not related to
24 the water loss. The water loss happened in another
25 area."

Page 228

1    What expert do you have to rely upon that has
2 opined to a reasonable degree of certainty that the mold
3 found in the wall was not related to the water loss?
4 A Because they told me it happened in a totally
5 different area from where the water loss occurred.
6 Q Who told you that?
7 A It says right here in the note. They opened up
8 the wall. This was not related to the water loss.
9 Happened in another area. I explained this would not be
10 covered because this is mold not caused by a covered
11 cause of loss.
12 Q That's your opinion that turned out to be wrong?
13 A Yes.
14 Q Okay. My --
15 MR. CANNON: Wait. That was two questions. I'm
16 going to object to that.
17 MR. BALMER: What?
18 MR. CANNON: That it turned out to be wrong. We
19 don't know that.
20 MR. BALMER: We do because he's already testified
21 about that.
22 MR. CANNON: Okay.
23 MR. BALMER: The witness shakes his head up and down,
24 nods.
25 Q "Yes"?

Page 229

1  A  Yes.
2  Q  Okay. So back to my question, you use the word
3  "they" several times. My question is asking you to be
4  far more specific than that.
5      What expert ever opined to you that the mold
6  found in that area, as noted in the 6-26-2012 claims
7  note, was not in any way related to the water loss?
8  A  There's no expert involved.
9  Q  You didn't hire any expert that told you that,
10 did you?
11 A  No.
12 Q  You didn't go out and take a look at it
13 yourself?
14 A  No.
15 Q  Hyrum didn't tell you that, did he?
16 A  I don't know. I don't think so.
17 Q  You would have said that in here if he would
18 have told you that; right?
19 A  Yes. Well, I did say that I would discuss the
20 loss with Hyrum.
21 Q  Okay. But at the time that you wrote this note
22 and following, there was no indication from any expert or
23 anyone with any specialized knowledge that could tell you
24 whether or not the mold in that wall was related to the
25 water loss; true?

Page 230

1  A  Yes.
2  Q  In fact the very first note on page 356 -- this
3  is the note dated March 11, 2012 -- says, "Insured
4  discovered water throughout the entire house," does it
5  not?
6  A  Yes.
7  Q  Okay. It looks like you called -- back to
8  6-26-2012 -- it looks like you called Chris at PDR and
9  then there's a telephone number. Do you see that?
10 A  Yes.
11 Q  Who is PDR?
12 A  Paul Davis Restoration.
13 Q  You called Chris at PDR; right?
14 A  Yes.
15 Q  And so you were dealing directly with Paul Davis
16 Restoration concerning their estimate; true?
17 A  I was calling about something. Let's see here.
18 Q  What did you request?
19 A  I don't know. I just called them and left a
20 message, looks like.
21 Q  What does it say in the claims note?
22 A  "He was not in but requested E-mail copy of PDR
23 estimate. Will E-mail all, when available, to named
24 insured."
25 Q  Okay. So that tells you why you called; right?

Page 231

1  A  Yes.
2  Q  And why was that?
3  A  I was going to provide the estimate from Paul
4  Davis Restoration to the insured.
5  Q  But you called Chris to get the Paul Davis
6  Restoration estimate; right?
7  A  Yes.
8  Q  All right. Down on 6-27-2012 -- that's the next
9  day -- this is where you indicate, "Coverage review.
10 Reviewed coverage of the named-insured policy and see
11 endorsement HO 04 27 02 provides coverage for mold hidden
12 in walls; therefore coverage will be available for the
13 newly discovered mold." Right?
14 A  Yes.
15 Q  "However, this will be subject to another $1,000
16 deductible." Do you see that?
17 A  Yes.
18 Q  Now, ultimately you determined that there was
19 not another thousand dollar deductible that was required;
20 isn't that right?
21 A  No.
22 Q  You're not? Did you charge the insureds the
23 thousand dollar deductible?
24 A  No.
25 Q  Okay. So either there was a thousand dollar

Page 232

1  deductible or there wasn't.
2  A  There wasn't any other thousand dollar
3  deductible applied.
4  Q  But you say here in the claims notes, "However,
5  this will be subject to another $1,000 deductible." So
6  you were wrong on that?
7  A  No.
8  Q  You waived it?
9  A  I -- it goes on. If you read on further, it
10 talks about how I tried to get the insured to submit
11 another claim and the insured refused.
12 Q  So ultimately it was -- there was not another
13 thousand dollar deductible; true?
14 A  True.
15 Q  Down in the 7-12-2012 note from you, last three
16 lines you say, "We then discussed that, due to
17 construction, the home is intenanable"?
18 A  That's supposed to be "untenable," but that's
19 right.
20 Q  What does that mean?
21 A  It's supposed to be untenable, uninhabitable.
22 Q  It says, "I offered to call CRS." That's you;
23 right?
24 A  Yes.
25 Q  Okay. And so this is an example of you bringing