# Exhibit 6D

Page 233

1   on another Universal preferred vendor; right?
2   A   Bringing on another vendor.
3   Q   Okay. And then you called CRS, according to the
4   note?
5   A   Yes.
6   Q   Down on 7-20-2012 there's another note from you.
7   See that?
8   A   Yes.
9   Q   What's the note say?
10  A   "Received mold certification. Scanned in."
11  Q   So that answers our question about whether you
12  ever received some sort of mold certification; right?
13  A   Yes.
14  Q   Actually received it; true?
15  A   Yes.
16  Q   Earlier you said you weren't so sure whether you
17  even received it, and I asked you, "Well, you knew where
18  to go get it; right?" And you said yes. Now it appears
19  that, from the claims notes, that you in fact had a copy
20  of the mold certification scanned into the computers but
21  still did not give that to the insureds until February of
22  2013, nearly seven months later. True?
23  A   Yes.
24  Q   How is that reasonable?
25  MR. CANNON: That's argumentative.

Page 234

1   Go ahead.
2   THE WITNESS: I'm not sure that they requested it.
3   BY MR. BALMER:
4   Q   You don't think that the insureds had an
5   interest in knowing what's going on with the remediation
6   of their home?
7   MR. CANNON: Calls for speculation as to what's in
8   their mind.
9   Go ahead.
10  THE WITNESS: I think they would have an interest in
11  their remediation, yes.
12  BY MR. BALMER:
13  Q   So regardless of whether they asked for it, at
14  that time when you received it, why didn't you give it to
15  them?
16  A   I don't know.
17  Q   Then ultimately you'll admit, won't you, that
18  they started asking for that information and you still
19  didn't give it to them? Isn't that true?
20  A   Well, I can't remember when they started asking.
21  Q   But you recall they started asking for it;
22  right?
23  A   Yes.
24  Q   And you still didn't give it to them?
25  MR. CANNON: I'm going to object. He just said he

Page 235

1   didn't know when they started asking.
2   BY MR. BALMER:
3   Q   Go ahead. You can answer.
4   A   Yeah, I don't know.
5   Q   Well, I mean you either gave it to them or you
6   didn't.
7   A   I didn't.
8   Q   So down in the next note on 7-30-2012, it
9   indicates that you received and paid a CRS invoice for
10  temporary housing for $1,450.45 for one night. Is that
11  correct?
12  A   I think that's an error. That's got to be an
13  error.
14  Q   Another error in the claims notes?
15  A   Yes. It was -- I can go back and get the
16  records, the actual invoice.
17  Q   You would agree that $1450.45 for one night is
18  excessive?
19  A   Yes.
20  Q   I mean your hotel at the Nugget isn't $1450 a
21  night, is it?
22  A   No.
23  Q   Now, down at the bottom of the page is a
24  "supervisor review, random file review." Do you see that
25  on September 10th?

Page 236

1   A   Yes.
2   Q   Who is that?
3   A   That's Otto Kieslich.
4   Q   Here's Otto?
5   A   K-i-e-s-l-i-c-o.
6   Q   It seems like there was not a lot of activity
7   between the end of June and the middle of September when
8   Mr. "Keys" -- that guy --
9   A   Kieslich.
10  Q   -- Kieslich did his random file review; isn't
11  that right?
12  A   In the notes, yes.
13  Q   Well, we talked about what that means, didn't
14  we? Because it's important to document thoroughly and
15  accurately the claims activity on the file in the claims
16  notes. We talked about that, didn't we?
17  A   Yes.
18  Q   And so based on Otto's review on the next page,
19  does he not give you direction on what to do with this
20  claim?
21  A   Yes.
22  Q   What does he say?
23  A   "Please advise action plan to bring this to
24  resolution. Notes indicate open damages under contents
25  and apparently ALE. Thanks."

Page 237

1  Q  What action plan did you bring to the table to
2  resolve this ongoing claim?
3  A  I may not have noted it, but I may have gone
4  over and talked to him about this claim.
5  Q  Again that would be something that, if you were
6  taking thorough notes, would be, if it happened, in the
7  claims notes; true?
8  A  That's probably something that would have been
9  better put in notes, yes.
10  Q  Because right now you can't truthfully testify
11  that that even occurred, can you?
12  A  No.
13  Q  Okay. On September 12th, 2012, another note
14  from you, it looks like you get a call from Paul Davis
15  Restoration saying that there is additional charge for
16  breaking granite top while removing cabinets. Do you
17  recall that?
18  A  Yes.
19  Q  All right. So your preferred vendor broke the
20  granite countertop at the Cathcart residence during their
21  work there; is that true?
22  A  Yes.
23  Q  Also on the 12th it looks like you took a
24  telephone call from Mr. and Mrs. Cathcart, did you not?
25  A  Yes.

Page 238

1  Q  And the Cathcarts informed you that Ms. Cathcart
2  has MS and has been hospitalized a few days. See that?
3  It's at the bottom of that 9-12-2012 claims note, the
4  second of the two claims notes.
5  A  Oh, yeah.
6  Q  Do you see that?
7  A  Yeah.
8  Q  Do you have any general knowledge about stress'
9  relationship with MS flareups?
10  A  No.
11  Q  Looks like on 9-13-2012 you're directly
12  communicating with Paul Davis Restoration again
13  concerning the granite countertop, are you not?
14  A  Yes.
15  Q  She's pleading her case that they took every
16  precaution but the darn thing still broke; right?
17  A  Yes.
18  Q  And ultimately you gave them permission to order
19  and replace that granite countertop, did you not?
20  A  Yes.
21  Q  Who was going to pay for that? Who is going to
22  pay for that?
23  A  Universal.
24  Q  Okay. Now, down in -- at the bottom of that
25  claim note, there appears to be an E-mail from Karen

Page 239

1  Reason to Paul Davis. The last sentence says, "I know
2  the homeowners are motivated to move forward. Please
3  advise of your approval so we can complete the work
4  necessary."
5     It appears that Paul Davis is looking to
6  Universal to kind of move things along because the
7  homeowners are motivated to get it done. Is that your
8  understanding of that?
9  A  Yes.
10  Q  Okay. So on the next claim note on 10-3 of
11  2012, another note by you, do you see that?
12  A  Yes.
13  Q  It says, "Got call from named insured. Went
14  over additional utilities."
15     Read the rest of that sentence into the record,
16  please.
17  A  "Electric bill increased due to negative air
18  setup for mold remediation."
19  Q  Does that further refresh your memory that Paul
20  Davis Restoration was engaged in mold remediation in the
21  Cathcart home?
22  A  Yes.
23  Q  And it says down there a little bit later in
24  that note that you called Paul Davis Restoration about
25  the countertop; right?

Page 240

1  A  Yes.
2  Q  As of November 7, 2012, looks like you got a
3  call from the named insured while you were on vacation.
4  Where did you go?
5  A  I don't remember.
6  Q  "She said she has no sink, no water. Refuses to
7  deal with Paul Davis Restoration."
8     So at this point you were starting to figure out
9  that your preferred vendor was somebody that the insureds
10  no longer wanted to deal with. Is that right?
11  A  Yes.
12  Q  Okay. The next entry, 11-12-2012, another entry
13  by you says, "Call from named insured. He upset that,
14  while re-installing the countertops, technicians found
15  more mold on the other side of the kitchen," and then you
16  say, "probably not related to the original loss." Do you
17  see that?
18  A  Yes.
19  Q  What expert opined to Universal that that mold
20  was not related to the original loss?
21  A  No one at that time.
22  Q  Well, no one at any time; isn't that right?
23  A  Well, I think it was -- the loss happened way
24  far away from the kitchen unless it's -- it's pretty
25  obvious. You don't need an expert to tell you that water

Page 241

1  can't climb from one area to another. It can't climb up
2  a wall.
3    Q  I'm going to call your -- water can't wick up a
4  wall?
5    A  Can't go up a wall.
6    Q  Water cannot wick up a wall; is that what you're
7  saying?
8    MR. CANNON: He just explained what he was saying,
9  Counsel.
10   MR. BALMER: Well, I'm trying --
11   MR. CANNON: Read it back. Will you read back his
12  response, please.
13       (The record was read as follows:
14          "QUESTION: Well, I think it
15       was -- the loss happened way far away
16       from the kitchen unless it's -- it's
17       pretty obvious. You don't need an
18       expert to tell you that water can't
19       climb from one area to another. It
20       can't climb up a wall.")
21
22   THE WITNESS: Climb.
23  BY MR. BALMER:
24   Q  Climb, c-l-i-m-b?
25   A  Uh-huh.

Page 242

1    Q  Is that a "yes"?
2    A  Yes.
3    Q  You know, you've been doing water-damage claims
4  for a long time, sir. Is that true?
5    A  Yes.
6    Q  When there is a flood and water impacts the
7  cellulose-based building materials such as dry wall,
8  sheetrock, plaster, baseboards, water tends to wick up a
9  wall, does it not?
10   A  Yes.
11   Q  What's the difference between wicking and
12  climbing?
13   A  **Well, it only wicks up a certain amount on the
14  wall like, you know, less than 12 inches.**
15   Q  Well, it depends on how much water is there,
16  does it not?
17   A  It could be a factor, yeah.
18   Q  And based upon your testimony just now about how
19  high water can wick up on a wall up to about 12 inches,
20  tell me what technical training that opinion is based on.
21   A  It's not.
22   Q  I'm going to call your attention back to the
23  very first page, the very first entry. Do you see where
24  it says, "Insured discovered water throughout the entire
25  house"?

Page 243

1    A  Yes.
2    Q  So if the insureds discovered water throughout
3  the entire house, water doesn't have to climb anywhere to
4  get anywhere in the house, does it? It's already there.
5    A  That's true.
6    Q  Thank you.
7       So back to this 11-12-2012 entry, which is on
8  page 363, where you say, "probably not related to the
9  original loss," you agree that there's no expert that
10  told you that; right?
11   A  Correct.
12   Q  You don't have any technical training to
13  determine that for yourself either, do you?
14   A  No.
15   Q  Okay. So it looks like down a couple of lines
16  says, "Called Chris and he confirmed that more mold
17  found."
18       So now you are calling Chris at Paul Davis
19  Restoration?
20   A  Yes.
21   Q  Now, you go on to say, "And I sending out Carl
22  is foreman to inspect tomorrow. Explain we need to get
23  this six- to seven-month-old claim brought to a
24  conclusion." Do you see that?
25   A  Yes.

Page 244

1    Q  You wrote that?
2    A  Yes.
3    Q  And then you told Paul Davis Restoration what?
4    A  **To proceed with any new mold detecting.**
5    Q  To remediate it; correct?
6    A  Yes.
7    Q  You didn't tell Paul Davis Restoration, "Hold
8  on. There's a mold limit here." You told Paul Davis
9  Restoration to proceed with any new mold detected, didn't
10  you?
11   A  Yes.
12   MR. CANNON: I'm going to object; it's a joint
13  question. Ask him a straight question.
14   MR. BALMER: I just did.
15   Q  Answer it, please.
16   MR. CANNON: Move to strike.
17       Go ahead.
18   THE WITNESS: Yes.
19   MR. BALMER: Well, I'm going to make sure that the
20  question is clear if we're going to have an objection.
21   Q  So in relationship to your direction to Paul
22  Davis to proceed with any new mold detected, you did not
23  inform Paul Davis that there was any sort of mold
24  limitation that would somehow cap the amount that they
25  would be able to spend to remediate that mold issue;

Page 245

1  true?
2  A  True.
3  Q  In fact you gave Paul Davis Restoration what
4  appears to be carte blanche permission to proceed with
5  any new mold detected, didn't you?
6  A  Yes.
7  Q  Do you see an inconsistency with the permission
8  that you were giving to Paul Davis, the preferred vendor
9  of Universal, concerning mold remediation and the
10  position now being taken by Universal that some sort of a
11  mold limitation of $10,000 somehow now applies to the
12  claim of the Cathcarts?  Do you see some inconsistency
13  there?
14      MR. CANNON:  I'm going to object to that.  It's
15  compound, it's argumentative, lacks foundation.
16      Go ahead.
17  BY MR. BALMER:
18  Q  Go ahead.
19  A  Yeah, I can see some conflicts.
20  Q  You see some inconsistency, don't you?
21  A  Yes.
22  Q  Now, you're supposed to be fair with the
23  insureds, aren't you?
24  A  Yes.
25  Q  The insurance company is supposed to honor its

Page 246

1  obligation to the insured, is it not?
2      MR. CANNON:  Asked and answered about five times now.
3      MR. BALMER:  Let's go for number six.  I'm on a roll.
4  Q  Go ahead.
5  A  Yes.
6  Q  And the insurance company is supposed to honor
7  its express authority given to its preferred vendors, is
8  it not?
9  A  Yes.
10  Q  Okay.  So down on 11-13-2012 -- this is still on
11  363 -- it says, "Received call from named insured.
12  Contractors have now found additional mold all along the
13  opposite wall where the original mold was found.  They
14  are also checking under the tub as everyone keeps
15  smelling an odor coming from the tub/bedroom area."
16      Did you write that?
17  A  Yes.
18  Q  Did you ever authorize any sort of
19  pre-remediation inspection or testing by a professional,
20  an indoor environmental professional?
21  A  No.
22  Q  Well, now you've got contractors talking about
23  smells in the home related to what they believe to be
24  mold in that tub/bedroom area; right?
25  A  Yes.

Page 247

1  Q  And that was directly in the area of the broken
2  pipe under the slab; correct?
3  A  As far as I know, yes.
4  Q  And we already testified earlier, didn't you,
5  that the water loss most likely was a category 2 given it
6  was an underground leak?  True?
7  A  Yes.
8  Q  But still Universal took no action to retain an
9  appropriate expert to test and otherwise examine for that
10  issue; isn't that right?
11      MR. CANNON:  Object to the form.
12      Go ahead.
13      THE WITNESS:  Yes.
14  BY MR. BALMER:
15  Q  Page 364, this is an E-mail from Paul Davis to
16  James Ketcham, says "James," comma.  Do you see that?
17  A  Yes.
18  Q  And this is one of those E-mails that you cut
19  and paste into the notes?
20  A  Yes.
21  Q  Down about midway through, there are -- it looks
22  like four bullet points that they're looking for
23  permission to do.  Do you see that?
24  A  Yes.
25  Q  Okay.  And it says -- just above that says,

Page 248

1  "However, without approval from you, we will not be able
2  to proceed."  Do you see that?
3  A  Yes.
4  Q  So Paul Davis is clearly looking to the
5  insurance company for direction and approval on the
6  claim; isn't that right?
7  A  Yes.
8      MR. CANNON:  Well --
9  BY MR. BALMER:
10  Q  So there are four bullet points.  One is,
11  "Replace carpet in master bedroom, living room and dining
12  room."  Do you see that?
13  A  Yes.
14  Q  The next one is, "Replace three tiles in the
15  entryway.  He ascertains our equipment caused damage.  We
16  cannot say for sure if we caused any damage.  The tiles
17  have been poorly installed and are hollow."  Do you see
18  that?
19  A  Yes.
20  Q  No. 3 is "duct cleaning."  They say that the
21  Cathcarts' request seems reasonable due to the amount of
22  construction in his home and concerns with mold spores.
23  Do you see that?
24  A  Yes.
25  Q  And then No. 4, "He is insisting on new

Page 249

1  kitchen -- upper and lower kitchen cabinets."  Do you see
2  that?
3      A   Yes.
4      Q   Now, go back to the last page, 363, and the
5  bottom entry on 11-14-2012 you are responding to that
6  E-mail in the claims notes; right?
7      A   Yes.
8      Q   Okay.  Read into the record, please, the first
9  sentence.  It starts with "E-mail."
10     A   "E-mail from PDR.  I will authorize items 1, 2
11 and 3 but do not understand why the kitchen cabinets have
12 to be replaced.  Please call me on this item so we can
13 discuss."
14     Q   Okay.  So this is another example of where
15 Universal expressly authorized Paul Davis Restoration to
16 do some work in the Cathcart home; true?
17     A   Yes.
18     Q   And that included replacing of the carpet in the
19 master bedroom, living room and dining room, replacing
20 tiles in the entryway, and duct cleaning due to the
21 amount of construction in the home and concern over mold
22 spores; true?
23     A   Yes.
24     Q   And there's no indication from you in your
25 claims notes that you informed anybody that, "Hey, wait a

Page 250

1  minute.  On the mold-spore thing, there's some alleged
2  cap on what we pay for mold."  You didn't say that, did
3  you?
4      A   No.
5      Q   No.  You authorized them to move forward on the
6  duct cleaning due to concerns with mold spores, didn't
7  you?
8      A   Yes.
9      Q   Just like you had authorized Paul Davis
10 Restoration to proceed with any new mold detected; is
11 that right?
12     A   Yes.
13     Q   And ultimately, although not on this page,
14 you'll recall that you did authorize the replacement of
15 the cabinets, both upper and lower; true?
16     A   Yes.
17     Q   And that was after further communication with
18 Paul Davis Restoration; is that right?
19     A   Yes.
20     Q   Paul Davis Restoration told you on the telephone
21 on November 14, 2012 that -- and this is Karen Reason in
22 a discussion that you were having with her about the
23 cabinet situation.  Do you see this note?
24     A   Yes.
25     Q   You say, "She was at the site yesterday and saw

Page 251

1  mold behind the cabinets"; correct?
2      A   Yes.
3      Q   "She says she knows insured has been upset and
4  with things as they have progressed, but there is a
5  legitimate argument for replacing the kitchen cabinets.
6  She indicated they were very moldy and, if it was her
7  home, she would want the kitchen cabinets replaced with
8  the new mold discovered."  Do you see that?
9      A   Yes.
10     Q   Apparently she was going to send you some photos
11 to show the damage.  You then go on to say, do you not,
12 "We then discussed the lien by the mold vendor.  PDR
13 explains that this issue has been resolved with payment
14 of the mold vendor."
15         Who is the mold vendor?
16     A   I don't know.  Doesn't say who it is.
17     Q   So here Karen Reason of Paul Davis Restoration
18 is telling you that the kitchen cabinets need to be
19 replaced; true?
20     A   Yes.
21     Q   Ultimately you agreed to replace the cabinets
22 and -- did you not?
23     A   Yes.
24     Q   And again, even though that dealt with a mold
25 issue, you didn't inform anyone to be wary of any sort of

Page 252

1  a mold limitation in the insurance policy, did you?
2      A   Not at this time.
3      Q   Well, not at any time until you decided to sue
4  your insureds; isn't that right?
5      MR. CANNON:  Objection; foundation.
6      THE WITNESS:  I don't remember if it was before or --
7  the litigation started or not.
8  BY MR. BALMER:
9      Q   So at the time that you were busy providing all
10 sorts of express authorization to Paul Davis Restoration
11 to take care of any and all mold in the house, you were
12 providing that express permission and authorization to
13 move forward without any statement of -- that Universal
14 might not pay; is that right?
15     A   Correct.
16     Q   In fact it would have been reasonable for Paul
17 Davis to presume and expect that Universal would pay for
18 the work that it is expressly authorizing Paul Davis to
19 perform; right?
20     A   Yes.
21     Q   And it would be also reasonable for the insured
22 to also expect that Paul Davis would be paid by Universal
23 for work that Universal expressly authorized Paul Davis
24 to perform; true?
25     MR. CANNON:  Calls for speculation as to what the

Page 253

1  insured knew.
2      Go ahead.
3      THE WITNESS: It would be likely, yes.
4  BY MR. BALMER:
5   Q   I'm going to call your attention, please, to the
6  claim note on 11-30-2012 and it runs over onto the next
7  page from 365 to 366. Do you see that claim note?
8   A   Yes.
9   Q   You received an E-mail from Paul Davis
10 Restoration?
11  A   Yes.
12  Q   And they were giving you an update on the claim?
13  A   Yes.
14  Q   They were discussing with you the flooring
15 vendor coming to the house?
16  A   Yes.
17  Q   Ultimately you agreed that Paul Davis
18 Restoration replaced the tile throughout the house; isn't
19 that true?
20  A   Yes, I did.
21  Q   There were no strings attached to that
22 authorization, were there?
23  A   No.
24  Q   And you would agree that Paul Davis and the
25 Cathcarts had a reasonable expectation that when

Page 254

1  Universal agreed to pay Paul Davis for the work and have
2  it done, that Universal would actually pay Paul Davis for
3  that work; is that true?
4   A   Yes.
5   Q   In fact just below her E-mail -- well, her
6  E-mail asks, "How would you like us to proceed?" So
7  that's Paul Davis looking to Universal for direction on
8  the claim; right?
9   A   Yes.
10  Q   And then down below you say, "Called Karen.
11 Went over tile costs. Explain I feel, with all that has
12 gone on with this claim, that the named insured will not
13 be satisfied with anything else. Has bid 7,000." Do you
14 see that?
15  A   Yes.
16  Q   And then what did you tell her? What's the next
17 line, Karen from Paul Davis?
18  A   **So told her to proceed with the tile**
19 **replacement.**
20  Q   What else do you say?
21  A   **"Unfortunately it is tile that is continuous**
22 **throughout the home."**
23  Q   So there's your express authorization to Paul
24 Davis to move forward with the retiling of the house;
25 true?

Page 255

1   A   Yes.
2   Q   Again no strings attached; right?
3   A   Correct.
4   Q   Down from 12-7-2012 and through December 12,
5  2012 you're discussing replacement of those kitchen
6  cabinets, are you not?
7   A   Yes.
8   Q   And you're looking for estimates for those
9  kitchen cabinets; true?
10  A   Yes.
11  Q   Down on 12-10-2012 you did an entry and the last
12 line of that says what? Starts with "Told."
13  A   **"Told PDR in Vegas to proceed with order.**
14 **Unfortunately it will take six weeks to arrive. Note**
15 **from PDR about cabs. I spoke with Patrick at Lowe's**
16 **(702)568-3300. He stated the payment would need to be**
17 **made in full payable to Lowe's."**
18  Q   All right. So these two notes on the
19 December 10 and December 12 represent express authority
20 given by Universal to Paul Davis to move forward with
21 ordering the kitchen cabinets from Lowe's; true?
22  A   Yes.
23  Q   And there's nothing in that authorization that
24 demonstrates any sort of notice or statement to Paul
25 Davis or the homeowners that there was any sort of a mold

Page 256

1  limitation in play for those cabinets. Is that right?
2   A   Correct.
3   Q   All right. Let's go on to January 2nd,
4  please --
5   A   What page?
6   Q   -- 2013.
7      It's on page 367. It's the fourth entry up from
8  the bottom. What happened?
9   A   **"Call from named insured about broken slider.**
10 **Named insured called and said PDS broke glass."**
11  Q   PDR.
12  A   **"PDR broke glass in custom eight-foot slider.**
13 **Explained this issue with the slider is not being**
14 **properly sealed at the origin -- original installation is**
15 **a separate claim and another deductible would apply."**
16  Q   Okay. That's good enough.
17     So basically what happened is the preferred
18 vendor for Universal, Paul Davis, broke the sliding glass
19 door in the Cathcart home --
20  A   Correct.
21  Q   -- right?
22     Who is Don Grimm?
23  A   He is a director of claims.
24  Q   How does he sit in the hierarchy at Universal
25 during the period of the Cathcart claim?

Page 257

1  A   He was in charge of compliance, of claims
2  compliance.
3  Q   Claims compliance with what?
4  A   If you get -- he kept track of what they called
5  CRN, Civil Remedy Notices, Department of Insurance
6  complaints, lawsuits, that type of thing.
7  Q   So why did you -- on February 12th, 2013 -- this
8  is on page 371 -- why was attorney correspondence -- it
9  says, "I sent an E-mail to Don Grimm." Why was that
10 going on?
11 A   I think he says that Don Grimm is sending a
12 letter of rep to Jim K. Is that what you mean?
13 Q   No. It says on 2-12-2013 TaslerJ writes,
14 "Attorney correspondence. I sent an E-mail to Don
15 Grimm."
16 A   Yes.
17 Q   What's that all about?
18 A   That is the clerical person in the claims
19 department is notifying Don Grimm that attorney
20 correspondence has arrived.
21 Q   Have you ever seen one of those E-mails that
22 notifies of attorney correspondence arriving?
23 A   Yes.
24 Q   What do those documents say to Mr. Grimm?
25 A   It just says, "Attached is attorney

Page 258

1  correspondence." Real simple.
2  Q   So in terms of your response to that
3  February 11, 2013 letter sent to you that requested many
4  bullet points of authority and information and other
5  things, ultimately the director of claims ratified your
6  response to that letter; is that right?
7       MR. CANNON: Objection; legal conclusion.
8       Go ahead.
9       THE WITNESS: No.
10 BY MR. BALMER:
11 Q   Did he give you direction on how to respond?
12 A   No.
13 Q   You as the supervisor had the authority to
14 respond and bind the company by virtue of your position?
15 A   Yes.
16 Q   Okay. On page 373, on March 19, 2013 there's an
17 entry by you. What does that mean?
18 A   It starts out "CRS"?
19 Q   No, the next one down on the 19th.
20 A   Oh, 3-19? Sorry. I just made a large-loss
21 report and forwarded it to Otto for review.
22 Q   Where is that large-loss report? Is that in the
23 file?
24 A   It is.
25 Q   You've seen it in there?

Page 259

1  A   I saw it in there.
2  Q   What was the purpose of that large-loss report?
3  A   Any time you get a large loss that exceeds
4  50,000, you got to present it to the next person up the
5  line.
6  Q   Otto was your next person up?
7  A   Yes.
8  Q   You've made some statements throughout the
9  claims notes that we've talked about concerning mold
10 being not related or possibly related or possibly not
11 related here and there. We've talked about -- we've
12 talked about the fact that you don't have any expert
13 opinions or conclusions to back you up there. When I
14 look at that large-loss report, am I going to see the
15 same kinds of opinions and allegations that are
16 unsupported by any expert in that large-loss report?
17      MR. CANNON: I'm going to object to the form of the
18 question.
19      Go ahead. You can answer.
20      THE WITNESS: I have to look at it, but I don't think
21 there's any expert reports in there.
22 BY MR. BALMER:
23 Q   Okay. So any sort of opinion similar to those
24 that we've been talking about about mold and water and
25 what water can do and what parts of the house were

Page 260

1  affected or unaffected, those would just be statements
2  made by you without the benefit of an expert opinion to
3  ensure that your position on that issue is correct. Is
4  that right?
5  A   I have to read the report to give you a good
6  answer on that. I don't think I would have mentioned
7  anything about expert reports in there.
8  Q   My question is a little bit different though,
9  sir. My question is, throughout the claim notes you --
10 we've talked about instances where you have jumped to a
11 conclusion about whether mold or water is related or
12 unrelated, those kinds of things. We've talked very
13 specifically about the fact that there's no expert
14 opinion or conclusion that supports those types of
15 positions taken by you. My question is, if I get into
16 your large-loss report in the foot and a half stack of
17 information that I got today and I see some sort of
18 opining by you as to mold or relationship or area of
19 water damage, that those similarly are unsupported by any
20 sort of an expert opinion or conclusion. Is that right?
21      MR. CANNON: I'm going to object to the form.
22      Go ahead.
23      THE WITNESS: Yes, I would say so.
24 BY MR. BALMER:
25 Q   Down at the bottom of this 373 page, there are

Page 261

1  two E-mails, both from TaslerJ. Who is TaslerJ?
2  A  That's a clerical person, a customer rep.
3  Q  Okay. She's sending some more attorney
4  correspondence to Don Grimm. See that?
5  A  Yes.
6  Q  Do you have any idea what was said in those?
7  A  No.
8  Q  Okay. So on the next page, 374, there's a claim
9  note by Otto on April 10, 2013, says, "Supervisor review
10 Jim," comma. "Reviewed claim. Ad authority extended to
11 conclude up to the requested 134,736.05." Do you see
12 that?
13 A  Yes.
14 Q  You haven't paid $134,736.05 on this claim, have
15 you?
16 A  No.
17 Q  But the authority is there?
18 A  Yes.
19 Q  Why was the amount of the authority not tendered
20 to the insured?
21 A  'Cause it was in dispute.
22 Q  Well, you would agree that insurance companies
23 are required to tender undisputed amounts, aren't you?
24 A  Yes.
25 Q  So are you saying that all of that 134,736.05

Page 262

1  was in dispute?
2  MR. CANNON: I'm going to object; that
3  mischaracterizes his testimony.
4  BY MR. BALMER:
5  Q  Well, I'm asking you.
6  A  I don't remember the total that was paid out,
7  but most of the undisputed was paid out at that time.
8  Q  At the time that -- okay. Let me make sure I
9  understand this correctly.
10    So, "Reviewed claim. Ad authority extended to
11 conclude up to the requested 134,736.05." Up to that
12 point, how much of that hundred -- is that additional on
13 top of what's already been paid?
14 A  No. That's the whole thing.
15 Q  Okay. So at the time of April 10, 2013 where
16 this authority was extended, how much had been paid?
17 A  I'd have to go look at the checks that had been
18 issued to get a full amount on that.
19 Q  Well, do you think it was -- can you estimate
20 for me? I mean it wasn't anywhere close to $134,000, was
21 it?
22 A  It was a good chunk of money.
23 Q  Probably over 50,000 due to the large-loss
24 designation; right?
25 MR. CANNON: I'm going to object to the form.

Page 263

1  Don't guess. If you have an idea, do it.
2  THE WITNESS: I could probably find it pretty quick.
3  BY MR. BALMER:
4  Q  Where would you go to look?
5  A  In the payment -- whatever I can find with the
6  payments that have been made, a list of the checks that
7  were issued.
8  Q  Where is that list?
9  A  In the claims.
10 Q  So I could go look at that list of checks --
11 A  And add them up.
12 Q  -- and I could see what was paid up to April 10,
13 2013 and then compare that to the 134,736.05 and I would
14 know how much money was left on authority that had been
15 paid; is that right?
16 A  Yes.
17 MR. CANNON: It's April 19th though, not April 10th.
18 MR. BALMER: No, that's not true.
19 MR. CANNON: If you look at the entry, it's right
20 there, isn't it?
21 MR. BALMER: No, it's not.
22 MR. CANNON: Okay.
23 MR. BALMER: Let's ask the witness.
24 Q  Isn't that sentence, "Reviewed claim. Ad
25 authority" -- doesn't that follow a "Supervisor review.

Page 264

1  Jim," comma, and then that --
2  A  Yeah. That entry was made April 10th, 2013.
3  Q  Thank you.
4     Down on April 19, 2013 you received an E-mail
5  from Todd Osmundson at Earth Resource Group?
6  A  Yes.
7  Q  And Todd Osmundson indicated that, "The results
8  indicate that elevated airborne fungal spores are present
9  within the structure and mold growth was identified
10 within wall cavities and on carpet tack and dry wall."
11 Do you see that?
12 A  Yes.
13 Q  And at the time this was the only mold report
14 that you had; right?
15 MR. CANNON: Object; that mischaracterizes earlier
16 testimony.
17 THE WITNESS: Yeah. We had other mold reports before
18 this.
19 BY MR. BALMER:
20 Q  Well, how many?
21 A  There's been so many.
22 Q  On this case?
23 A  Yeah.
24 Q  I think we've only talked about -- I mean
25 there's only the Nevada Mold Testing one from the summer,

Page 265

1  July of 2012, that you never provided until February
2  sometime of 2013. We've seen invoices from MSE, but you
3  didn't say that you had those reports. Do you have those
4  reports?
5  A  No, I don't have the reports, no.
6  Q  Okay. I'm talking about reports.
7     So the opinion that is set forth here in Todd
8  Osmundson's E-mail to you identifies a problem within the
9  Cathcart home, does it not?
10 A  Yes.
11 Q  And at no time following your receipt of this
12 expert opinion and conclusion did you go out and hire any
13 other expert to tell you any different, did you?
14 A  No.
15 Q  Okay. So on 4-23-2013 it looks like there's
16 another entry by you. Do you see that?
17 A  Yes.
18 Q  Okay. You're talking about some balance with
19 CRS. Do you see that?
20 A  On -- what's the date of the entry?
21 Q  It's on the bottom of page 374. It's 4-23-2013.
22 A  Yes.
23 Q  On the next page it continues. Down at the very
24 last sentence of that claim note it says, "Will discuss
25 obtaining counsel on our behalf with Rich/Otto." Do you

Page 266

1  see that? It's the very last sentence above -- on 375,
2  which is a continuation of the claim note from 374.
3  A  Yes.
4  Q  Well, what happened? Why did you -- why were
5  you now discussing obtaining counsel?
6  A  Because of the mold limit and determining what
7  was mold and what was water damage and --
8  Q  Well, you'd been giving Paul Davis Restoration
9  unlimited authority to go handle all the mold remediation
10 up to this point --
11 MR. CANNON: I'm going to object to the
12 characterization.
13 BY MR. BALMER:
14 Q  -- were you not?
15 MR. CANNON: Object to the characterization, form of
16 the question.
17 THE WITNESS: Yes, I was.
18 BY MR. BALMER:
19 Q  And now all of a sudden there's a mold limit in
20 play?
21 A  Yes.
22 Q  Who made that decision? It's inconsistent, is
23 it not?
24 A  You do things on claims that you try and
25 facilitate the conclusion of a claim; and it may seem to

Page 267

1  be inconsistent, but you're just trying to get the
2  insured taken care of.
3  Q  So by authorizing Paul Davis to do a bunch of
4  work, including mold remediation throughout the home, and
5  then not paying Paul Davis for all that work, resulting
6  in a Notice of Lien on the Cathcarts' home, that somehow
7  facilitated resolution of the claim?
8  MR. CANNON: Argumentative.
9     Go ahead.
10 THE WITNESS: No, that didn't.
11 MR. BALMER: Right.
12 Q  And so now you're in trouble and you're looking
13 to hire counsel to protect the insurance company at the
14 expense of the insured. Is that true?
15 MR. CANNON: Objection; form of the question.
16 THE WITNESS: I looked to counsel to give guidance on
17 this claim.
18 BY MR. BALMER:
19 Q  Because there were problems with the claim.
20 Looking back on it at that point, you could see the
21 inconsistency of the positions that Universal was going
22 to have to take to protect itself; right?
23 A  I was looking to get counsel's view of the claim
24 and their recommendations.
25 Q  Because of the inconsistencies in the claim?

Page 268

1  MR. CANNON: Objection; asked and answered.
2  THE WITNESS: A lot of things in the claim, just a
3  lot of problems with the claim.
4  BY MR. BALMER:
5  Q  Were you looking to find out whether or not the
6  insurance company had to honor its commitments to its
7  preferred vendor and pay for things that it had expressly
8  authorized?
9  A  It was a lot of different aspects of the claim.
10 Q  Including that?
11 A  A lot of different things. It's private between
12 the --
13 Q  Well, I'm entitled to know what you think is a
14 problem with the claim. I'm not asking you what the -- I
15 know what the lawyers told you. They told you to
16 litigate it and file a lawsuit against the insureds.
17 What I want to know from you is what problems you saw
18 with the claim.
19 A  The mold limit and what was mold and what was
20 water damage.
21 Q  But you didn't hire an expert to tell you either
22 one of those things --
23 A  That's correct.
24 Q  -- did you?
25 A  That's correct.

Page 269

1  Q  Which was one of your problems, wasn't it?
2  A  No.
3  Q  So up to the point where it turns out that all
4  of the mold-remediation work being done in the home by
5  Universal's preferred vendor, Paul Davis Restoration, and
6  it turns out that they caused a significant mold
7  contamination problem in the Cathcart home, that's when
8  you go and you seek counsel to protect Universal. Isn't
9  that true?
10  MR. CANNON: Asked and answered.
11  THE WITNESS: I was looking to counsel for guidance
12  on this claim.
13  BY MR. BALMER:
14  Q  What about the -- what about the claim were you
15  looking for guidance on?
16  A  To review the claim to see its merits and make
17  the best decision that we could.
18  Q  How much have you paid in attorneys' fees so far
19  in suing your insureds on this case?
20  A  I don't know.
21  Q  Do you have any idea whether that amount of
22  money may have come close to satisfying what would be
23  necessary to fix the house?
24  A  I don't know.
25  Q  How do we find that out?

Page 270

1  A  You have to see what -- call up Universal and
2  find out what they paid. I have no idea since I left.
3  Q  So despite all those things that we've been
4  talking about, you decided to talk with Rich and Otto
5  about obtaining counsel and spending money to protect
6  Universal instead of spending that same money to help the
7  insureds fix a problem caused by your preferred vendors.
8  Isn't that right?
9  MR. CANNON: I'm going to object to that. He's
10  already answered the question three times.
11     Go ahead.
12  THE WITNESS: I've already answered that question.
13  BY MR. BALMER:
14  Q  Answer it for me. I haven't heard an answer to
15  that question yet. I hear everything but an answer.
16  MR. CANNON: You've heard an answer. You just don't
17  like the answer.
18  MR. BALMER: No. I think the answers that he's given
19  are not responsive to the question.
20  MR. CANNON: Can you amplify your answer at all?
21  THE WITNESS: There were a lot of inconsistencies
22  with this file as we all know. There were -- the file
23  kept changing as it went along. It started out as a
24  simple water loss and grew into more and more issues that
25  may or may not have been related to the claim, and I

Page 271

1  wanted some advice from counsel on how to proceed with
2  this claim.
3  BY MR. BALMER:
4  Q  But along the way you had the opportunity, did
5  you not, to hire an expert on mold to come in and tell
6  you what's related and what's not? Isn't that right?
7  A  But that was -- there were experts hired.
8  Q  Which ones?
9  A  That Gershwin and the other fellows we talked
10  about earlier.
11  Q  What? Okay. Earlier you didn't know who the
12  heck they were. Now you're telling me in April -- by
13  April of 2013 you had spoken with Eric Gershwin? Do you
14  know who he is?
15  A  I didn't speak with him.
16  Q  I see. Well, you didn't have counsel at that
17  time yet either, did you? Because you're having your
18  first discussion about hiring counsel on April 23, 2013.
19     So my question to you is, prior to April of
20  2013, you talked to Eric Gershwin?
21  A  No, I did not talk to Eric Gershwin.
22  Q  Well, it wouldn't have been your counsel because
23  you didn't have counsel at that time; correct?
24  A  I was talking to counsel probably at that time.
25  Q  Well, that's not what your claim note says. It

Page 272

1  says -- on 4-23-2013 it says, "Will discuss obtaining
2  counsel on our behalf with Rich/Otto."
3  A  Uh-huh.
4  Q  It says that, doesn't it?
5  A  Yes.
6  Q  It doesn't say, "I've retained counsel" or "I've
7  been talking to counsel." It says, "I'm going to talk
8  with Rich and Otto about maybe doing that." That's kind
9  of what it says, isn't it?
10  A  Yes.
11  Q  Okay. So is there somebody else at Universal
12  that was conversing with Eric Gershwin before April 23,
13  2013?
14  A  Not that I'm aware of.
15  Q  Okay. And I think you were about ready to say
16  these other guys like Perry and Exponent; right?
17  A  Yes.
18  Q  But those guys -- you didn't talk to Perry
19  Contracting, did you?
20  A  No.
21  Q  And you didn't talk to Exponent or Jeff Hicks,
22  did you?
23  A  No.
24  Q  And so as of April 23, 2013, they're not on your
25  radar; isn't that true?

Page 273

1  A  I'm not sure.
2  Q  Well, there's nothing in the claim notes that
3  say that anybody from Universal, including you or anybody
4  else -- Otto, Rich, Jenkins, the rest of any of the other
5  people that touched this claim notes -- talked to Perry;
6  right?
7  A  Correct.
8  Q  Or talked to Exponent; correct?
9  A  Correct.
10 Q  Which would include Jeff Hicks, who owns
11 Exponent; right?
12 A  Yes.
13 Q  Okay.  So when we're talking about the leading
14 up to 4-23-2013 and you're talking about these
15 inconsistencies, my question to you was directed to a
16 time before you decided to hire counsel, and the question
17 is this: Universal had the opportunity to hire whatever
18 experts in the field it wanted to hire to help it figure
19 out what mold is there, what water damage is there, what
20 category of water damage, what's related to this or that
21 or anything else.  You had the opportunity to do that,
22 didn't you?
23 A  Yes.
24 Q  And you didn't; correct?
25 A  Correct.

Page 274

1  Q  All right.  So now on April 23, 2013 you're
2  starting to see that your -- that Universal may be in
3  trouble and that's why you started discussing obtaining
4  counsel?
5     MR. CANNON:  I'm going to object; it mischaracterizes
6  what he said.
7  BY MR. BALMER:
8  Q  I'm asking you.  Isn't that true?
9  A  I wanted counsel to review the file for
10 guidance.
11 Q  And ultimately the direction taken by Universal
12 was to sue its insured; right?
13 A  Correct.
14 Q  But not until after pretending to want to
15 resolve the claim by getting an inspection of the
16 Cathcart home; true?  In fact let me ask it this way:
17 Isn't it true that Universal put on the appearance of
18 maybe considering resolving the claim when it asks for
19 access to the Cathcart home, but in reality the decision
20 had already been made to file a dec-relief action in
21 federal court against the insured?  Isn't that true?
22    MR. CANNON:  I'm going to object to that question.
23 It's argumentative, it's compound.
24    Go ahead.
25    THE WITNESS:  Yeah, I don't remember the timing on

Page 275

1  it.
2  BY MR. BALMER:
3  Q  Okay.  So I'm going to call your attention to
4  page 376.  Down at the bottom on 5-9-2013, do you see
5  that?
6  A  Yes.
7  Q  It says, "Mold expert E-mail.  Mold throughout."
8  You wrote that, didn't you?
9  A  Yes.
10 Q  Okay.  So now you know, from the only mold
11 expert that has done any significant testing in the home,
12 that there is mold throughout the house.  So you know
13 this as of May 9, 2013; true?
14 A  True.
15 Q  Then it looks like you got a telephone call from
16 Attorney Bailey.  Who is that?
17 A  Sunny Bailey.
18 Q  Is she with Walt's office?
19 A  Yes.
20 Q  And it says -- down here on 5-10-2013 it says,
21 "We agreed to use construction expert John Perry."  Do
22 you see that?
23 A  Yes.
24 Q  So this was -- you started looking into fixing
25 your problem by hiring experts after you retained

Page 276

1  counsel; is that right?
2  A  Yes.
3  Q  Hadn't done it before, did you?
4  A  No.
5  Q  But there never was ever a report or opinions
6  that were ever produced by John Perry; isn't that right?
7  A  Best of my knowledge, no.
8  Q  There was all kinds of screw-ups concerning the
9  calculation of the additional living expenses; isn't that
10 right?
11 A  There were a few.
12 Q  You couldn't get straight what the
13 additional-living-expense tally was, could you?
14    MR. CANNON:  Objection; argumentative.
15    THE WITNESS:  No.  I figured it out.
16    MR. BALMER:  Oh.
17 Q  Ultimately isn't it true that when you cut off
18 additional living expenses for the Cathcarts, that there
19 still remained a couple of thousand dollars on that
20 $46,000 limit?  Isn't that true?
21 A  About $1500.
22 Q  Do you know that you filed a lawsuit in federal
23 court against the insureds to say that you, Universal,
24 exhausted those policy limits?
25 A  Well, technically, yes.

Page 277

1  Q   What do you mean "technically, yes"?
2  A   Because there's a 2700 -- in the calculations
3  there's a $2700 refundable deposit.
4  Q   Did you get that back?
5  A   No, not that I'm aware of.
6  Q   Why would you not get that back?  There's no
7  evidence that the Cathcarts damaged in any way the home,
8  is there?
9  A   I don't know if the deposit was ever refunded.
10  Q   Why wouldn't you -- did you ever call and ask
11  about the deposit?
12  A   It's something that wasn't taken care of.
13  MR. CANNON:  What's the deposit for?
14  BY MR. BALMER:
15  Q   What was the deposit for?
16  A   Damage deposit.
17  Q   So a $2700 deposit and you're telling me that
18  you just never followed up on it.  Meanwhile the
19  Cathcarts are moving back into their house; is that true?
20  A   That's true.
21  Q   And it's also true, then, that when the lawsuit
22  says that Universal exhausted the $46,000
23  additional-living-expense limit, that's not true, is it?
24  MR. CANNON:  Objection; argumentative.
25  THE WITNESS:  No, that's true.

Page 278

1  BY MR. BALMER:
2  Q   So you decided that you would gift the $2700
3  refundable deposit to CRS at the expense of the insured?
4  MR. CANNON:  I'm going to object to formation of the
5  question.
6  BY MR. BALMER:
7  Q   Go ahead.
8  MR. CANNON:  Go ahead.
9  THE WITNESS:  I don't know if there's any damage that
10  was taken out or that we didn't get the whole deposit
11  back or we wouldn't have gotten it back.  I don't know.
12  BY MR. BALMER:
13  Q   You just didn't look into it, did you?
14  A   I was out of the claim -- no, I didn't.
15  Q   And so had that money been refunded as
16  expected -- like you expect a refundable security deposit
17  to be refunded; true?
18  A   No.  We oftentimes don't get it back.
19  Q   Is it because you just failed to follow up on
20  it?
21  A   No, because they've come up with some cleaning
22  fee or some damage fee or something like that.
23  Q   All right.  Is there anything in the file, the
24  claims file, at all to demonstrate that CRS was entitled
25  to retain, or the homeowner was entitled to retain, any

Page 279

1  part of that $2700 refundable deposit?
2  A   No.
3  Q   To the extent that that $2700 deposit was in
4  fact refundable but not pursued or received, that is a
5  full $2700 in the $46,000 additional-living-expense limit
6  that the Cathcarts no longer have access to; is that
7  right?
8  A   Well, not quite.
9  Q   Well, tell me how much of it would still be
10  left.
11  A   About roughly $750.
12  Q   So if $750 were left, then that would mean that
13  the allegation in the federal Complaint that was filed by
14  Universal against the insureds, the Cathcarts, that says
15  that $46,000 was exhausted, that's not true, is it?
16  A   Hang on.  Well, we actually overpaid the 46,000,
17  but that included the $2700 deposit; and we had to pay
18  that or they wouldn't have gotten the place.  So at the
19  time it was exhausted.
20  Q   Okay.  And I think what you're referring to is
21  on page 378 in a claims note made by you on August 2nd,
22  2013?
23  A   Yes.
24  Q   You say, "We still owe CRS $1800.58 and this
25  will bring the total payment on ALE, with what we paid

Page 280

1  the Cathcarts, directly to 46,690.33.  However, part of
2  the charges is a $2700 deposit, so they still have a
3  little left on their limit, taking into consideration the
4  deposit."
5  You wrote that, didn't you?
6  A   Yes.
7  Q   So the allegation in the Complaint that said
8  that the $46,000 was unequivocally exhausted is not true,
9  is it?
10  MR. CANNON:  Hundred percent misrepresents what the
11  Complaint says.  I'll object to the question.
12  BY MR. BALMER:
13  Q   Well, listen, I would imagine that if you're
14  making a federal case out of the insurance-coverage
15  issues and you represent to the Federal Court that the
16  $46,000 in additional living expenses is exhausted and
17  therefore judgment should be entered in the favor of the
18  insurance company, that you would be unequivocally sure
19  and certain that that $46,000 was completely exhausted.
20  Your claims note of --
21  MR. CANNON:  8-2.
22  BY MR. BALMER:
23  Q   -- August 2nd, 2013 is directly contrary to that
24  filing, isn't it?
25  MR. CANNON:  I'm going to object to the form of the

Page 281

1  question. It's argumentative, lacks foundation.
2      Go ahead.
3      THE WITNESS: No. We actually overpaid the policy
4  limits on ALE. We could not have rented out or got the
5  Cathcarts in temporary housing without that deposit. We
6  had to pay it.
7  BY MR. BALMER:
8    Q  Did you bill the deposit against the limit?
9    A  Yes, yes.
10   Q  How does it protect the insureds'
11 additional-living-expense limit when Universal has the
12 right and ability to request a refund of the refundable
13 deposit and you just fail to do it?
14   A  Well, sometimes it takes a long time to get that
15 deposit back and sometimes we don't get it all back and
16 it could exceed the $4600.
17   Q  Tell me where in the file it demonstrates any
18 effort on behalf of Universal to receive back any part of
19 the $2700 refundable deposit.
20   A  I'm not sure it's in there.
21   Q  And if it's not in there, you can't testify that
22 any effort was made in that regard; is that right?
23   A  That's true.
24   Q  And that's to the sole and complete detriment of
25 the insureds, isn't?

Page 282

1      MR. CANNON: I'm going to object to the formation of
2  the question.
3      THE WITNESS: No.
4      MR. CANNON: Go ahead.
5      THE WITNESS: I believe that we had to pay over the
6  policy limits to get them in a place.
7  BY MR. BALMER:
8    Q  You're not answering the question.
9       You say -- on 8-2-2013 you admit that the
10 Cathcarts still have a little left on their limit, taking
11 into consideration the deposit. You affirmatively make
12 that representation, don't you?
13   A  Yes.
14   Q  Nobody forced you to say that in the claims
15 notes, did they?
16   A  No.
17   Q  And it feels like to me -- and you can correct
18 me if I'm wrong -- that you're trying to wiggle out of
19 it. Is that right?
20   A  No.
21   Q  But you can't show to me any information or
22 documents or proof in the claims file that any effort was
23 made to get any of that deposit back, can you?
24   A  No.
25   Q  And if that was a refundable deposit, then

Page 283

1  certainly the Cathcarts would still have some money
2  available in the $46,000 policy limit. Is that true,
3  according to your own notes?
4    A  Yes.
5    Q  And if Universal, as it appears, failed to seek
6  reimbursement of that refundable security deposit, that
7  that failure would directly impact the Cathcarts' right
8  to the money under the additional-living-expense portion
9  of their policy, wouldn't it?
10   A  Yes.
11   Q  So without even so much as asking for the money
12 back, did Universal just decide that that would make its
13 declaratory-relief action against the insured a little
14 bit harder, a little bit more inconvenient, so you just
15 decided to leave the money with CRS or the rental
16 homeowner?
17     MR. CANNON: I'm going to object to that. It's
18 argumentative, misstates his testimony.
19     Go ahead.
20     THE WITNESS: No. It was -- we overpaid policy
21 limits to make sure the Cathcarts could rent something
22 out.
23 BY MR. BALMER:
24   Q  But you didn't really overpay because there's a
25 refundable deposit.

Page 284

1    A  No. We overpaid.
2    Q  It's hard to reconcile the overpayment testimony
3  right now that you're giving with the statement made,
4  unsolicitedly, by you on August 2nd, 2013 in the claims
5  notes that says, "So they still have a little left on
6  their limit, taking into consideration deposit." Either
7  you overpaid, you paid right on the money, or you
8  underpaid. What did you do?
9    A  Overpaid for right know that I know of.
10   Q  For right now. What can you do to determine
11 whether or not you underpaid?
12   A  I can't do anything right now.
13   Q  Why not?
14   A  I'm not employed by Universal.
15   Q  What could a Universal employee do?
16   A  They could probably check on it.
17   Q  How would they do it?
18   A  Call up CRS.
19   Q  And say, "Where's the deposit"?
20   A  Yes.
21   Q  Two and a half years later? Yeah?
22   A  Yes.
23     MR. CANNON: We've been here seven and a half hours
24 right now.
25     MR. BALMER: I know. I just got a couple more

Page 285

1  questions, if you'll oblige.
2      MR. CANNON: All right.
3  BY MR. BALMER:
4      Q  On 377 there is -- on June 11, 2013 it talks
5  about "feature No. 1 expense." What is that?
6      A  Where are you, what page?
7      Q  I'm on 377, sir.
8      A  What's the date of the entry?
9      Q  The date of the entry is June 11, 2013.
10         My question is, what is a feature No. 1 expense?
11     A  A feature No. 1 would be under building A,
12 expense payment.
13     Q  What's the difference between an expense and an
14 indemnity payment?
15     A  An expense would be not an indemnity payment.
16 That's the only way I can explain it. It's an expense
17 that we incur.
18     Q  Like an investigation expense?
19     A  Or legal fees.
20     Q  So why wouldn't the money paid to Earth Resource
21 Group not be an expense as opposed to an indemnity
22 payment?
23     A  Because that's what it says in the policy.
24     Q  But you relied on the Earth Resource Group
25 report as part of your investigation, did you not?

Page 286

1      A  Yes.
2      Q  So do you agree that it would be unfair for the
3  insurance company to save on the expense side of things
4  and bill the insured under the indemnity portion for an
5  expense that benefits the insurance carrier's
6  investigation?
7      MR. CANNON: Object to the form of the question.
8  It's argumentative, it's compound.
9         Go ahead.
10     THE WITNESS: It's a moot point because it states in
11 the policy on the mold limit that any testing would be
12 part of the mold limit.
13 BY MR. BALMER:
14     Q  Not if the insurance company was doing it;
15 right?
16     A  The insurance company didn't test anything.
17     Q  So you're back to talking about that mold limit
18 that kind of surfaced toward the end of the claim?
19     A  Uh-huh.
20     Q  Is that a "yes"?
21     A  Yes.
22     Q  Okay. Down on 6-24-2013 on page 377 it looks
23 like you wrote an E-mail that says something about, at
24 the very end of it, "All the experts presented are
25 approved." Do you see that?

Page 287

1      A  Yes.
2      Q  But there haven't been any reports or any
3  opinions from any experts produced?
4      A  Correct.
5      Q  You paid for experts that didn't produce any
6  opinions?
7      A  Apparently.
8      Q  On page 378 on a July 24, 2013 entry it says,
9  "Discussion with our attorney Bailey. She went over her
10 findings with her inspection with our experts. Bottom
11 line is it looks like the mold issues are unrelated to
12 the original water claim. They also do not see where
13 there is a mold problem. The experts think UBNA is being
14 taken for a ride. The NI have used UNA to completely
15 remodel their home."
16        Did you write that?
17     A  Yes.
18     Q  Is Attorney Bailey some sort of an expert in
19 water damage or mold?
20     A  Not aware one way or the other.
21     Q  Well, she didn't do a report, did she? There's
22 no report from her in the file that says those are her
23 credentialing?
24     A  No.
25     Q  And you're making some pretty broad allegations

Page 288

1  here about what your experts are saying, aren't you?
2      A  Yes.
3      Q  And of course there isn't a single one of those
4  experts available for me to cross-examine on any one of
5  those opinions, is there?
6      A  I'm not aware.
7      Q  Well, is there?
8      A  No.
9      Q  I can tell you, as a representative of the
10 Cathcarts in this case, I find this language completely
11 offensive. There's no question there. I'm telling you.
12 I find that completely offensive that you would undertake
13 such a belittling of your insured in your claims notes.
14 You can move to strike if you want. I'm just telling
15 you.
16     MR. CANNON: You're making a statement. You're not
17 asking a question. You're running out of time. Go
18 ahead.
19     MR. BALMER: There's no question there.
20     Q  8-2-2013 on 378 it says, "We discussed the
21 option of filing a dec action on coverage, as we have
22 paid our limits on mold and ALE, in Federal Court." Do
23 you see that?
24     A  Yes.
25     Q  We've talked about where the ALE sits, haven't

Page 289

1  we?
2  A  Yes.
3  Q  And we've talked about the problems,
4  inconsistencies, with the mold-limit claim, haven't we?
5  A  Yes.
6  Q  You say, "After our conversation I discussed
7  claim with Dave in legal. He needs to review the claim
8  and coverage opinion and he was in agreement with the fed
9  dec action." See that? Who is Dave?
10  A  Dave Quera.
11  Q  Who is Dave Quera?
12  A  He's the head of legal.
13  Q  So the idea here was hatched to sue the insureds
14  in federal court; right?
15  MR. CANNON: Objection to "hatched" phraseology.
16  Go ahead.
17  THE WITNESS: It was discussed with legal counsel and
18  the head of legal and they decided that they would
19  proceed with a dec action.
20  BY MR. BALMER:
21  Q  Okay. Down to the last E-mail or the last -- I
22  guess it is an E-mail -- on 8-2 of 2013 on 378. This is
23  after you discussed the Cathcarts having a little left on
24  their limit, taking into consideration deposit. Can you
25  read into the record, please, the last two sentences

Page 290

1  there that you wrote.
2  A  "While typing"?
3  Q  Yes, sir.
4  A  "While typing this E-mail, CRS called and are
5  arranging to pick up the rented furniture. This should
6  be interesting. I explained to CRS rep that if Cathcarts
7  refuse to give up the furniture, that they should be
8  informed they will be responsible for rental of the
9  furniture starting August 1st."
10  Q  I'm offended by the language -- I'm just going
11  to tell you that -- but I got a question for you.
12  Do you write these kinds of things about your
13  insureds in the claims notes often, "This should be
14  interesting"?
15  A  It was probably a mistake on my part.
16  Q  What do you mean "mistake"?
17  A  I shouldn't have put anything in there like
18  that.
19  Q  I mean you can --
20  MR. CANNON: Like "should be interesting"?
21  THE WITNESS: "Should be interesting." I shouldn't
22  have said that.
23  BY MR. BALMER:
24  Q  You can imagine how a jury might look at that.
25  A  Yeah.

Page 291

1  Q  Right?
2  A  Yes.
3  Q  Do you believe that that is condescending to an
4  insured --
5  A  No.
6  Q  -- to have something like that in the notes?
7  A  No.
8  Q  Disrespectful?
9  A  No.
10  Q  On the next page, 379, we've got feature No. 1
11  expense, "feature No. 1 expense to feature No. 1
12  indemnity," and then there's a "feature No. 1 expense to
13  feature No. 3 indemnity." These are on August 8, 2013.
14  Do you see that?
15  A  Yes.
16  Q  Okay. What I find interesting is that we've had
17  a discussion about expense versus indemnity on the Earth
18  Resource Group payment, haven't we?
19  A  Yes.
20  Q  And it appears, does it not, that initially the
21  Earth Resource Group payment was listed as a feature
22  No. 1 expense. Isn't that true?
23  A  Yes.
24  Q  Claim expense --
25  A  Yes.

Page 292

1  Q  -- as opposed to billing it against the
2  indemnity; isn't that right?
3  A  Yes.
4  Q  And so this was way back from June 4, 2013.
5  Then on August 8, 2013, over two months later, you're
6  raking back through the file and re-allocating expense to
7  indemnity?
8  A  Yes.
9  Q  Was that to assist in the Federal Court action?
10  A  No. That was -- those entries are made --
11  payments for those to -- payments were made by clerical
12  people and they made a mistake, and I just found it and
13  corrected it.
14  Q  So perhaps a clerical person had the same vision
15  that I had communicated to you about that being an
16  expense payment as opposed to an indemnity payment?
17  MR. CANNON: I'm going to object to that. How would
18  he know what an expense person was thinking? Total
19  speculation on his part.
20  THE WITNESS: I have no idea why they did it.
21  BY MR. BALMER:
22  Q  Down at the bottom of 379 it says -- on
23  August 12, 2013 it says, "Reserve: I raised the expense
24  reserve by 20,000 as we are now filing a declaratory
25  judgment action." Do you see that?

Page 293

1  A  Yes.
2  Q  Now, expense reserve, is that $20,000 then was
3  allotted off to attorneys' fees?
4  A  Raised, it said raised 20,000.
5  Q  Oh. So the attorneys' fees were more than the
6  20,000? You were raising it by 20-?
7  A  Yes.
8  Q  Okay. The next line there on August 19, 2013
9  says, "Void and re-enter. Out of the total paid to CRS,
10 $3,071.29 were fees, so have been recoded to expense."
11 What does that mean?
12 A  Correct. It was the same thing that happened in
13 reverse to the entry above. They were paid out of
14 indemnity and they should have been expense. That was a
15 fee charged by the CRS for housing.
16 Q  Okay. On page 380, 9-24-2013 it says, "Invoice
17 from expert Exponent. Received expert invoice from
18 Exponent, $2,240 invoice. Will send E-mail to vendor for
19 their W-9." Do you see that?
20 A  What date?
21 Q  9-24.
22    And then the very next 9-24 entry you're making
23 payment in the amount of $2,240 to Exponent?
24 A  Yes.
25 Q  Who didn't even provide a report?

Page 294

1  A  Correct.
2  Q  But meanwhile the insureds had to move back into
3  their home because the ALE was allegedly exhausted when
4  it wasn't. Is that fair?
5  MR. CANNON: I'm going to object to the form of the
6  question. It's argumentative. It's five questions and
7  two statements.
8     Go ahead.
9  THE WITNESS: Yeah, this expense payment has nothing
10 to do with ALE.
11 BY MR. BALMER:
12 Q  The point is that Universal was spending money
13 that otherwise could conceivably have been spent on the
14 insureds. Isn't that true?
15 MR. CANNON: I'm going to object to the form of the
16 question.
17 THE WITNESS: No, that's not true.
18 BY MR. BALMER:
19 Q  It's all coming out of the same wallet, isn't
20 it?
21 A  No.
22 Q  It's not?
23 A  Huh-uh.
24 Q  It's not coming out of Mr. and Mrs. Puerto Rico
25 family's ultimate wallet?

Page 295

1  A  Well, there's expense side of the claims and
2  there's indemnity.
3  Q  Ultimately both on the expense side and the
4  indemnity side both play into the profitability of the
5  company; is that right?
6  MR. CANNON: Objection; asked and answered. We
7  answered that about 45 minutes earlier today.
8  THE WITNESS: Yeah, there's a lot of factors.
9  BY MR. BALMER:
10 Q  All right. Next page -- we're almost done --
11 380 -- I'm sorry, we did this one.
12    381, please. On October 18, 2013 looks like you
13 paid Perry Consultant $1,980.
14 A  Correct.
15 Q  For no report?
16 A  Correct.
17 Q  On 11-4-2013 there is a notation to you that you
18 were given a litigation update and the Cathcarts were
19 served with Summons and Complaint on November 2, 2013;
20 correct?
21 A  Correct.
22 Q  On the next page, 382, on November 8, 2013 there
23 is an expert invoice from Exponent for $355.41. I
24 suppose that's in addition to the other $2,000 that you
25 had previously paid?

Page 296

1  MR. CANNON: Wait a moment. Exponent, it doesn't say
2  anything about expert. It says Exponent.
3  MR. BALMER: It says, "Expert invoice from Exponent
4  for $355.41."
5  MR. CANNON: Go ahead.
6  BY MR. BALMER:
7  Q  Is that in addition to the other money that you
8  had already paid for no report from Exponent?
9  A  Well, if it's there like that, yes, it is.
10 Q  Call your attention to 384 and the entry of
11 July 1st, 2014 which follows --
12 MR. CANNON: Okay, I see it.
13 BY MR. BALMER:
14 Q  -- one, two, three, four, five -- five other
15 "defense invoice paid legal." Do you see all that? Are
16 those all legal bills that have been incurred by
17 Universal on --
18 A  From when?
19 Q  -- prosecuting their insureds?
20 A  From 1-13?
21 MR. CANNON: Object to the form of that.
22 BY MR. BALMER:
23 Q  Go ahead.
24 A  They were expense -- legal expense.
25 Q  What does that typically mean, attorneys' fees?

Page 297

1  A  Yeah, yes.
2  Q  Down at the 7-1-2014 it says, "Increased expense
3  reserves. Increased expense reserves by 25,000." Do you
4  see that?
5  A  Yes.
6  Q  And this is in addition to the increase of
7  $20,000 we talked about before?
8  A  Yes.
9  Q  On top of some unknown amount; right?
10 A  Yes.
11 Q  Can you read into the record the third sentence,
12 please, that starts "In an effort."
13 A  "In an effort to defuse the claim, we have filed
14 a dec action. The insured is filing many pleadings and
15 running up the litigation costs. There is no way to
16 resolve the action without paying monies that we don't
17 believe are justified."
18 Q  And that opinion comes from which expert that
19 has produced any kind of opinion or report?
20 A  That's Attorney Valerie Leatherwood.
21 Q  Who is Valerie Leatherwood?
22 A  She was in our legal department.
23 Q  Is she not there anymore?
24 A  No.
25 Q  She just kind of ducks in and makes this kind of

Page 298

1  statement and then she's gone?
2  MR. CANNON: I'm going to object to that. It's a
3  statement.
4  BY MR. BALMER:
5  Q  So the question I had earlier today was whether
6  or not you tried to get a jump on an action against your
7  insureds, and apparently there's an admission here: "In
8  an effort to defuse the claim, we filed a dec action."
9  Does that refresh your memory about why you decided to do
10 it?
11 A  I just took it under advice from legal and they
12 took it over -- they took the claim over from there and
13 proceeded with the claim.
14 Q  One more question: Next page, 385, the last
15 page of the claims notes, call your attention to
16 March 30, 2015. The reserves were increased again by
17 20,000?
18 A  Yes.
19 Q  In addition to the 25,000 before that and the
20 20,000 before that on top of an unspecified sum?
21 A  Yes.
22 Q  That's a lot of money.
23 A  Yes, it is.
24 Q  That's a lot of money.
25    Okay. I think we got this one marked, did we

Page 299

1  not?
2  A  We do. It's marked.
3  Q  I think Walt is running me out of time here and
4  I'm going to -- we can stop for today. Listen, I'm going
5  to reserve my right to bring you back and talk to you
6  about all the big stacks of stuff that were brought for
7  the first time today. I don't know if that's going to
8  happen or not. I just feel like I need to do that on the
9  record and also to object to the documents being produced
10 today as things that should have been produced years ago.
11 Walt and I can fight about all that stuff later.
12   THE REPORTER: Mr. Cannon, do you want a copy?
13   MR. CANNON: Please.
14     (Discussion held off the record.)
15 BY MR. BALMER:
16 Q  So in looking through the stack of materials as
17 we ran out of time, I noticed in there that there was an
18 invoice from James Ketcham to Olson Cannon Gormley Angulo
19 Stoberski in the amount of $1400. When you testified
20 earlier that you didn't have a copy of the invoice with
21 you, you mistestified?
22 A  Yes.
23 Q  So I'm going to go ahead and keep this and
24 attach it to the record as the next exhibit in line.
25   MR. CANNON: I believe I have a copy.

Page 300

1     MR. BALMER: Okay. We'll attach this as
2  Exhibit No. 12.
3     (Defendants' Exhibit 12 was marked for
4  identification by the Certified Court Reporter.)
5     (Deposition concluded at 5:35 p.m.)

Page 301

1     CERTIFICATE OF DEPONENT
2
3  PAGE  LINE   CHANGE       REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13
14         * * * * *
15
16     I, JAMES R. KETCHAM, deponent herein, do hereby
17  certify and declare under penalty of perjury the within
18  and foregoing transcription to be my deposition in said
19  action; that I have read, corrected and do hereby affix
20  my signature to said deposition.
21     _____
           JAMES R. KETCHAM, Deponent
22
23
24
25

Page 302

1         REPORTER'S CERTIFICATE
2     I, Ellen A. Goldstein, a duly certified court
3  reporter in and for the County of Clark, State of Nevada,
4  do hereby certify:
5        That I reported the taking of the deposition of
6  JAMES R. KETCHAM at the time and place aforesaid;
7        That prior to being examined, the witness was by
8  me duly sworn to testify to the truth, the whole truth
9  and nothing but the truth;
10       That the witness requested, or it was requested
11 on his behalf, to read and sign the transcript herewith;
12       That I thereafter transcribed my shorthand notes
13 into typewriting and that the typed transcript of said
14 deposition is a complete, true and accurate transcription
15 of my shorthand notes taken down at the proceedings.
16       I further certify that I am not a relative or
17 employee of an attorney or counsel of any of the parties,
18 nor a relative or employee of any attorney or counsel
19 involved in said action, nor a person financially
20 interested in the action.
21       IN WITNESS THEREOF, I have hereunto set my hand
22 in the County of Clark, State of Nevada, this 6th day of
23 March 2016.
24       _____
          Ellen A. Goldstein, CCR No. 829
25